# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| American Eagle Energy Corporation | ) | |
| Tax ID / EIN: 20-0237026 | ) | Case No.  15-15073-HRT |
| | ) | |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| | ) | |

## COVERSHEET FOR MOTION SEEKING EXPEDITED ENTRY OF ORDERS

The Debtors in the above-captioned Chapter 11 cases filed on May 8, 2015, request the Court to enter the Orders listed below ("Motions") on an expedited basis, pursuant to L.B.R. 2081-1.   **THE DEBTORS ARE SEEKING EXPEDITED ENTRY OF ORDERS GRANTING THE FOLLOWING MOTIONS:**

1.   __X__   Order Authorizing the Joint Administration of Multiple Debtor Bankruptcy Cases (see L.B.R. 1015-1)

2.   __X__   Order Authorizing Payment of Prepetition Wages, Salaries, Expenses

3.   __X__   Interim Order Authorizing Use of Cash Collateral (see L.B.R. 4001-3)

4.   __X__   Interim Order Determining Adequate Assurance of Payment for Future Utility Services and Restraining Utility Companies from Discontinuing, Altering or Refusing Service

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| American Eagle Energy Corporation | ) | |
| Tax ID / EIN: 20-0237026 | ) | Case No.  15-15073-HRT |
| | ) | |
| Debtor. | ) | |
| | ) | |

## MOTION SEEKING  EXPEDITED ENTRY OF ORDERS

**AMERICAN EAGLE ENERGY CORPORATION**, debtor-in-possession ("American Eagle"), together with its affiliate, AMZG, Inc., which is also a debtor and debtor-in-possession ("AMZG") (collectively, the "Debtors"), by and through their undersigned counsel, hereby submit their Motion Seeking Expedited Entry of Orders (the "Motion"), and in support thereof, state as follows:

## INTRODUCTION

1.     The Motion is filed pursuant to Local Bankruptcy Rule 2081-1.  The Debtors seek the entry of the following orders on an expedited basis:

    a.  Order Granting Debtors' Motion for Joint Administration of Cases;

    b.  Interim Order (I) Authorizing Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (II) Providing Adequate Protection to Secured Parties Pursuant to Sections 361, 362, and 363 of the Bankruptcy Code, and (III) Scheduling Final Hearing;

    c.  Order Granting American Eagle Energy Corporation's Emergency Motion for Authority to Pay Prepetition Benefits, Honor Prepetition Vacation Time, Reimburse Prepetition Employee Business Expenses, and Pay Prepetition Wages; and

    d.  Order Granting American Eagle Energy Corporation's Expedited Motion to Determine Adequate Assurance of Payment for Utility Services and Preclude Utilities from Altering, Refusing, or Discontinuing Service.

606327087v2

2.      The relief sought herein is also set forth on the Cover Sheet filed concurrently herewith.  In support of the Motion, the Debtors rely upon and incorporate by reference the Affidavit of Bradley M. Colby in Support of the Motion Seeking Expedited Entry of Orders (the "Affidavit") filed with the Court concurrently herewith and attached hereto as **Exhibit "A".**

3.      The Debtors hereby certify that the relief requested herein is needed on an expedited basis to ensure uninterrupted company operations.  Proposed orders, in substantial conformity with applicable local rules, have been submitted with their respective first day motions.

4.      With respect to the Debtors' Cash Collateral Motion which requests relief on an interim basis, the Debtors also request the scheduling of a final hearing ("Final Hearing") to consider the relief requested and entry of a final order and approval of the form of notice with respect to the Final Hearing.

## BACKGROUND

5.      American Eagle was incorporated in the state of Nevada in March 2003 under the name Golden Hope Resources Corp., but later changed its name in July 2005 to Eternal Energy Corp. In December 2011 the company changed its name to American Eagle Energy Corporation in connection with its acquisition of, and merger with, American Eagle Energy, Inc.

6.      Upon completion of the 2011 acquisition, American Eagle Energy, Inc. became AMZG, Inc., a wholly owned subsidiary of American Eagle. As of the Petition Date, AMZG has no assets and no operations. AMZG's only debt relates to guarantee claims on American Eagle obligations.

7.      The Debtors' principal offices are located at 2549 W. Main Street, Suite 202, Littleton, Colorado 80120.

2

606327087v2

8.      The Debtors engage in the acquisition, exploration and development of oil and gas properties, and are primarily focused on extracting proved oil reserves from those properties. During the past five years, the Debtors have engaged in exploration and production activities in the northern United States as well as southeast Saskatchewan, Canada.  In July 2014, the Debtors sold all of their net revenue and working interests in Canada to focus on exploration and production opportunities in North Dakota and Montana.

9.      American Eagle's current exploration and production activities are focused in the northwest portion of Divide County, North Dakota commonly referred to as the Spyglass Area ("Spyglass Area") were American Eagle produces oil and natural gas reserves from the Three Forks and Middle Bakken formations.

## SECURED PARTIES DEBT OBLIGATIONS

10.     On August 27, 2014, the Debtors entered into: (i) that certain Credit Agreement among American Eagle, as borrower, AMZG, as guarantor, the Lenders (as defined therein), SunTrust Bank, as Administrative Agent and Issuing Bank, and SunTrust Robinson Humphrey, Inc., as Bookrunner and Sole Lead Arranger (the "SunTrust Credit Agreement"); and (ii) the Indenture (the Indenture, together with all other agreements and documents delivered pursuant thereto or in connection therewith, the "Prepetition Notes Documents") among American Eagle, as issuer, AMZG, as guarantor, and the Trustee.

11.     Pursuant to the Indenture and the Prepetition Notes Documents, the Debtors incurred indebtedness to the Noteholders (the "Senior Secured Notes").

12.     The Debtors used the funds borrowed under the Senior Secured Notes to pay-off a loan facility from Morgan Stanley in the approximate amount of $135,000,000 including related

3

fees and ancillary costs and a working capital deficit of $26,100,000. The Debtors used the remaining $13,800,000 in proceeds as capital for future operations.

13.    Originally, the Debtors planned to complete their capitalization and borrow funds from SunTrust to provide additional capital, but SunTrust reduced the borrowing base to $0 and the Debtors were unable to borrow funds under the SunTrust Credit Agreement had they wanted to. On April 2, 2015, the Debtors received notice from SunTrust that, among other things, all Commitments (as defined in the SunTrust Credit Agreement) had terminated and neither SunTrust nor the Lenders (as defined in the SunTrust Credit Agreement) had any further commitment or other obligation to make Loans (as defined in the SunTrust Credit Agreement) to, or issue Letters of Credit (as defined in the SunTrust Credit Agreement) on behalf of, the Debtors.

14.    As of the Petition Date, the Debtors were indebted and liable to the Secured Parties, without objection, defense, counterclaim, or offset of any kind, under the Prepetition Notes Documents, in the aggregate amount of not less: (i) $175,000,000 in aggregate principal amount; (ii) all accrued and unpaid interest; and (iii) additional amounts owed under the Prepetition Notes Documents including, but not limited to, defaulted interest, interest on defaulted interest, fees, expenses, costs, charges, premiums, make-whole, prepayment, yield maintenance or similar amounts payable pursuant to the Indenture or the Prepetition Notes Documents, and all other amounts due and owing under the Prepetition Notes Documents (collectively, the "Prepetition Notes Obligations").

## EVENTS LEADING TO CHAPTER 11 FILING

15.    As an exploration and development company, the Debtors' assets, revenue, and general financial condition are directly correlated to price of oil and natural gas. The sharp

4

decrease in oil and natural gas prices by in excess of fifty percent (50%) from the time the Prepetition Notes Obligations were issued and remaining depressed until now has made it difficult to obtain capital for further development of American Eagle's leasehold interests.

16.      Unable to raise additional capital in this environment, the Debtors were faced with declining assets and revenue while costs remained relatively constant.

17.      In February of 2015, liquidity concerns caused the Debtors to commence and engage in discussions with the an ad hoc group of Noteholders (the "Ad Hoc Group") regarding the approaching interest payment due under the Prepetition Notes Documents.   Those discussions yielded a forbearance agreement executed by the Debtors and the Ad Hoc Group, which provided for, among other things, a $4,000,000 partial interest payment to the Trustee for the benefit of the Noteholders and forbearance to allow the Debtors and Ad Hoc Group to discuss restructuring and sale alternatives.

18.      As crude oil prices remained low, the Debtors and Ad Hoc Group continued discussions on maximizing value to the Secured Parties and all stakeholders in the Debtors' business and ultimately determined that relief under Chapter 11 of the Bankruptcy Code would allow the Debtors the best opportunity to restructure or sell its assets and maximize value.

## RELIEF SOUGHT ON AN EXPEDITED BASIS

**A.      Order Granting Debtors' Motion for Joint Administration of Case**

19.      The Debtors have filed a motion requesting entry of an order directing the joint administration of the Debtors' Chapter 11 cases for procedural purposes only, including the filing of any joint disclosure statements and plans of reorganization and other contested matters, pursuant to Fed. R. Bankr. P. 1015(b) ("Joint Administration Motion").

606327087v2

20.    In accordance with Local Bankruptcy Rule 1015(d)(1), the Debtors specifically request that their Chapter 11 cases be jointly administered under the lower case number of American Eagle Energy Corporation, Case No. 15-15073 ("Lead Case").

21.    The Debtors submit that joint administration of their Chapter 11 cases will dispense with the need for duplicative notices, motions, applications, hearings and orders. This will save considerable time and expense for the Debtors and their estates and free the Court from the burden of scheduling duplicative hearings, entering duplicative orders, and maintaining redundant files. In addition, joint administration will result in simplified supervision of the administrative aspects of the Debtors' Chapter 11 cases by the Office of the United States Trustee.

22.    The Debtors also submit that joint administration will not give rise to any conflict of interest among the estates of the Debtors. The rights of the respective creditors of the Debtors will not be adversely affected by the proposed joint administration because the Debtors will continue as separate and distinct legal entities and will continue to maintain separate books and records. Moreover, each creditor may still file its proof of claim against a particular estate. In fact, the rights of all creditors will be enhanced by the reduction in costs resulting from joint administration.

23.    Accordingly, the Debtors respectfully request that the Court enter an order on an expedited basis granting the Joint Administration Motion.

**B.    Interim Order (I) Authorizing Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (II) Providing Adequate Protection to Secured Parties Pursuant to Sections 361, 362, and 363 of the Bankruptcy Code, and (III) Scheduling Final Hearing**

24.    The Debtors have filed an Emergency Motion for Authority to Use Cash Collateral ("Cash Collateral Motion").

606327087v2

25.     In order to continue operations and allow for a successful reorganization and/or sale of the Debtors' assets on a going concern basis, the Debtors will require the use of funds on hand and funds to be received.  The Debtors believe those funds are subject to a lien in favor of the Secured Parties

26.     The cash collateral, which the Debtors seek to use, is comprised, in whole or in part, of funds held in various bank accounts at Key Bank, Wells Fargo Bank, the Bank of North Dakota, and US Bank ("Cash Accounts"), along with receivables owed to the Debtors (collectively, the "Cash Collateral").

27.     Pursuant to the Prepetition Notes Documents, the Debtors granted to the Secured Parties, to secure the Prepetition Notes Obligations, a security interest in and continuing lien ("Prepetition Liens") on all of the Debtors' assets and property ("Prepetition Collateral"), including the Cash Collateral.  The Prepetition Liens in the Prepetition Collateral, including the Cash Collateral, are legal, valid, binding, enforceable, non-avoidable and perfected liens.

28.     Consequently, prior to filing the Cash Collateral Motion, the Debtors sought and obtained consent to use of Cash Collateral from the Ad Hoc Group and the Trustee.  Such limited consent is conditioned upon the court's entry of an order in the form attached to the Cash Collateral Motion as **Exhibit "A"**.

29.     A budget showing estimated receipts and disbursements (the "Approved Budget") for the Debtors for the next four weeks (the "Approved Budget Period") is also attached to the Cash Collateral Motion as **Exhibit "B"**.

30.     As adequate protection for the use of Cash Collateral, the Debtors propose to grant Secured Parties, replacement liens to the same validity, extent, and priority as their respective prepetition liens on all property of the Debtors now existing or hereafter acquired

606327087v2

including, without limitation, all Cash Collateral, cash and cash equivalents, and any investment in such cash or cash equivalents, money, inventory, goods, accounts receivable, other rights to payment, intercompany loans and other investments, investment property, contracts, contract rights, properties, plants, equipment, machinery, general intangibles, payment intangibles, accounts, deposit accounts, documents, instruments, chattel paper, documents of title, letters of credit, letter of credit rights, supporting obligations, leases and other interests in leaseholds, real property, fixtures, patents, copyrights, trademarks, trade names, other intellectual property, intellectual property licenses, capital stock of subsidiaries, tax and other refunds, insurance proceeds, commercial tort claims, rights under section 506(c) of the Bankruptcy Code, avoidance actions under chapter 5 of the Bankruptcy Code, all other Prepetition Collateral and all other "property of the estate" (within the meaning of the Bankruptcy Code) of any kind or nature, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, and all rents, products, substitutions, accessions, profits, replacements and cash and non-cash proceeds of all of the foregoing (all of the foregoing collateral collectively referred to as the "Adequate Protection Collateral" and such adequate protection replacement liens, the "Adequate Protection Replacement Liens").

31.     The Adequate Protection Replacement Liens and the Adequate Protection Priority Claims (as defined herein) will be subject to and subordinate to a fund (the "Carve Out") for the payment of: (i) the unpaid quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a), together with interest payable thereon pursuant to applicable laws; (ii) any fees payable pursuant to the Clerk of the Bankruptcy Court; and (iii) the allowed and reasonable fees and expenses of professionals employed by the Debtors and any Official Committee of Unsecured Creditors appointed in the Debtors' Chapter 11 cases ("Committee") and pursuant to sections 327, 328 and

8

1103 of the Bankruptcy Code: (1) if incurred prior to the occurrence of the Termination Date (as defined in the proposed order attached hereto as Exhibit "A") up to the amounts set forth in the Approved Budget under the line item designated for each professional; and (2) if incurred following the occurrence of the Termination Date, up to an amount not to exceed $250,000 (excluding any retainers paid to the Debtors' professionals prior to the Petition Date).

32.     As additional adequate protection for the use of Cash Collateral, the Debtors propose to grant Secured Parties an administrative expense claim pursuant to §503(b) of the Bankruptcy Code to the extent of any diminution in value of the interest of the Secured Parties in the Prepetition Collateral including, without limitation, the Cash Collateral, from and after the Petition Date.

33.     To the extent that the adequate protection described in the Cash Collateral Motion proves to be insufficient, the Trustee, for the benefit of the Secured Parties, subject to the Carve-Out, shall be granted first priority superpriority administrative expense claims under section 507(b) of the Bankruptcy Code (the "Adequate Protection Priority Claims") with priority in payment over any other administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code, whether or not such expenses or claims arise in these Chapter 11 Cases or in any subsequent case or proceedings under the Bankruptcy Code that may result therefrom.

34.     As more fully set forth in the Cash Collateral Motion, the Debtors will provide additional adequate protection to the Secured Parties, including: (i) paying certain professional

fees of the Ad Hoc Group and Trustee; (ii) providing regular financial reporting to the Ad Hoc Group and Trustee; and (iii) providing inspection rights to the Ad Hoc Group and Trustee.

35.     American Eagle has an urgent need to use its existing cash on hand for continuing operations because it incurs expenses daily in connection with production of oil and gas from its properties.  If those expenses are not paid in the ordinary course, operations will stop.  Vendors and employees need assurance that they will be paid for materials, service, and work performed during the Chapter 11 case and, absent that assurance, they will refuse to provide materials and services and American Eagle will have no choice but to cease all operations.  Any disruption in the operations of the business would create immediate and irreparable harm to the Debtor, its creditors, employees, and all parties in interest.

36.     Accordingly, the Debtors request the Court enter the proposed Interim Order (I) Authorizing Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (II) Providing Adequate Protection to Secured Parties Pursuant to Sections 361, 362, and 363 of the Bankruptcy Code, and (III) Scheduling Final Hearing on an expedited basis.

**C.    Order Granting Debtors' Emergency Motion for Authority to Pay Prepetition Benefits, Honor Prepetition Vacation Time, Reimburse Prepetition Employee Business Expenses, and Pay Prepetition Wages**

37.     American Eagle Energy also filed an Emergency Motion for Authority to Pay Prepetition Benefits, Honor Prepetition Vacation Time, Reimburse Prepetition Employee Business Expenses, and Pay Prepetition Wages ("Benefits Motion").

38.     Prior to the Petition Date, American Eagle paid the Salaried Employees their normal salary through the Petition Date.  However, Salaried Employees are still owed various sums for 401(K) match obligations ("401(K) Obligations") and are entitled to certain accrued, but unpaid vacation ("Vacation Benefits").  Additionally, American Eagle owes various amounts

10

to certain Employees for reimbursement of reasonable prepetition business expenses ("Business Expenses"). Finally, American Eagle owes $3,056.25 to its two Contract Employees for work performed prior to the Petition Date ("Contract Wages") (collectively, 401(K) Obligations, Vacation Benefits, Business Expenses, and Contract Wages are hereinafter "Employee Benefits").

39.     Not all accrued Employee Benefits for services rendered prior to the Petition Date became due prior to the Petition Date, but will become due in the ordinary course in the immediate future.

40.     As more fully set forth in the Benefits Motion, American Eagle seeks authority to: (i) pay a total of $12,915.00 for the 401(K) Obligations; (ii) honor accrued, but unused vacation time in the ordinary course of business; (iii) pay a total of up to $9,655.12 for Business Expenses; and (iv) pay up to $3,056.25 in Contract Wages.

41.     If American Eagle is not permitted to pay the Employee Benefits to its Employees in the ordinary course of business, Employees will not receive full payment for services already performed. Such a result would seriously undermine the morale and loyalty of the Employees and, as a result, American Eagle's reorganization and/or sale efforts would be substantially jeopardized.

42.     To maintain the continuity of American Eagle's business and to preserve the morale of its continuing work force, it is essential that the company be permitted to pay benefits which have accrued but remain unpaid.

43.     No single Employee will receive payment in excess of the priority limitations set forth in §§507(a)(4) and (a)(5) of the Bankruptcy Code.

606327087v2

44.     American Eagle believes it is in the best interest of creditors for the requested payments set forth above to be authorized.

45.     Accordingly, American Eagle requests that this Court enter an expedited order granting the Benefits Motion.

### D.     Order Granting Debtors' Expedited Motion to Determine Adequate Assurance of Payment for Utility Services and Preclude Utilities from Altering, Refusing, or Discontinuing Service

46.     Finally, American Eagle filed an Expedited Motion to Determine Adequate Assurance of Payment for Utility Services and Preclude Utilities from Altering, Refusing, or Discontinuing Service ("Utility Motion").

47.     In connection with its business, American Eagle receives utility service from multiple vendors in Colorado and North Dakota (the "Utilities").

48.     Continuity of American Eagle's utility service is essential for continued operation of American Eagle's business and to prevent irreparable damage to the value of its estate.

49.     In the Utility Motion, American Eagle seeks entry of any order, pursuant to §366 of the Bankruptcy Code to: (i) determine adequate assurance for the payment of utility service to the Utilities; and (ii) preclude the Utilities from altering, refusing, or discontinuing service.

50.     As more fully set forth in the Utility Motion, American Eagle proposes the payment of a one month deposit to each of the Utilities as well as additional procedures to provide adequate assurance to such Utilities.

51.     American Eagle asserts that the procedures and guidelines outlined in the Utility Motion in addition to the anticipated adequate post-petition cash flow of American Eagle constitute adequate assurance of payment as required by Bankruptcy Code Section 366

12

52.     Accordingly, American Eagle requests expedited entry of an order granting the Utility Motion.

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court: (i) enter the respective expedited orders on the Joint Administration Motion, the Cash Collateral Motion, the Benefits Motion, and the Utility Motion; and (ii) grant such other relief as deemed appropriate under the circumstances.

RESPECTFULLY SUBMITTED this 11th day of May, 2015.

/s/Elizabeth A. Green
Elizabeth A. Green, Esq.
Florida Bar No.: 0600547
egreen@bakerlaw.com
Jimmy D. Parrish, Esq.
Florida Bar No.: 0526401
jparrish@bakerlaw.com
**BAKER & HOSTETLER LLP**
200 South Orange Ave.
SunTrust Center, Suite 2300
Post Office Box 112 (32802-0112)
Orlando, Florida 32801-3432
Telephone: (407) 649-4000
Fax: (407) 841-0168
Attorneys for Debtor
American Eagle Energy Corporation

606327087v2

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF COLORADO

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| American Eagle Energy Corporation | ) |
| Tax ID / EIN: 20-0237026 | ) Case No.  15-15073-HRT |
| | ) |
| Debtor. | ) |
| | ) |

### CERTIFICATE OF SERVICE

   **I HEREBY CERTIFY** that on May 11, 2015, a true and correct copy of the foregoing, *Motion Seeking   Expedited Entry of Orders*, together with all exhibits, was furnished via electronic transmission to all CM/ECF participants requesting electronic notice and via U.S. Postage Prepaid Mail to the following American Eagle Energy Corporation, 2549 W. Main Street, Suite 202, Littleton, CO 80120 (Debtor); AMZG, Inc., 2549 W. Main Street, Suite 202, Littleton, CO 80120 (Debtor); Paul Silverstein, Esq., Andrews Kurth, 450 Lexington Avenue, New York, NY 10017 (Counsel for the Ad Hoc Noteholders); all creditors and parties-in-interest on the matrix attached to the original of this Motion and filed with the Court; and the Office of the United States Trustee, Byron G. Rogers Federal Building, 1961 Stout St., Suite 12-200, Denver, Colorado 80294.

                                   */s/ Elizabeth A. Green* _____
                                   Elizabeth A. Green, Esq.

606327087v2

Top 20 Unsecured Creditors Matrix (as of 5.11.15).TXT

640 Energy, LLC
1400 16th Street
Suite 400
Denver, CO 80202

Arctic Energy Services, LLC
PO Box 1321
Glenrock, WY 82637

Atlas Tubular, LP
PO Box 431
Robstown, TX 78380

Cruz Energy Services, LLC
7000 E. Palmer-Wasilla Hwy
Palmer, AK 99645

Dishon Disposal, Inc.
5613 DTC Parkway
Suite 800
Greenwood Village, CO 80111

DNOW L.P.
NOV Wilson, LP.
PO Box 200822
Dallas, TX 75320-0822

GE Oil & Gas Pressure Control LP
PO Box 911776
Dallas, TX 75391-1776

Halliburton  Energy Services, Inc.
PO Box 301341
Dallas, TX 75303-1341

Hydratek, Inc.
12069 Highway 16
Sidney, MT 59270

Jacam Chemicals 2013, LLC
PO Box 96
205 South Broadway
Sterling, KS 67579

Top 20 Unsecured Creditors Matrix (as of 5.11.15).TXT
KLX Energy Services, LLC
28099 Expedite Way
Chicago, IL 60695-0001

Liberty Oilfield Services, LLC
950 17th Street
Suite 2000
Denver, CO 80202

National Oilwell Varco
Wells Fargo Bank
PO Box 201224
Dallas, TX 75320-1224

Northern States Completions
PO Box 1267
Williston, ND 58802

Precision Completion & Production
Svcs.
PO Box 204789
Dallas, TX 75320-4789

Recievables Control Corp.
FBO  Creditors of Portal Service
7373 Kirkwood Court
Minneapolis, MN 55369

Samson Resources Company
PO Box 972282
Dallas, TX 75397-2282

Schlumberger Lift Solutions Canada Ltd.
Lockbox C05618U
PO Box 45 STN M
Calgary, AB T2P 2G9
CANADA

Super Heaters, North Dakota, LLC
PO Box 421328
Houston, TX 77242-1328

Well Water Solutions and
Rentals, Inc.

Page 2

Top 20 Unsecured Creditors Matrix (as of 5.11.15).TXT
PO Box 2105
Casper, WY 82602

Secured Creditors Matrix as of 5.11.15 - American Eagle.TXT
Bill Roberts, Esq.
Roberts & Olivia, LLC
2060 Broadway
Suite 250
Boulder, CO 80302

Calfrac Well Services Corp.
717-17 Street
Suite 1445
Denver, CO 80202

CMG Oil & Gas, Inc.
PO Box 829
Stanley, ND 58784

Drill Tech Subsidiary of BJ's DST
f/k/a Drill Tech, LLC
PO Box 519
Mohall, ND 58761

G-Style Transport, LLC
N51012 Hutchins Lane
Eleva, WI 54738

Hamm & Phillips Service Company,
Inc.
PO Box 201653
Dallas, TX 75320-1653

M-I, LLC d/b/a MI-SWACO
PO Box 732135
Dallas, TX 75373-2135

Miller Oil Company, Inc.
Box 4708
Culbertson, MT 59218

Nabors Drilling USA, LP
PO Box 973527
Dallas, TX 75397-3527

Sanjel  USA , Inc.
PO Box 732149
Denver, CO 80202

Page 1

Secured Creditors Matrix as of 5.11.15 - American Eagle.TXT

Schlumberger Technology Corp.
PO Box 732149
Dallas, TX 75373-2149

State of North Dakota
Oil and Gas Division
600 E. Boulevard
Dept. 405
Bismarck, ND 58505-0840

SunTrust Bank
SunTrust Robinson Humphrey, Inc.
ATTN  Yann Pirio
3333 Peachtree Street NE
Atlanta, GA 30326

Thru Tubing Solutions, Inc.
PO Box 203379
Dallas, TX 75320-3379

Triple S Enterprises, Inc.
PO Box 477
Crosby, ND 58730-0477

U.S. Bank National Association
Trustee, Collateral Agent, Control
Agent -  11th Floor
5555 San Felipe Street
Houston, TX 77056

USG Midstream Bakken 1, LLC
700 Universe Blvd.
Juno Beach, FL 33408

WISCO, Inc.
PO Box 732328
Dallas, TX 75373-2328

**EXHIBIT "A"**

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| American Eagle Energy Corporation | ) |
| Tax ID / EIN: 20-0237026 | ) Case No.  15-15073-HRT |
| | ) |
| Debtor. | ) |
| | ) |

### AFFIDAVIT OF BRADLEY M. COLBY, PRESIDENT OF AMERICAN EAGLE ENERGY CORPORATION, IN SUPPORT OF FIRST DAY PLEADINGS AND MOTION FOR EXPEDITED ENTRY OF ORDERS AND NOTICE OF IMPENDING HEARING THEREON PURSUANT TO LOCAL BANKRUPTCY RULE 2081-1

I, Bradley M. Colby, being first duly sworn, hereby depose and say:

1.      I am the President, Chief Executive Officer, and a director of American Eagle Energy Corporation ("American Eagle" or "Debtor") and of AMZG, Inc. ("AMZG", together with American Eagle, the "Debtors").  I have personal knowledge of, and I am competent to testify to, the matters set forth in this affidavit.

### Introduction

2.      As President, Chief Executive Officer and a director of the Debtors, I am familiar with the above referenced Chapter 11 bankruptcy cases and the financial affairs of the Debtors.

3.      This affidavit is submitted in support of: (i) the Emergency Motion of the Debtor-In-Possession for Authority to Use Cash Collateral ("Cash Collateral Motion"); (ii) the Debtor's Expedited Motion to Determine Adequate Assurance of Payment for Utility Services and Preclude Utilities from Altering, Refusing, or Discontinuing Service; (iii) Debtors' Motion for Joint Administration of Cases; (iv) the Debtor's Emergency Motion for Authority to Pay Prepetition Benefits; and (v) the Debtors' Motion for Expedited Entry of Orders and Notice of Impending Hearing Thereon (collectively, the "Motions").

### General Background of the Debtors

4.      American Eagle Energy Corporation ("American Eagle") was incorporated in the state of Nevada in March 2003 under the name Golden Hope Resources Corp., but later changed its name in July 2005 to Eternal Energy Corp. and then to American Eagle Energy Corporation in December 2011 in connection with its acquisition of, and merger with, American Eagle Energy, Inc.

5.      Upon completion of the 2011 acquisition, American Eagle Energy, Inc. became AMZG, Inc. ("AMZG") and a wholly owned subsidiary of American Eagle. As of the Petition Date, AMZG has no assets and no operations.   AMZG's only debt relates to guarantee claims on American Eagle obligations.

6.      The Debtors' principal offices are located at 2549 W. Main Street, Suite 202, Littleton, Colorado 80120.

7.      American Eagle engages in the acquisition, exploration and development of oil and gas properties, and is primarily focused on extracting proved oil reserves from those properties. During the past five years, American Eagle has engaged in exploration and production activities in the northern United States as well as southeast Saskatchewan, Canada. In July 2014, American Eagle sold all of its net revenue and working interests in Canada to focus on exploration and production opportunities in North Dakota and Montana.

8.      American Eagle's current exploration and production activities are focused in the northwest portion of Divide County, North Dakota commonly referred to as the Spyglass Area ("Spyglass Area") where American Eagle produces oil and natural gas reserves from the Three Forks and Middle Bakken formations.

9.      American Eagle's primary assets are its leasehold interests ("Leasehold Interests"), which grant the company fee ownership of oil and gas under the ground of the real estate subject to the leasehold.

606337926.2                                        2

10.     Each Leasehold Interest is subject to the rights of royalty owners ("Royalty Owners") who hold some interest in the real property subject to the Leasehold Interest. The Royalty Owners retain an interest in the oil and gas reserves that are subject to their respective Leasehold Interests.

11.     Under the terms of the respective leases, American Eagle extracts reserves and hold a portion of any proceeds from such reserves in trust for the appropriate Royalty Owner.

12.     Similarly, many of American Eagle's operating wells are subject to joint operating agreements ("JOAs") whereby the Debtor serves as operator of the well, but shares costs and profits with other non-operating parties called non-operating working interest owners ("Non-Operating Working Interest Owners"). Under the terms of the JOAs, American Eagle pays the Non-Operating Working Interest Owners their proportional share of proceeds from production of wells subject to the JOA.

13.     In instances where American Eagle is the operator under a JOA, it holds an average of approximately a sixty-five percent (65%) working interest.

14.     In some cases, American Eagle participates as a non-operating working interest owner in other operator's wells subject to certain JOAs. In instances where American Eagle participates as a non-operating working interest owner under a JOA, its average holding is approximately a five percent (5%) interest.

15.     Typically on wells operated by American Eagle, the company will market and collect all the revenues from oil and gas sales and then distribute the proportionate share of the revenues to the Non-Operating Working Interest Owners and royalty interest owners on a monthly basis. Likewise, the proportionate share of production costs are billed on a monthly basis to Non-Operating Working Interest Owners in the well through a joint interest billing ("JIB") process.

16.     American Eagle intends to file a Motion to Allow the Debtor to make prepetition payments due to Royalty and Non-Operating Working Interest Owners in the next week. Payments due to

Royalty interests and Non-Operating Working Interest Owners are actually owned by the Royalty and Non-Operating Working Interest Owners and those funds are subject to state law lien rights.

17.     In connection with American Eagle's business, it employs nineteen (19) salaried employees who are typically paid on the last business day of each month for the proceeding month. American Eagle also employs two (2) additional employees on a contract basis.

### Debt Structure

18.     In August of 2014, as part of a refinance of a $112,000,000 loan facility with Morgan Stanley, American Eagle issued 11% bonds through a Rule 144A/Regulation S Private offering ("August Refinance"). In connection with this offering, American Eagle executed an Indenture dated August 27, 2014 and related documents in favor of purchasers of the 11% Senior Secured Notes due 2019 ("Noteholders") and U.S. Bank National Association as Trustee and Collateral Agent ("Trustee", together with the Noteholders, the "Secured Parties").

19.     AMZG guaranteed the obligations to the Secured Parties subject to a second lien position.

20.     The Debtors used the funds borrowed from the Noteholders to pay-off the loan facility from Morgan Stanley plus related fees and ancillary costs in the approximate aggregate amount of $135,000,000 and a working capital deficit of $26,100,000. The Debtors used the remaining $13,800,000 in proceeds as capital for future operations.

21.     Also as part of the August Refinance, the Debtors entered into credit agreement and related documents with SunTrust Bank ("SunTrust Credit Agreement") in a first lien position.

22.     As the Debtors were finalizing the August Refinance, crude oil prices began to decline. Notwithstanding industry experts predicting crude oil would average no less than $97 a barrel through the later part of 2014, oil prices continued a steep decline in the months thereafter. Between August 2014 and the beginning of 2015, crude oil prices declined in excess of fifty percent (50%) and have remained depressed through 2015.

606337926.2

4

23.     Originally, the Debtors planned to complete their recapitalization, of which the August Refinance was a part and to borrow funds from SunTrust to provide additional capital, but, following the continuing decline in oil and natural gas prices the Debtors declined to borrow any funds under the SunTrust Credit Agreement.

24.     Ultimately, SunTrust reduced the first lien borrowing base to $0 and the Debtors were unable to borrow funds under the SunTrust Credit Agreement had they wanted to. On April 2, 2015, the Debtors received notice from SunTrust that, among other things, all Commitments (as defined in the SunTrust Credit Agreement) had terminated and neither SunTrust nor the Lenders (as defined in the SunTrust Credit Agreement) had any further commitment or other obligation to make Loans (as defined in the SunTrust Credit Agreement) to, or issue Letters of Credit (as defined in the SunTrust Credit Agreement) on behalf of, the Debtors.

25.     As of the Petition Date, the Debtors owed the Secured Parties the aggregate amount of approximately $175,000,000 plus accrued and unpaid interest and fees under the Prepetition Notes Documents ("Prepetition Notes Obligations").

### Reasons for Filing Chapter 11

26.     As an exploration and development company, American Eagle's assets, revenue, and general financial condition are directly correlated to the price of oil and natural gas. The sharp decrease in oil and natural gas prices by in excess of fifty percent (50%) from the time the Prepetition Notes Obligations were issued and remaining depressed until now has made it difficult to obtain capital for further development of the current Leasehold Interests.

27.     On February 20, 2015, American Eagle retained Seaport Global, LLC ("Seaport") and Canaccord Genuity, Inc. ("Canaccord") to assist in obtaining new capital including seeking potential lenders to assume SunTrust's first lien position under the SunTrust Credit Agreement prior to its termination. Notwithstanding that Seaport and Canaccord contacted over fifty (50) potential financing

606337926.2                                                    5

sources, the efforts to obtain new capital were unsuccessful given the general uncertainty of oil and natural gas prices and existing secured indebtedness.

28.     Without the ability to continue development with additional capital investment, American Eagle saw oil and gas production volumes and related revenues decline while costs remained relatively constant.

29.     In addition, in February of 2015, liquidity concerns caused American Eagle to commence discussions with an Ad Hoc Group of Noteholders, comprised of holders of in excess of fifty percent (50%) of the principal amount of the August Refinance bond ("Ad Hoc Group") regarding the approaching interest payment due under the Prepetition Notes Obligations.

30.     As a result of these discussions, the Debtors and the Ad Hoc Group entered a forbearance agreement dated April 2, 2015 ("Forbearance Agreement") which provided for a $4,000,000 partial interest payment and forbearance to allow the Debtors and Ad Hoc Group to discuss restructuring and sale alternatives.

31.     Later in April, Power Energy Partners, LP ("Power"), American Eagle's crude oil purchaser, indicated to American Eagle that it would be withholding certain payments to American Eagle due to receipt of a lien claim from one of the Debtor's road maintenance vendors, G Style Transport ("GST").

32.     Ultimately, Power paid American Eagle all but the funds necessary to pay the lien claim assert by GST ("GST Lien Claim").

33.     American Eagle believes Power is still holding $762,684.36 related to the GST Lien Claim and anticipates seeking turnover of these funds if they are not relinquished voluntarily.

34.     For the last several months, the Debtors, the Ad Hoc Group, and their respective attorneys and advisors have conducted multiple meetings, held numerous conference calls, and worked collectively to develop a strategy to maximize value for all stakeholders.  Ultimately, the parties determined that the

best way to preserve the value of the Debtors' assets and maximize value to all stakeholders would probably be through a restructuring and/or sale of the Debtors' assets in a Chapter 11 bankruptcy case.

35.    On May 7, 2015, the Debtors conducted meetings of their respective directors, who approved the filing of the Debtors' voluntary petitions under Chapter 11 of the Bankruptcy Code on May 8, 2015.

## Necessity for Immediate Use of Cash Collateral

36.    American Eagle has an urgent need to use its existing cash on hand for continuing operations because it incurs expenses daily in connection with production of oil and gas from its properties.  If those expenses are not paid in the ordinary course, operations will stop.  Vendors and employees need assurance that they will be paid for materials, service, and work performed during the Chapter 11 case and, absent that assurance, they will refuse to provide materials and services and American Eagle will have no choice but to cease all operations.  Any disruption in the operations of the business would create immediate and irreparable harm to the Debtor, its creditors, employees, and all parties in interest.

37.    Additionally, American Eagle believes that the best way to maximize value for all stakeholders is to conduct an expedited and robust sale process that seeks to sell its assets on a going concern basis.  Any disruption in current operations and revenue would have a severe negative impact on the ultimate sale price to the detriment of all creditors in the Chapter 11 cases.

38.    Alternatively, if American Eagle is allowed to use the Cash Collateral, it will be able to pay ongoing business expenses, which will preserve the going concern value for the estate and maximize any sale of the Debtors' assets and return to creditors.

39.    The Debtors have sought permission from the Secured Parties to use Cash Collateral and the Secured Parties have consented to the use of Cash Collateral under the terms expressed in the Cash Collateral Motion and proposed order.

40.     A budget showing estimated income and expenses for the Debtors for the next four (4) weeks (the "Budget") is attached to the Cash Collateral Motion as **Exhibit "B."**

### Immediate Need to Establish Adequate Assurance for Utilities

41.     As part of American Eagle's business, it has engaged multiple utility companies ("Utility Companies") to provide utilities services such as power, phone and internet to American Eagle's corporate offices in Colorado, as well as to field locations in North Dakota.

42.     American Eagle is dependent on continued utility service at these locations in order to ensure its business operations are not disrupted.  In the event utility services are interrupted, the company's business operations would be jeopardized to the detriment of employee morale and vendor confidence.

43.     American Eagle has proposed adequate deposits equal to one month's worth of services to provide assurance to the Utility Companies that all post-petition obligations will be met.  Moreover, American Eagle has provided for ordinary course business payments to the Utility Companies in the proposed budget submitted to the Court in connection with the Cash Collateral Motion.

44.     Continued uninterrupted utility service provides significant benefit to the estate as it signals to customers, vendors and potential bidders that the company continues to operate just as it did prepetition, which preserves value to the estate as the company approaches a potential sale.

### Basis for Joint Administration

45.     American Eagle's wholly owned subsidiary, AMZG, filed a simultaneous Chapter 11 petition with American Eagle.

46.     As mentioned previously, AMZG's only obligations are in connection with guarantee of debt related to obligations of American Eagle.  AMZG has no assets.

47.     I believe joint administration of AMZG and American Eagle is appropriate given the relationship between the two companies.

48.     Joint Administration is efficient and will not prejudice any party in interest because AMZG has no assets and its only obligations are certain guarantee claims related to American Eagle obligations.

49.     If the cases are not jointly administered, the Court will be unnecessarily burdened with duplicate notices and hearings and by maintaining redundant files.

**Emergency Basis for Authority to Pay Prepetition Employment Benefits and Claims**

50.     As of the Petition Date, American Eagle owes a total of approximately $12,915 in matching 401k contributions to its employees. The individual amounts owed range from a high of $1,750 to a low of $230.

51.     In addition to the prepetition amounts owed in connection with the company's 401k matching program, American Eagle owes two of its contract employees approximately $3,056.25.

52.     American Eagle's employees also have a small number of accrued vacation days to which they are entitled, which the company is seeking authority to honor in the ordinary course of business. Finally, American Eagle is seeing authority to honor reasonable prepetition reimbursement requests.

53.     Although the prepetition amounts owed are very small, payment of these amounts is crucial to maintaining the morale and spirit of American Eagle's workforce.

54.     If such payments are not authorized, I believe at least some of the employees will seek other employment opportunities out of fear that future obligations will not be paid.

55.     Even employees who do not seek alternative employment would be negatively affected by nonpayment.

56.   Such a distraction will be costly and disruptive to American Eagle's business operations and will affect the performance of the company.

57.   Efforts to recruit new employees to a company in a pending Chapter 11 case would tax the company's limited resources at a time when all efforts should be focused on maintaining operations and marketing, auctioning, and selling American Eagle's valuable assets.

58.   Consequently, I believe that the relief requested in the Motion to Pay Prepetition Salaries and Benefits is in the best interest of American Eagle and its bankruptcy estate.

Further Affiant Sayeth Naught.

_____
Bradley M. Colby
President of the American Eagle Energy Corp.


STATE OF COLORADO        )
                         )
COUNTY OF Arapahoe       )

SWORN TO and subscribed before me this ___8___ day of May , 2015 by BRADLEY M. COLBY

[X] personally known to me or [ ] who has produced _____ as identification.

```
LINDSEY MARIE WINTERS
Notary Public
State of Colorado
Notary ID 20134026823
My Commission Expires Apr 30, 2017
```

[NOTARY SEAL]

_____
Notary Public
PrintName: Lindsey M. Winters

My commission expires: April 30, 2017

606337926.1                        10