**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF COLORADO**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| American Eagle Energy Corporation | ) |
| Tax ID / EIN: 20-0237026 | ) Case No.  15-15073-HRT |
| | ) |
| AMZG, Inc. | ) Case No.  15-15074-HRT |
| Tax ID / EIN: 20-8642477 | ) |
| | ) |
| Debtors. | ) |
| | ) |

**LIST OF EXHIBITS**

  AMERICAN EAGLE ENERGY CORPORATION, debtor and debtor-in-possession, together with its affiliate, AMZG, INC., as debtor and debtor-in-possession, (the "Parties"), through their undersigned counsel, hereby designate the following exhibits for the hearing on May 12, 2015, at 2:30 p.m. in Courtroom B.

**EXHIBITS**

  The Parties intend to introduce those exhibits enumerated in Attachment 1, attached hereto and incorporated herein.

Dated: May 11, 2015

               *Elizabeth A. Green*
               Elizabeth A. Green, Esq.
               Florida Bar No.: 0600547
               egreen@bakerlaw.com
               Jimmy D. Parrish, Esq.
               Florida Bar No.: 0526401
               jparrish@bakerlaw.com
               **BAKER & HOSTETLER LLP**
               200 South Orange Ave.
               SunTrust Center, Suite 2300
               Post Office Box 112 (32802-0112)
               Orlando, Florida 32801-3432
               Telephone: (407) 649-4000
               Fax: (407) 841-0168
               Attorneys for Debtors

UNITED STATES BANKRUPTCY COURT
DISTRICT OF COLORADO

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| American Eagle Energy Corporation | ) |
| Tax ID / EIN: 20-0237026 | ) Case No.  15-15073-HRT |
| | ) |
| AMZG, Inc. | ) Case No.  15-15074-HRT |
| Tax ID / EIN: 20-8642477 | ) |
| | ) |
| Debtors. | ) |
| | ) |

**ATTACHMENT 1**

**EXHIBITS FOR HEARING**

Submitted by: AMERICAN EAGLE ENERGY CORPORATION AND AMZG, INC.
In connection with:  <u>Hearing on Debtors' Motion for Expedited Entry of Orders and Debtors' Motion for Authority to Use Cash Collateral.</u>

| **Exhibit Number** | **Description** | **Offered (Yes/No)** | **Admitted (Yes/No)** | **Additional Comments** |
|---|---|---|---|---|
| Debtor -1 | Affidavit of Bradley M. Colby | | | |
| Debtor-2 | Budget in Support of Debtors' Motion for Use of Cash Collateral | | | |
| | | | | |
| | | | | |
| | | | | |

1

606349360.2

UNITED STATES BANKRUPTCY COURT
DISTRICT OF COLORADO

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| American Eagle Energy Corporation | ) |
| Tax ID / EIN: 20-0237026 | ) Case No. 15-15073-HRT |
| | ) |
| Debtor. | ) |
| | ) |

**AFFIDAVIT OF BRADLEY M. COLBY, PRESIDENT OF AMERICAN EAGLE ENERGY CORPORATION, IN SUPPORT OF FIRST DAY PLEADINGS AND MOTION FOR EXPEDITED ENTRY OF ORDERS AND NOTICE OF IMPENDING HEARING THEREON PURSUANT TO LOCAL BANKRUPTCY RULE 2081-1**

I, Bradley M. Colby, being first duly sworn, hereby depose and say:

1. I am the President, Chief Executive Officer, and a director of American Eagle Energy Corporation ("American Eagle" or "Debtor") and of AMZG, Inc. ("AMZG", together with American Eagle, the "Debtors"). I have personal knowledge of, and I am competent to testify to, the matters set forth in this affidavit.

## Introduction

2. As President, Chief Executive Officer and a director of the Debtors, I am familiar with the above referenced Chapter 11 bankruptcy cases and the financial affairs of the Debtors.

3. This affidavit is submitted in support of: (i) the Emergency Motion of the Debtor-In-Possession for Authority to Use Cash Collateral ("Cash Collateral Motion"); (ii) the Debtor's Expedited Motion to Determine Adequate Assurance of Payment for Utility Services and Preclude Utilities from Altering, Refusing, or Discontinuing Service; (iii) Debtors' Motion for Joint Administration of Cases; (iv) the Debtor's Emergency Motion for Authority to Pay Prepetition Benefits; and (v) the Debtors' Motion for Expedited Entry of Orders and Notice of Impending Hearing Thereon (collectively, the "Motions").



## General Background of the Debtors

4. American Eagle Energy Corporation ("American Eagle") was incorporated in the state of Nevada in March 2003 under the name Golden Hope Resources Corp., but later changed its name in July 2005 to Eternal Energy Corp. and then to American Eagle Energy Corporation in December 2011 in connection with its acquisition of, and merger with, American Eagle Energy, Inc.

5. Upon completion of the 2011 acquisition, American Eagle Energy, Inc. became AMZG, Inc. ("AMZG") and a wholly owned subsidiary of American Eagle. As of the Petition Date, AMZG has no assets and no operations. AMZG's only debt relates to guarantee claims on American Eagle obligations.

6. The Debtors' principal offices are located at 2549 W. Main Street, Suite 202, Littleton, Colorado 80120.

7. American Eagle engages in the acquisition, exploration and development of oil and gas properties, and is primarily focused on extracting proved oil reserves from those properties. During the past five years, American Eagle has engaged in exploration and production activities in the northern United States as well as southeast Saskatchewan, Canada. In July 2014, American Eagle sold all of its net revenue and working interests in Canada to focus on exploration and production opportunities in North Dakota and Montana.

8. American Eagle's current exploration and production activities are focused in the northwest portion of Divide County, North Dakota commonly referred to as the Spyglass Area ("Spyglass Area") where American Eagle produces oil and natural gas reserves from the Three Forks and Middle Bakken formations.

9. American Eagle's primary assets are its leasehold interests ("Leasehold Interests"), which grant the company fee ownership of oil and gas under the ground of the real estate subject to the leasehold.

10. Each Leasehold Interest is subject to the rights of royalty owners ("Royalty Owners") who hold some interest in the real property subject to the Leasehold Interest. The Royalty Owners retain an interest in the oil and gas reserves that are subject to their respective Leasehold Interests.

11. Under the terms of the respective leases, American Eagle extracts reserves and hold a portion of any proceeds from such reserves in trust for the appropriate Royalty Owner.

12. Similarly, many of American Eagle's operating wells are subject to joint operating agreements ("JOAs") whereby the Debtor serves as operator of the well, but shares costs and profits with other non-operating parties called non-operating working interest owners ("Non-Operating Working Interest Owners"). Under the terms of the JOAs, American Eagle pays the Non-Operating Working Interest Owners their proportional share of proceeds from production of wells subject to the JOA.

13. In instances where American Eagle is the operator under a JOA, it holds an average of approximately a sixty-five percent (65%) working interest.

14. In some cases, American Eagle participates as a non-operating working interest owner in other operator's wells subject to certain JOAs. In instances where American Eagle participates as a non-operating working interest owner under a JOA, its average holding is approximately a five percent (5%) interest.

15. Typically on wells operated by American Eagle, the company will market and collect all the revenues from oil and gas sales and then distribute the proportionate share of the revenues to the Non-Operating Working Interest Owners and royalty interest owners on a monthly basis. Likewise, the proportionate share of production costs are billed on a monthly basis to Non-Operating Working Interest Owners in the well through a joint interest billing ("JIB") process.

16. American Eagle intends to file a Motion to Allow the Debtor to make prepetition payments due to Royalty and Non-Operating Working Interest Owners in the next week. Payments due to

Royalty interests and Non-Operating Working Interest Owners are actually owned by the Royalty and Non-Operating Working Interest Owners and those funds are subject to state law lien rights.

17. In connection with American Eagle's business, it employs nineteen (19) salaried employees who are typically paid on the last business day of each month for the proceeding month. American Eagle also employs two (2) additional employees on a contract basis.

### Debt Structure

18. In August of 2014, as part of a refinance of a $112,000,000 loan facility with Morgan Stanley, American Eagle issued 11% bonds through a Rule 144A/Regulation S Private offering ("August Refinance"). In connection with this offering, American Eagle executed an Indenture dated August 27, 2014 and related documents in favor of purchasers of the 11% Senior Secured Notes due 2019 ("Noteholders") and U.S. Bank National Association as Trustee and Collateral Agent ("Trustee", together with the Noteholders, the "Secured Parties").

19. AMZG guaranteed the obligations to the Secured Parties subject to a second lien position.

20. The Debtors used the funds borrowed from the Noteholders to pay-off the loan facility from Morgan Stanley plus related fees and ancillary costs in the approximate aggregate amount of $135,000,000 and a working capital deficit of $26,100,000. The Debtors used the remaining $13,800,000 in proceeds as capital for future operations.

21. Also as part of the August Refinance, the Debtors entered into credit agreement and related documents with SunTrust Bank ("SunTrust Credit Agreement") in a first lien position.

22. As the Debtors were finalizing the August Refinance, crude oil prices began to decline. Notwithstanding industry experts predicting crude oil would average no less than $97 a barrel through the later part of 2014, oil prices continued a steep decline in the months thereafter. Between August 2014 and the beginning of 2015, crude oil prices declined in excess of fifty percent (50%) and have remained depressed through 2015.

23. Originally, the Debtors planned to complete their recapitalization, of which the August Refinance was a part and to borrow funds from SunTrust to provide additional capital, but, following the continuing decline in oil and natural gas prices the Debtors declined to borrow any funds under the SunTrust Credit Agreement.

24. Ultimately, SunTrust reduced the first lien borrowing base to $0 and the Debtors were unable to borrow funds under the SunTrust Credit Agreement had they wanted to. On April 2, 2015, the Debtors received notice from SunTrust that, among other things, all Commitments (as defined in the SunTrust Credit Agreement) had terminated and neither SunTrust nor the Lenders (as defined in the SunTrust Credit Agreement) had any further commitment or other obligation to make Loans (as defined in the SunTrust Credit Agreement) to, or issue Letters of Credit (as defined in the SunTrust Credit Agreement) on behalf of, the Debtors.

25. As of the Petition Date, the Debtors owed the Secured Parties the aggregate amount of approximately $175,000,000 plus accrued and unpaid interest and fees under the Prepetition Notes Documents ("Prepetition Notes Obligations").

## Reasons for Filing Chapter 11

26. As an exploration and development company, American Eagle's assets, revenue, and general financial condition are directly correlated to the price of oil and natural gas. The sharp decrease in oil and natural gas prices by in excess of fifty percent (50%) from the time the Prepetition Notes Obligations were issued and remaining depressed until now has made it difficult to obtain capital for further development of the current Leasehold Interests.

27. On February 20, 2015, American Eagle retained Seaport Global, LLC ("Seaport") and Canaccord Genuity, Inc. ("Canaccord") to assist in obtaining new capital including seeking potential lenders to assume SunTrust's first lien position under the SunTrust Credit Agreement prior to its termination. Notwithstanding that Seaport and Canaccord contacted over fifty (50) potential financing

sources, the efforts to obtain new capital were unsuccessful given the general uncertainty of oil and natural gas prices and existing secured indebtedness.

28. Without the ability to continue development with additional capital investment, American Eagle saw oil and gas production volumes and related revenues decline while costs remained relatively constant.

29. In addition, in February of 2015, liquidity concerns caused American Eagle to commence discussions with an Ad Hoc Group of Noteholders, comprised of holders of in excess of fifty percent (50%) of the principal amount of the August Refinance bond ("Ad Hoc Group") regarding the approaching interest payment due under the Prepetition Notes Obligations.

30. As a result of these discussions, the Debtors and the Ad Hoc Group entered a forbearance agreement dated April 2, 2015 ("Forbearance Agreement") which provided for a $4,000,000 partial interest payment and forbearance to allow the Debtors and Ad Hoc Group to discuss restructuring and sale alternatives.

31. Later in April, Power Energy Partners, LP ("Power"), American Eagle's crude oil purchaser, indicated to American Eagle that it would be withholding certain payments to American Eagle due to receipt of a lien claim from one of the Debtor's road maintenance vendors, G Style Transport ("GST").

32. Ultimately, Power paid American Eagle all but the funds necessary to pay the lien claim assert by GST ("GST Lien Claim").

33. American Eagle believes Power is still holding $762,684.36 related to the GST Lien Claim and anticipates seeking turnover of these funds if they are not relinquished voluntarily.

34. For the last several months, the Debtors, the Ad Hoc Group, and their respective attorneys and advisors have conducted multiple meetings, held numerous conference calls, and worked collectively to develop a strategy to maximize value for all stakeholders. Ultimately, the parties determined that the

best way to preserve the value of the Debtors' assets and maximize value to all stakeholders would probably be through a restructuring and/or sale of the Debtors' assets in a Chapter 11 bankruptcy case.

35. On May 7, 2015, the Debtors conducted meetings of their respective directors, who approved the filing of the Debtors' voluntary petitions under Chapter 11 of the Bankruptcy Code on May 8, 2015.

### Necessity for Immediate Use of Cash Collateral

36. American Eagle has an urgent need to use its existing cash on hand for continuing operations because it incurs expenses daily in connection with production of oil and gas from its properties. If those expenses are not paid in the ordinary course, operations will stop. Vendors and employees need assurance that they will be paid for materials, service, and work performed during the Chapter 11 case and, absent that assurance, they will refuse to provide materials and services and American Eagle will have no choice but to cease all operations. Any disruption in the operations of the business would create immediate and irreparable harm to the Debtor, its creditors, employees, and all parties in interest.

37. Additionally, American Eagle believes that the best way to maximize value for all stakeholders is to conduct an expedited and robust sale process that seeks to sell its assets on a going concern basis. Any disruption in current operations and revenue would have a severe negative impact on the ultimate sale price to the detriment of all creditors in the Chapter 11 cases.

38. Alternatively, if American Eagle is allowed to use the Cash Collateral, it will be able to pay ongoing business expenses, which will preserve the going concern value for the estate and maximize any sale of the Debtors' assets and return to creditors.

39. The Debtors have sought permission from the Secured Parties to use Cash Collateral and the Secured Parties have consented to the use of Cash Collateral under the terms expressed in the Cash Collateral Motion and proposed order.

40. A budget showing estimated income and expenses for the Debtors for the next four (4) weeks (the "Budget") is attached to the Cash Collateral Motion as **Exhibit "B."**

### Immediate Need to Establish Adequate Assurance for Utilities

41. As part of American Eagle's business, it has engaged multiple utility companies ("Utility Companies") to provide utilities services such as power, phone and internet to American Eagle's corporate offices in Colorado, as well as to field locations in North Dakota.

42. American Eagle is dependent on continued utility service at these locations in order to ensure its business operations are not disrupted. In the event utility services are interrupted, the company's business operations would be jeopardized to the detriment of employee morale and vendor confidence.

43. American Eagle has proposed adequate deposits equal to one month's worth of services to provide assurance to the Utility Companies that all post-petition obligations will be met. Moreover, American Eagle has provided for ordinary course business payments to the Utility Companies in the proposed budget submitted to the Court in connection with the Cash Collateral Motion.

44. Continued uninterrupted utility service provides significant benefit to the estate as it signals to customers, vendors and potential bidders that the company continues to operate just as it did prepetition, which preserves value to the estate as the company approaches a potential sale.

### Basis for Joint Administration

45. American Eagle's wholly owned subsidiary, AMZG, filed a simultaneous Chapter 11 petition with American Eagle.

46. As mentioned previously, AMZG's only obligations are in connection with guarantee of debt related to obligations of American Eagle. AMZG has no assets.

47. I believe joint administration of AMZG and American Eagle is appropriate given the relationship between the two companies.

48. Joint Administration is efficient and will not prejudice any party in interest because AMZG has no assets and its only obligations are certain guarantee claims related to American Eagle obligations.

49. If the cases are not jointly administered, the Court will be unnecessarily burdened with duplicate notices and hearings and by maintaining redundant files.

### Emergency Basis for Authority to Pay Prepetition Employment Benefits and Claims

50. As of the Petition Date, American Eagle owes a total of approximately $12,915 in matching 401k contributions to its employees. The individual amounts owed range from a high of $1,750 to a low of $230.

51. In addition to the prepetition amounts owed in connection with the company's 401k matching program, American Eagle owes two of its contract employees approximately $3,056.25.

52. American Eagle's employees also have a small number of accrued vacation days to which they are entitled, which the company is seeking authority to honor in the ordinary course of business. Finally, American Eagle is seeing authority to honor reasonable prepetition reimbursement requests.

53. Although the prepetition amounts owed are very small, payment of these amounts is crucial to maintaining the morale and spirit of American Eagle's workforce.

54. If such payments are not authorized, I believe at least some of the employees will seek other employment opportunities out of fear that future obligations will not be paid.

55. Even employees who do not seek alternative employment would be negatively affected by nonpayment.

56.  Such a distraction will be costly and disruptive to American Eagle's business operations and will affect the performance of the company.

57.  Efforts to recruit new employees to a company in a pending Chapter 11 case would tax the company's limited resources at a time when all efforts should be focused on maintaining operations and marketing, auctioning, and selling American Eagle's valuable assets.

58.  Consequently, I believe that the relief requested in the Motion to Pay Prepetition Salaries and Benefits is in the best interest of American Eagle and its bankruptcy estate.

Further Affiant Sayeth Naught.

_____
Bradley M. Colby
President of the American Eagle Energy Corp.

STATE OF COLORADO   )
                    )
COUNTY OF Arapahoe  )

SWORN TO and subscribed before me this ___8___ day of __May__, 2015 by BRADLEY M. COLBY

[✓] personally known to me or [ ] who has produced _____ as identification.

**LINDSEY MARIE WINTERS**
**Notary Public**
**State of Colorado**
**Notary ID 20134026823**
**My Commission Expires Apr 30, 2017**

[NOTARY SEAL]

_____
Notary Public
PrintName: Lindsey M. Winters
My commission expires: April 30, 2017

606337926.1                    10

# EXHIBIT "B"

American Eagle Energy Corporation
Weekly Cash Forecast
Summary

| Week | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Week Ended | 5/16/15 | 5/23/15 | 5/30/15 | 6/6/15 |
| Beginning Cash | $ 8,496,615 | $ 6,961,432 | $ 8,422,466 | $ 7,696,452 |
| **Sources:** | | | | |
| Operated Revenue Receipts | - | 2,315,060 | - | - |
| Non-Operated Revenue Receipts | - | 97,609 | - | - |
| Joint Interest Billing (JIB) Collections | 88,396 | 453,921 | 28,396 | 27,981 |
| **Uses:** | | | | |
| Capital Expenditures | (47,619) | (47,619) | (47,619) | (59,524) |
| Lease Operating Expenses | (1,190,529) | - | - | (325,000) |
| Revenue Distributions - Current | - | (1,355,997) | - | - |
| Revenue Distributions - Suspense Wells | (331,331) | - | - | (3,911) |
| Cash G&A | (54,100) | (2,000) | (706,791) | (20,500) |
| Interest Payment | - | - | - | - |
| Ending Cash | $ 6,961,432 | $ 8,422,466 | $ 7,696,452 | $ 7,315,499 |
| Ending Revenue Receivables | $ 5,604,744 | $ 4,640,621 | $ 4,867,376 | $ 5,148,382 |
| Ending JIB & Misc. Receivables | $ 2,908,720 | $ 2,568,326 | $ 2,653,458 | $ 2,761,184 |
| Ending Total Net Receivables | $ 8,513,464 | $ 7,208,948 | $ 7,520,835 | $ 7,909,566 |
| Cash Collateral | $ 15,474,896 | $ 15,631,414 | $ 15,217,287 | $ 15,225,065 |



# EXHIBIT "B"

American Eagle Energy Corporation
Weekly Cash Forecast
Vendor Payments

| Week | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Week Ended | 5/16/15 | 5/23/15 | 5/30/15 | 6/6/15 |
| Total Capital Expenditures | $ (47,619) | $ (47,619) | $ (47,619) | $ (59,524) |
| | | | | |
| LOE Payments: | | | | |
| May-2015 | (1,190,529) | | | |
| Jun-2015 | | | | (325,000) |
| Jul-2015 | | | | |
| Aug-2015 | | | | |
| Sep-2015 | | | | |
| Oct-2015 | | | | |
| Nov-2015 | | | | |
| Dec-2015 | | | | |
| | (1,190,529) | - | - | (325,000) |

EXHIBIT "B"

American Eagle Energy Corporation
Weekly Cash Forecast
G&A

| Week | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Week Ended | 5/16/15 | 5/23/15 | 5/30/15 | 6/6/15 |
| Cash Items: | | | | |
| Payroll & 401K | $ - | $ - | $ 199,191 | $ - |
| Employee Benefit Insurance | 12,100 | - | - | - |
| Office Rent | - | - | 20,600 | - |
| Office Expenses | 2,000 | 2,000 | 2,000 | 2,000 |
| Travel, Meals & Entertainment | 20,000 | - | - | - |
| NYSE & SEC Fees & Filing Fees/Services | - | - | - | - |
| IT & Computer Expenses | - | - | - | 15,000 |
| Directors Fees | - | - | - | - |
| Other | 10,000 | - | - | - |
| Insurance (paid in January) | - | - | - | - |
| Accounting Fees | 10,000 | - | - | 3,500 |
| North Dakota State Taxex | | | | |
| | 54,100 | 2,000 | 221,791 | 20,500 |
| Professional Fees: | | | | |
| Legal Fees - Baker Hostetler | | - | - | - |
| Legal Fees - Roberts & Olivia | | | | |
| Legal Fees - Other | | - | - | - |
| Consulting Fees | | | | |
| Financial Advisor Fees - Canaccord | | | 35,000 | |
| Financial Advisor Fees - Walter Jones | | | 400,000 | |
| Legal Fees - Andrews Kurth | | - | 50,000 | - |
| Legal Fees - Noteholders CO counsel | | | | |
| Trustee Fees | | | | |
| | - | - | 485,000 | - |
| Total G&A | $ 54,100 | $ 2,000 | $ 706,791 | $ 20,500 |