## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| American Eagle Energy Corp. | ) | **Case No. 15-15073 (HRT)** |
| Tax ID / EIN: 20-0237026 | ) | |
| | ) | |
| AMZG, Inc. | ) | Case No. 15-15074 (HRT) |
| Tax ID / EIN: 20-8642477 | ) | |
| | ) | **(Jointly Administered)** |
| Debtors. | ) | |

## VERIFIED STATEMENT PURSUANT TO
## RULE 2019 OF FEDERAL RULES OF BANKRUPTCY PROCEDURE

Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Andrews Kurth LLP ("Andrews Kurth") hereby submits this verified statement (the "Verified Statement") in connection with Andrews Kurth's representation of a group of certain holders (the "Ad Hoc Group") of the 11.0% Senior Secured Notes due 2019 (the "Senior Secured Notes") issued under the Indenture, dated as of August 27, 2014, by and among American Eagle Energy Corp. ("AEEC"), as issuer, AMZG, Inc. ("AMZG," and together with AEEC, the "Debtors"), as guarantor, and U.S. Bank, as indenture trustee and collateral agent.

1.      In March 2015, the Ad Hoc Group retained Andrews Kurth to represent them in connection with a potential restructuring of the Debtors.  As of the date of this Verified Statement, Andrews Kurth represents only the Ad Hoc Group and does not represent or purport to represent any entities other than the Ad Hoc Group in connection with the Debtors' above-captioned chapter 11 cases (the "Chapter 11 Cases").  On May 11, 2015, Andrews Kurth engaged Markus Williams Young & Zimmerman LLC as local counsel for the Ad Hoc Group in connection with these Chapter 11 Cases.

2.       The present members of the Ad Hoc Group or their affiliates hold claims or manage or advise certain funds that hold claims against the Debtors' estates arising from their purchase of Senior Secured Notes.  In accordance with Bankruptcy Rule 2019, attached hereto as **Exhibit A**, is a list of the names, addresses, and "the nature and amount of all disclosable economic interests" held by each present member of the Ad Hoc Group, its affiliates or its affiliated funds or accounts in relation to the Debtors as of the date of this Verified Statement. The information contained in **Exhibit A** is subject to change.[1]

3.       On May 15, 2015, the members of the Ad Hoc Group entered into that certain Restructuring Support Agreement (the "RSA").  The RSA is attached to this Verified Statement as **Exhibit B**.  Pursuant to the RSA, the members of the Ad Hoc Group agreed, among other things, to: (i) support the transactions contemplated by that certain Restructuring Term Sheet dated as of April 23, 2015; (ii) be bound by and to support all actions consistent with decisions made by Consenting Senior Secured Noteholders (as defined in the RSA) holding a majority in aggregate principal amount of the Senior Secured Notes held by the Consenting Senior Secured Noteholders; and (iii) observe and abide by the restrictions on the transfer of Senior Secured Notes set forth in section 8 of the RSA.

4.       Nothing contained in this Verified Statement or **Exhibit A** shall be construed as a limitation upon, or waiver of, any rights to assert, file and/or amend claims in accordance with applicable law and any orders entered in these cases by any member of the Ad Hoc Group, any of their affiliates, or any other entity.

---

1 During the course of its representation of the Ad Hoc Group, Andrews Kurth has been in communication with additional holders of Senior Secured Notes (the "Additional Holders").  According to information provided to Andrews Kurth, the aggregate holdings of the Ad Hoc Group and the Additional Holders totals approximately 85% of the Senior Secured Notes.  The Additional Holders are not a part of the Ad Hoc Group and are not represented by Andrews Kurth in connection with the Chapter 11 Cases.

5.     No member of the Ad Hoc Group represents or purports to represent any other entities in connection with the Debtors' Chapter 11 Cases.

6.     Andrews Kurth reserves the right to amend or supplement this Verified Statement in accordance with the requirements set forth in Bankruptcy Rule 2019.

7.     The information contained herein is intended only to comply with Bankruptcy Rule 2019 and is not intended for any other use or purpose.

The undersigned verifies under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: May 20, 2015

  _/s/ Paul N. Silverstein_____
Paul N. Silverstein
**ANDREWS KURTH LLP**
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 850-2800
Facsimile: (212) 850-2929
Email: paulsilverstein@andrewskurth.com

Timothy A. Davidson II
**ANDREWS KURTH LLP**
600 Travis, Suite 4200
Houston, Texas 77002
Telephone: (713) 220-4200
Facsimile: (713) 220-4285
Email: TDavidson@andrewskurth.com

*Counsel to Ad Hoc Group of 2019 Senior Secured Noteholders*

And

John F. Young (#26989)
James T. Markus (#25065)
**MARKUS WILLIAMS YOUNG &
ZIMMERMANN LLC**
1700 Lincoln Street, Suite 4550
Denver, Colorado  80203
Telephone: (303) 830-0800
Facsimile: (303) 830-0809
Email:      jyoung@markuswilliams.com
Email:      jmarkus@markuswilliams.com

*Local Counsel to Ad Hoc Group of 2019 Senior
Secured Noteholders*

## <u>CERTIFICATE OF SERVICE</u>

 I hereby certify that a true and correct copy of the foregoing was served this 19th day of May, 2015, via regular U.S. mail, postage prepaid upon the following:

Elizabeth A. Green
200 S. Orange Ave.
Suntrust Center, Ste. 2300
Orlando, FL 32801-3432

Daniel J. Morse
308 W. 21st St.
Ste. 203
Cheyenne, WY 82001

Robert Hill
5334 S. Prince Street
Littleton, CO 80166

Jeremy L. Graves
Gibson, Dunn & Crutcher, LLP
1801 California Street, Suite 4200
Denver, Colorado 80202-2642

Barry L. Wilkie
Jones & Keller, P.C.
1999 Broadway, Suite 3150
Denver, CO 80202

Stephen K. Dexter
Lathrop & Gage LLP
950 17th Street
Suite 2400
Denver, Colorado 80202

Jimmy D. Parrish
200 S. Orange Ave.
Suntrust Center, Ste. 2300
Orlando, FL 32801-3432

Alan K. Motes
Byron G. Rogers Federal Building
1961 Stout St., Ste. 12-200
Denver, CO 80294

Carl Doré, Jr.
Doré Law Group, P.C.
17171 Park Row, Suite 160
Houston, Texas 77084

William A. (Trey) Wood III
Bracewell & Giuliani LLP
711 Louisiana Street, Suite 2300
Houston, Texas 77002

Theodore J. Hartl
Lindquist & Vennum LLP
600 17th Street, Suite 1800 South
Denver, CO 80202

*s/ Roberta Purser*
Roberta Purser

# EXHIBIT A

| Party and Address | Nature and Amount of Holdings |
|---|---|
| Aristeia Capital, LLC<br>136 Madison Ave., 3rd Floor<br>New York, NY 10016 | $31,565,000.00 of Senior Secured Notes |
| Bennett Management Corporation<br>281 Tresser Blvd.<br>Stamford, CT 06901 | $36,685,000.00 of Senior Secured Notes |
| Kayne Anderson Capital Advisors, L.P.<br>1800 Avenue of the Stars, 3rd Floor<br>Los Angeles, CA 90067 | $23,500,000.00 of Senior Secured Notes |
| Northeast Investors Trust<br>125 High St., Suite 1802<br>Boston, MA 02110 | $15,500,000.00 of Senior Secured Notes |

# EXHIBIT B

**EXECUTION VERSION**

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT dated as of May 15, 2015 (this "Agreement"), among each of the undersigned holders of, or the investment advisor or manager to a holder or holders (the "Ad Hoc Group") of the 11.0% Senior Secured Notes due 2019 (the "Senior Secured Notes") issued under the Indenture, dated as of August 27, 2014 (the "Indenture"), by and among American Eagle Energy Corp. ("AEEC"), as issuer, AMZG, Inc. ("AMZG" and, together with AEEC, the "Debtors"), as guarantor, and US Bank, as indenture trustee and collateral agent (in such capacity, the "Trustee").   The Ad Hoc Group and any permitted transferee that executes a Transfer Agreement (as defined in Section 8) are collectively referred to herein as the "Consenting Senior Secured Noteholders" or the "Parties."

## RECITALS:

**WHEREAS,** the Senior Secured Notes are secured by valid, binding, enforceable, non-avoidable and perfected liens on all or substantially all of the Debtors' assets;

**WHEREAS,** under the terms of the Indenture, the Debtors were required to make a semi-annual interest payment to the Trustee for the benefit of the holders of Senior Secured Notes in the amount of approximately $9,800,000 on March 2, 2015 (the "Notes Interest Payment");

**WHEREAS,** on March 2, 2015, the Debtors announced their intention to forego making immediate payment of the Notes Interest Payment and to utilize the thirty (30) day grace period provided for in the Indenture to evaluate strategic alternatives and determine whether to make the Notes Interest Payment;

**WHEREAS**, the Ad Hoc Group organized on March 6, 2015 for the purpose of, among other things, engaging with the Debtors in discussions regarding a consensual restructuring of the Debtors businesses and finances;

**WHEREAS,** as presently constituted, the Ad Hoc Group consists of holders of Senior Secured Notes holding, in the aggregate, approximately 62.0% of the outstanding principal amount of the Senior Secured Notes;

**WHEREAS,** on April 2, 2015, the Debtors and the Ad Hoc Group executed that certain Forbearance Agreement (the "Forbearance Agreement") providing for, among other things, a $4,000,000 partial interest payment to the Trustee for the benefit of the holders of Senior Secured Notes and a forty-five (45) day forbearance period to allow the Debtors and Ad Hoc Group to discuss restructuring and sale alternatives;

**WHEREAS,** during the Forbearance Period, the Ad Hoc Group, the Debtors, and their professionals engaged in arm's length good faith negotiations regarding a restructuring (the "Restructuring") of the Debtors' indebtedness and other obligations pursuant to a sale by the Debtors of substantially all of their assets pursuant to section 363(b) of chapter 11, title 11 of the

United States Code (the "Bankrutpcy Code") and the terms and conditions set forth in the Restructuring Term Sheet (the "Term Sheet") attached hereto as Exhibit A;

**WHEREAS,** under the terms of the Indenture and the other documents executed in connection with the issuance of the Senior Secured Notes (together with the Indenture, the "Senior Secured Notes Documents"), the Ad Hoc Group holds sufficient Senior Secured Notes to direct the Trustee, among other things, to take actions necessary to effectuate the Restructuring as contemplated in the Term Sheet;

**WHEREAS,** on May 8, 2015 (the "Petition Date"), the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases") in the United States Bankrutpcy Court for the District of Colorado (the "Bankrutpcy Court");

**WHEREAS,** on May 9, 2015, the Debtors filed an Emergency Motion for the use of cash collateral (the "Cash Collateral Motion");

**WHEREAS,** the limited consent of the Trustee and the Ad Hoc Group to the relief requested in the Cash Collateral Motion is conditioned on the Debtors' compliance with the terms and conditions contained in the proposed interim cash collateral order (the "Interim Cash Collateral Order") attached hereto as Exhibit B; and

**WHEREAS**, the Debtors, the Ad Hoc Group, and their professionals are continuing to engage in arm's length good faith negotiations regarding the Restructuring and the execution of the documentation necessary to effectuate the transactions contemplated by the Term Sheet.

**NOW, THEREFORE,** in consideration of the covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which each Party hereby acknowledges, each Party, intending to be legally bound hereby, agrees as follows:

1.   Definitions.   Capitalized terms used but not otherwise defined herein shall be defined as follows:

"Affiliate" means, with respect to any Person, any other Person which directly or indirectly controls, or is under common control with, or is controlled by, such Person.  As used in this definition, "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean, with respect to any Person, the possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise) of such Person.

"APA" means an Asset Purchase Agreement entered into by the Debtors and the Trustee, for the benefit of holders of Senior Secured Notes, for the sale by the Debtors of substantially all of their assets to the Trustee for the benefit of the holders of Senior Secured Notes.

NYC:333119.6

"Business Day" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in New York, New York are authorized by law or other governmental action to close.

"Credit Bid" means the surrender and releaseof a portion of the Indenture Obligations by the Trustee as consideration for the purchase from the Debtors of all or substantially all of the Debtors' assets pursuant to an APA.

"Final Cash Collateral Order" means a final order entered with respect to the use by the Debtors' of cash collateral that is in all respects in a form and substance acceptable to the Consenting Senior Secured Noteholders.

"Indenture Obligations" means all obligations of the Debtors to the holders of Senior Secured Notes, which is an amount that is not less than the sum of (i) $175,000,000 in aggregate principal amount, (ii) all accrued and unpaid interest, and (iii) all additional amounts owed under the Senior Secured Notes Documents including, but not limited to, defaulted interest, interest on defaulted interest, fees, expenses, costs, charges, premiums, make-whole, prepayment, yield maintenance or similar amounts payable pursuant to the Indenture or the Senior Secured Notes Documents.

"Person" means an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, a group or any legal entity or association.

"Qualified Marketmaker" means any Person that holds itself out to the public or to applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Senior Secured Notes in its capacity as a broker dealer or market maker for Senior Secured Notes and is in fact regularly in the business of making a market in similar securities or claims against issuers or borrowers.

"Transfer" has the meaning set forth in Section 8 herein.

"Transfer Agreement" has the meaning set forth in Section 8 herein.

"Waiver" has the meaning set forth in Section 11 herein.

2.    Commitment of the Consenting Senior Secured Noteholders.  Subject to the terms and conditions hereof, but prior to the termination of this Agreement as provided herein, the Consenting Senior Secured Noteholders and each of their respective successors and assigns as permitted under this Agreement shall:

a)    use their best efforts to effectuate the transactions contemplated by the Term Sheet within the time-frame contemplated by the Interim Cash Collateral Order, Final Cash Collateral Order, and the Term Sheet;

b)    agree to be bound by and to support all actions consistent with decisions made by Consenting Senior Secured Noteholders holding a majority in aggregate principal

3

amount of the Senior Secured Notes held by the Consenting Senior Secured Noteholders;

c)      direct the Trustee to take any action necessary to effectuate the transactions contemplated by the Term Sheet as determined by Consenting Senior Secured Noteholders holding a majority in aggregate principal amount of the Senior Secured Notes held by the Consenting Senior Secured Noteholders including, but not limited to: (i) making a Credit Bid; and (ii) declaring the occurrence of "Events of Default" under the Interim Cash Collateral order or Final Cash Collateral Order, as necessary;

d)      participate at any auction held for the sale by the Debtors of substantially all of their assets (an "Auction"), either directly or through an agent authorized to direct the Trustee on such Consenting Senior Secured Noteholder's behalf to modify or change the amount of any Credit Bid made by the Trustee; and

e)      not take any action directly or indirectly or encourage others to take actions inconsistent with transactions contemplated by this Agreement or which would delay the consummation of the Restructuring contemplated by the Term Sheet.

Notwithstanding the foregoing, nothing in this Agreement shall prohibit the Consenting Senior Secured Noteholders from appearing as a party-in-interest in any matter in the Chapter 11 Cases so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement.

Each Consenting Senior Secured Noteholder that fails to comply with its obligations under Section 2(d) shall be deemed to have irrevocably constituted and appointed the other Consenting Senior Secured Noteholders as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Consenting Senior Secured Noteholder to to direct the Trustee on such Consenting Senior Secured Noteholder's behalf to modify or change the amount of any Credit Bid made by the Trustee at an Auction.

3.      Mutual Representations and Warranties.  Each of the Parties, severally and not jointly, represents and warrants to each other Party, as of the date of this Agreement, as follows:

(a) it is validly existing and in good standing under the laws of the jurisdiction of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws; and

(b) the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part.

4.      Ownership of Senior Secured Notes.  Each Consenting Senior Secured Noteholder for itself and not jointly, represents and warrants as follows:

i)      as of the date of this Agreement, it is (i) either (A) the sole beneficial owner of the principal amount of Senior Secured Notes set forth below its signature hereto, or (B) has sole investment or voting discretion with respect to the principal amount of Senior

NYC:333119.6

Secured Notes set forth below its signature hereto and has the power and authority to bind the beneficial owner(s) of such Senior Secured Notes to the terms of this Agreement, (ii) has full power and authority to act on behalf of, vote and consent to matters concerning such Senior Secured Notes and dispose of, exchange, assign and transfer such Senior Secured Notes and (iii) subject to Section 19, holds no other Senior Secured Notes; and

ii)   other than pursuant to this Agreement, such Senior Secured Notes are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition or encumbrance of any kind, that would adversely affect in any way such Consenting Senior Secured Noteholder's performance of its obligations contained in this Agreement at the time such obligations are required to be performed.

5.      <u>Mutual Termination</u>.  This Agreement and the obligations of the Parties hereunder, may be terminated by mutual agreement among the Consenting Senior Secured Noteholders.

6.      <u>Automatic Termination</u>.  This Agreement and the obligations of all Parties hereunder shall terminate if (i) the Debtors' authority to use cash collateral is validly terminated in accordance with the terms of the Interim Cash Collateral Order or the Final Cash Collateral Order or (ii) Consenting Senior Secured Noteholders holding a majority in aggregate principal amount of the Senior Secured Notes held by the Consenting Senior Secured Noteholders take any action that is inconsistent with or which would delay the consummation of the Restructuring contemplated by the Term Sheet.

7.      <u>Termination by Ad Hoc Group</u>.  If, at any time prior to the consummation of the transactions contemplated by the Term Sheet, a majority in aggregate principal amount of the Senior Secured Notes held by the Consenting Senior Secured Noteholders are held by parties other than the members of the Ad Hoc Group, this Agreement and the obligations of the Parties hereunder may be terminated by the agreement of the members of the Ad Hoc Group holding a majority in aggregate principal amount of the Senior Secured Notes held by the members of the Ad Hoc Group at such time.

8.      <u>Transfer of Senior Secured Notes</u>.  The Consenting Senior Secured Noteholders agree, with the exception of the permitted transfers and purchases enumerated in i) and ii) below, that no Consenting Senior Secured Noteholder will, directly or indirectly, sell, contract to sell, give, assign, hypothecate, pledge, encumber, grant a security interest in, offer, sell any option or contract to purchase, or otherwise transfer or dispose of, any economic, voting or other right in or to (collectively, "<u>Transfer</u>"), all or any portion of its Senior Secured Notes now or hereafter owned, and no such Transfer will be effective, unless: (a)  the transferee executes and provides a transfer agreement in the form attached hereto as <u>Exhibit B</u> (the "<u>Transfer Agreement</u>"), pursuant to which the transferee agrees to be bound by all of the terms and conditions of this Agreement, including, but not limited to, the covenants of the Consenting Secured Creditors set forth in Section 2 of this Agreement and (b) the Consenting Senior Secured Noteholder effecting such Transfer notifies counsel to the other Parties hereto in writing of such Transfer within two (2) Business Days of the execution of an agreement (or trade confirmation) in respect of such Transfer.  Notwithstanding the foregoing, any transferee that specifies in the documentation executed in connection with the transfer by a Consenting Senior Secured Noteholder that it is acting as a Qualified Marketmaker

shall not be required to execute a Transfer Agreement in connection with such Transfer if such Qualifying Marketmaker transfers such Senior Secured Notes within five (5) Business Days of the date the terms of such Transfer were agreed upon by the Consenting Senior Secured Noteholder and the Qualified Marketmaker; provided, however, that such Qualified Marketmaker shall require any transferee of the Senior Secured Notes purchased by such Qualified Marketmaker to execute a Transfer Agreement in connection with such transfer unless such transferee is a Consenting Senior Secured Noteholder.  Within twenty-four (24) hours of any Transfer of Senior Secured Notes by a Consenting Senior Secured Noteholder to a Qualified Marketmaker, such Consenting Senior Secured Creditor shall notify Andrews Kurth LLP at the address listed in Section 16 of this Agreement in writing of the date of such Transfer, the identity of the Qualified Marketmaker, and the amount of Senior Secured Notes sold to such Qualified Marketmaker. In addition to the foregoing Transfers, the following Transfers shall be permitted:

i.      any Transfer by one Consenting Senior Secured Noteholder to an Affiliate of such Consenting Senior Secured Noteholder or one or more of its affiliated funds or an affiliated entity or entities with a common investment advisor (in each case, other than portfolio companies); and

ii.     any Transfer by one Consenting Senior Secured Noteholder to another Consenting Senior Secured Noteholder.

Any Transfer by a Consenting Senior Secured Noteholder of all or a portion of its Senior Secured Notes that does not comply with the foregoing shall be deemed void *ab initio*; provided, however, for the avoidance of doubt, that upon any purchase, acquisition or assumption by any Consenting Senior Secured Noteholder of any Senior Secured Notes such Senior Secured Notes shall automatically be deemed to be subject to all the terms of this Agreement.

9.      No Obligation to Provide Financing.  No Consenting Senior Secured Noteholder shall be required to provide any financing to the Debtors solely due to its status as a Consenting Senior Secured Noteholder.

10.     Amendments.  No amendment, modification, waiver or supplement of or to the terms of this Agreement (including the Restructuring Term Sheet) shall be valid unless such amendment, modification, waiver or supplement is in writing and has been signed by Consenting Senior Secured Noteholders holding a majority in aggregate principal amount of the Senior Secured Notes held by the Consenting Senior Secured Noteholders.

11.     Parties Bound.  To the extent any Consenting Senior Secured Noteholder (a) acquires additional Senior Secured Notes or (b) holds or acquires any other claims against the Debtors entitled to vote on the Restructuring, each such Consenting Senior Secured Noteholder agrees that such Senior Secured Notes or other claims shall be subject to and bound by the terms of this Agreement.

12.     Entire Agreement.  This Agreement, including the Restructuring Term Sheet, constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement, and supersedes all other prior negotiations, agreements and understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement; provided, however, that any

6

confidentiality agreement executed by any Party shall survive this Agreement and shall continue to be in full force and effect in accordance with its terms.

13.     <u>Waiver</u>.  If the transactions contemplated herein are not consummated, or following the occurrence of the termination of this Agreement, if applicable, nothing shall be construed herein as a waiver by any Party of any or all of such Party's rights and the Parties expressly reserve any and all of their respective rights.

14.     <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute the same instrument and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

15.     <u>Headings</u>.  The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

16.     <u>Relationship Among Parties</u>.  Notwithstanding anything herein to the contrary, the duties and obligations of the Parties under this Agreement shall be several, not joint.  It is understood and agreed that any Senior Secured Noteholder may trade in the equity, claims or debt of the Debtors, subject to Section 11 of this Agreement.  No Consenting Senior Secured Noteholder shall have any responsibility for any such trading by any other Consenting Senior Secured Noteholder by virtue of this Agreement.  No prior history, pattern or practice of sharing confidences among or between the Consenting Senior Secured Noteholders shall in any way affect or negate this understanding and agreement.

17.     <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction.  By its execution and delivery of this Agreement and to the extent possible, each of the Parties irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought exclusively in the Bankruptcy Court.

16.     <u>Notices</u>.  All notices, requests and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally or by facsimile transmission to the address set forth beneath such noteholder's signature block, with a copy to (which shall not constitute notice):

      Andrews Kurth LLP
      450 Lexington Avenue
      New York, NY 10017
      Attn: Paul N. Silverstein
      Email: [paulsilverstein@andrewskurth.com](mailto:paulsilverstein@andrewskurth.com)

      and

      Andrews Kurth LLP

NYC:333119.6

600 Travis, Suite 4200
Houston, Texas  77002
Attn:   Timothy A. Davidson II
Email:  TDavidson@andrewskurth.com

17.     Third-Party Beneficiaries.  The terms and provisions of this Agreement are intended solely for the benefit of the Parties hereto and their respective successors and permitted assigns, and no other person or entity shall be a third-party beneficiary hereof.

18.     Specific Performance.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party may be entitled to seek specific performance and injunctive or other equitable relief as a remedy for any such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

**[Signature Pages Follow]**

NYC:333119.6

IN WITNESS WHEREOF, the undersigned holder or investment advisor or manager to a holder or holders of Senior Secured Notes has caused this Agreement to be duly executed as of the date first written above.

**Bennett Management Corporation**

By:
Name:                          Joseph P von Meister
Title:                          VP
Address:                     281 Tresser Blvd, Stamford, CT 06901
Telephone number:      203-353-3101
Email Address:            jvonmeister@bennettmgmt.com
Principal Amount Owned:   36,685,000

IN WITNESS WHEREOF, the undersigned holder or investment advisor or manager to a holder or holders of Senior Secured Notes has caused this Agreement to be duly executed as of the date first written above.

**Aristeia Capital, LLC**

By: _____
Name:   William R. Techar
Title:   Manager
Address:   Aristeia Capital, L.L.C.
Telephone number: 212-842-8919
Email Address: techar@aristeiacapital.com

By: _____
Name:   Andrew B. David
Title:   General Counsel
Address: Aristeia Capital, L.L.C.
Telephone number: 212 842 8939
Email Address: andrew.david@aristeiacapital.com


Principal Amount Owned: $31,565,000

IN WITNESS WHEREOF, the undersigned holder or investment advisor or manager to a holder or holders of Senior Secured Notes has caused this Agreement to be duly executed as of the date first written above.

**Northeast Investors Trust**

By: _____

Name: Bruce H. Monrad

Title: Trustee

Address: 125 High St. #1802 Boston, MA 02110

Telephone number: 857-263-8109

Email Address: bmonrad@northeastinvestors.com

Principal Amount Owned: $15,500,000.00

This instrument is executed by the trustees as trustees and not individually and the obligations of such instrument are not binding upon any of the trustees or shareholders individually but are binding only upon the Trust's Assets.

IN WITNESS WHEREOF, the undersigned holder or investment advisor or manager to a holder or holders of Senior Secured Notes has caused this Agreement to be duly executed as of the date first written above.

**Kayne Anderson Capital Advisors, L.P.**

By: _David Shladovsky_
Name:  David Shladovsky
Title:  General Counsel
Address:  1800 Avenue of the Stars, 3rd Floor, Los Angeles CA, 90067
Telephone number: 310-284-6438
Email Address: dshladovsky@kaynecapital.com
Principal Amount Owned:  $23,500,000

## **Exhibit A**

Restructuring Term Sheet

**THIS NON-BINDING TERM SHEET IS FOR DISCUSSION PURPOSES ONLY AND IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS WITH RESPECT TO ANY RESTRUCTURING OR A CHAPTER 11 PLAN OF REORGANIZATION, NOR IS IT AN OFFER OR SOLICITATION FOR THE SALE OF SECURITIES. THIS TERM SHEET DOES NOT CONTAIN ALL OF THE TERMS OF A PROPOSED PLAN OF REORGANIZATION OR AN ASSET PURCHASE AGREEMENT. THIS TERM SHEET SHALL NOT BE CONSTRUED AS (I) AN OFFER CAPABLE OF ACCEPTANCE, (II) A BINDING AGREEMENT OF ANY KIND, (III) A COMMITMENT TO ENTER INTO, OR OFFER TO ENTER INTO, ANY AGREEMENT OR (IV) AN AGREEMENT TO FILE ANY CHAPTER 11 PLAN OF REORGANIZATION OR DISCLOSURE STATEMENT OR CONSUMMATE ANY TRANSACTION OR TO VOTE FOR OR OTHERWISE SUPPORT ANY PLAN OF REORGANIZATION OR RESTRUCTURING.**

**Does Not Contain All Material Terms**

## PRELIMINARY TERMS AND CONDITIONS FOR PROPOSED RESTRUCTURING OF AMERICAN EAGLE ENERGY CORP.

### April 23, 2015

This term sheet (the "Term Sheet") describes certain of the principal terms of a proposed restructuring (the "Restructuring") of American Eagle Energy Corp. and AMZG, Inc. (collectively, "AMZG" or the "Debtors"). The Restructuring shall be implemented through a sale of all of the assets (a "363 Sale") of the Debtors (the "Assets") pursuant to section 363(b)(1) of title 11 of the United States Code (the "Bankruptcy Code") in the Debtors' forthcoming chapter 11 cases (the "Chapter 11 Cases") to be filed in the United States Bankruptcy Court for the District of Colorado (the "Bankruptcy Court"). The Assets shall be sold to either (i) the holders (the "Noteholders") of the 11.0% Senior Secured Notes Due 2019 (the "Senior Secured Notes") issued by AMZG pursuant to that certain Indenture (the "Indenture") dated as of August 27, 2014, who may credit bid an amount up to the amount of the Senior Secured Noteholder Claims (as defined below) or (ii) to a qualified third party purchaser making a higher and better offer (a "Third Party Purchaser"). The 363 Sale process and milestones shall be in all respects consistent with this Term Sheet.

This Term Sheet has been prepared by an ad hoc group of Noteholders (the "Ad Hoc Group") in furtherance of settlement discussions and is entitled to the protection from use or disclosure afforded by Federal Rule of Evidence 408 and any similar applicable rule of evidence.

| | |
|---|---|
| **Implementation of Restructuring** | The Restructuring set forth in this Term Sheet shall be effectuated through a 363 Sale approved by an order of the Bankruptcy Court. |
| | The parties and their respective advisors shall use all deliberate speed to negotiate the definitive documentation to implement the Restructuring consistent with the terms described in this Term Sheet including, without limitation, an asset purchase agreement (an "APA") and all related documents (together with the APA, the "Acquisition Documents"). |
| **Financing of Chapter 11 Cases** | The Chapter 11 Cases shall be financed by (i) the Debtors' available cash-on-hand pursuant to an agreed order permitting the use of cash collateral (a "Cash Collateral |

NYC:329044.4

| | |
|---|---|
| | Order") on terms and conditions acceptable to the Noteholders and/or (ii) to the extent necessary, debtor-in-possession financing provided by the Noteholders pursuant to section 364(d) of the Bankruptcy Code on terms mutually acceptable to the parties (a "DIP Facility"). The Order of the Bankruptcy Court approving the DIP Facility shall incorporate the milestones set forth in the Bidding Procedures (as defined below). |
| **363 Sale Process** | U.S. Bank, National Association ("U.S. Bank"), as trustee and collateral agent under the Indenture, may credit bid an amount up to the amount of the Senior Secured Noteholder Claims (as defined below) as consideration for acquisition of the Assets (the "Credit Bid"). The Credit Bid shall serve as the "stalking horse" bid in the sale process. |
| | If the Credit Bid is the successful bid, upon acquisition of title to the Assets, U.S. Bank shall immediately convey the Assets to an entity formed for the purpose of acquiring title to the Assets (the "Buyer"), which shall be owned *pro rata* by the Noteholders. The capital structure of the Buyer shall be determined by the Noteholders in their sole discretion. |
| | If a Third Party Purchaser purchases the Assets, the consideration paid by the Third Party Purchaser shall be distributed to the Noteholders (less amounts necessary to satisfy DIP Financing Claims (as defined below) held by the Noteholders and the reasonable administrative expenses of the Chapter 11 Cases that are approved by the Ad Hoc Group and an order of the Bankruptcy Court) until the Senior Secured Noteholder Claims have been paid in full. If the consideration paid by the Third Party Purchaser is less than the sum of the Senior Secured Noteholder Claims, the Noteholders shall be entitled to a Deficiency Claim (as defined below) against the Debtors. |
| **Bidding Procedures** | On the date that the Debtors' commence their Chapter 11 Cases (the "Petition Date"), the Debtors shall file a motion seeking approval of bidding procedures with respect to the 363 Sale Process (the "Bidding Procedures"). The Bidding Procedures shall contain provisions relating to the qualification of bidders and milestones associated with the 363 Sale Process.  The Bidding Procedures shall provide that, in exchange for serving as a "stalking horse," the Buyer shall be entitled to appropriate bidding protections outlined in the Bidding Procedures. |
| | The motion seeking approval of the Bidding Procedures shall be agreed upon by the Debtors and the Ad Hoc Group. |
| **Senior Secured Noteholder Claims** | As of the date hereof, the claims arising under or related to the Senior Secured Notes and/or the Indenture (the "Senior Secured Noteholder Claims") consist of (i) $175,000,000 in |

2

| | |
|---|---|
| | outstanding principal, (ii) $[X] in accrued and unpaid interest, and $[X] in fees, expenses and other charges due under the Indenture and other agreements entered into by the Debtors and the Noteholders.  The Senior Secured Noteholder Claims are secured by the Collateral (as defined in the Indenture) pursuant to valid and perfected liens granted under the Indenture and the Security Documents (as defined in the Indenture).  As reflected above, to the extent that the value of the Collateral is less than the sum of the Senior Noteholder Claims, the Noteholders shall be entitled to an unsecured deficiency claim against the Debtors in amount of such deficiency (a "Deficiency Claim"). |
| **Treatment of DIP Financing Claims** | If the Buyer is the successful bidder, upon the closing of the 363 Sale, the claims arising under or related to any DIP Facility advanced by the Noteholders (the "DIP Financing Claims") shall either be converted into a first priority exit facility (and the liabilities relating to such DIP Financing Claims assumed by the Buyer) and/or treated in a manner agreed to by the Noteholders in connection with entry into the DIP Facility. |
| | If a Third Party Purchaser is the successful bidder, the DIP Financing Claims shall be payable in cash from the consideration provided by the Third Party Purchaser. |
| **Key Contracts and Agreements** | To the extent necessary in connection with the 363 Sale, the Debtors will seek to assume, pursuant to, *inter alia*, section 365 of the Bankruptcy Code, those agreements and contracts that the Noteholders designate to the Debtors as "Key Contracts and Agreements" pursuant to a notice prepared by the Buyer and delivered to the Debtors. |
| **Conditions & Next Steps** | The effectiveness of any Restructuring shall be subject to customary closing conditions, including, without limitation, satisfaction of all regulatory requirements and the negotiation and execution of definitive documentation, acceptable to the Noteholders. |
| | Additional conditions precedent to the consummation and Effective Date of the Restructuring and related transactions shall be acceptable to the Noteholders. |
| **Documentation** | All documentation prepared in connection with the Restructuring, including without limitation, any documents, motions, pleadings, orders or the like prepared or filed in connection with the Chapter 11 Cases shall be in form and substance acceptable to the Noteholders. |
| **Fees & Expenses** | The Debtors shall pay, when due and payable, all accrued and unpaid fees and expenses of the Ad Hoc Group in connection with the Restructuring including, without |

3

| | limitation, the costs and expenses incurred by (i) Andrews Kurth LLP, (ii) Walter A. Jones, and (iii) any other professionals that may be reasonably retained by the Ad Hoc Group in connection with the Restructuring. |
|---|---|
| **No Admission** | Nothing in the Term Sheet is or shall be deemed to be an admission of any kind. |
| **Non Binding** | This Term Sheet constitutes a preliminary statement of the intentions of the parties and does not contain all matters upon which agreement must be reached for the proposed Restructuring to be effectuated. It is understood that this Term Sheet does not constitute an obligation or commitment of any party to enter into any agreement. An obligation or commitment to proceed with the proposed Restructuring shall only arise upon the execution of definitive documentation with respect to such Restructuring. |

4

## Exhibit B

Transfer Agreement

## PROVISION FOR TRANSFER AGREEMENT

The undersigned ("Transferee") (a) hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of May 11, 2015 (the "Agreement"),[1] by and among certain holders (the "Consenting Senior Secured Creditors") of 11.0% Senior Secured Notes due 2019 (the "Senior Secured Notes") issued under the Indenture, dated as of August 27, 2014 (the "Indenture"), by an among American Eagle Energy Corp. ("AEEC"), as issuer, AMZG, Inc. ("AMZG" and, together with AEEC, the "Debtors"), as guarantor, and US Bank, as indenture trustee and collateral agent (in such capacity, the "Trustee"), (b) desires to acquire the Senior Secured Notes described below from one of the Consenting Senior Secured Creditors (the "Transferor") and (c) hereby irrevocably agrees to be bound by the terms and conditions of the Agreement to the same extent Transferor was thereby bound, and shall be deemed a Consenting Senior Secured Creditor for all purposes under the Agreement.

The Transferee hereby specifically and irrevocably agrees (i) to be bound by the terms and conditions of the Agreement, to the same extent applicable to the Transferred Senior Secured Notes, (ii) to be bound by the vote of the Transferor if cast prior to the effectiveness of the transfer of the Senior Secured Notes, and (iii) that each of the Parties shall be an express third-party beneficiary of this Provision for Transfer Agreement and shall have the same recourse against the Transferee under the Agreement as such Party would have had against the Transferor.

Date Executed:  _____, 2015

---

**Print name of Transferee**

**Name:**
**Title:**

**Address:**  _____

_____

**Attention:**  _____
**Telephone:**  _____
**Facsimile:**  _____

| Principal Amount Held | |
|---|---|
| **Claim** | **Amount** |
| Senior Secured Notes | |

---

[1]       Capitalized terms not used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.