UNITED STATES BANKRUPTCY COURT
DISTRICT OF COLORADO
The Honorable Howard R. Tallman

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| American Eagle Energy Corporation | ) | |
| | ) | Case No. 15-15073-HRT |
| In re: | ) | |
| | ) | |
| AMZG, Inc. | ) | Case No. 15-15074-HRT |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**ORDER GRANTING APPLICATION TO RETAIN AND EMPLOY
CANACCORD GENUITY, INC. UNDER 11 U.S.C. §§ 327(a) AND 328(a)
AS INVESTMENT BANKER AND FINANCIAL ADVISOR TO THE
DEBTORS EFFECTIVE *NUNC PRO TUNC* TO THE PETITION DATE**

This matter is before the Court on the Application to Retain and Employ Canaccord Genuity, Inc. Under 11 U.S.C. §§ 327(a) and 328(a) as Investment Banker and Financial Advisor to the Debtors Effective *Nunc Pro Tunc* to the Petition Date ("**Application**") filed by debtors American Eagle Energy Corporation and AMZG, Inc. (collectively, "**Debtors**"). This Court has jurisdiction over the Application pursuant to 28 U.S.C. §§ 157 and 1334 and venue of these Chapter 11 cases and the Application in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Having reviewed the Application, the Fee[1] and Expense Structure set forth in the Engagement Letter, and the attached Declaration regarding the terms and conditions of Debtors' employment of Canaccord, Inc. ("**Canaccord**"), the Court, following due deliberation, finds:

---

[1] Each capitalized term used, but not otherwise defined herein, shall have the meaning ascribed to such term in the Application.

1

1. Adequate notice of the Application has been provided, and no other or further notice need be provided;

2. A hearing has been held, or the Court has determined that a hearing on the Application is unnecessary;

3. Any objections to the Application have been considered, and either resolved, withdrawn, or overruled;

4. Canaccord does not hold or represent any interest adverse to the Debtors' estates;

5. Canaccord is a "disinterested person" as such term is defined under § 101(14) of the Bankruptcy Code;

6. The relief requested in the Application is in the best interests of the Debtors' estates, their creditors and other parties in interest;

7. The legal and factual bases set forth in the Application establish sufficient cause for the relief granted herein;

8. Employment by the Debtors of Canaccord under the terms set forth in the Engagement Agreement attached hereto are reasonable as required by § 328(a), 11 U.S.C. ("**Bankruptcy Code**").

THERFORE, it is HEREBY ORDERED that:

1. The Application is GRANTED to the extent provided herein.

2. The Debtors are authorized, pursuant to §§ 327(a) and 328(a) of the Bankruptcy Code, Federal Rule of Bankruptcy Procedure ("**Bankruptcy Rule**") 2014(a), and Local Bankruptcy Rule 2014-1, to employ and retain Canaccord as their investment banker and financial advisor in connection with these Chapter 11 cases in accordance with the terms and conditions set forth in the Engagement Letter attached hereto ("**Engagement Letter**"), *nunc pro tunc* to the Petition Date.

3. All of Canaccord's compensation as set forth in the Engagement Letter including, but not limited to, the Fee and Expense Schedule set forth therein, is approved pursuant to § 328(a) of the Bankruptcy Code. Canaccord shall be compensated and reimbursed for its

expenses in these Chapter 11 cases pursuant to § 328(a) of the Bankruptcy Code in accordance with the terms of the Engagement Letter.

4. Only the United States Trustee shall retain the right to object to Canaccord's fees and expenses payable pursuant to the Engagement Letter, and the United States Trustee shall be limited to object based only on the reasonableness standard provided for in § 330 of the Bankruptcy Code. In the event the United States Trustee objects, the Court shall review any applications of Canaccord for professional compensation and reimbursement of expenses pursuant to § 330 of the Bankruptcy Code.

5. Canaccord shall file with this Court a final fee application for allowance of its compensation and reimbursement of its expenses with respect to services rendered in these Chapter 11 cases in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the UST Guidelines, and any applicable orders of the Court; provided, however, that Canaccord shall be excused from any orders requiring professionals retained by the Debtors to file requests for interim compensations; provided further, however, that Canaccord shall be excused from keeping time records for services rendered in one-tenth of an hour increments and instead is permitted to present reasonably detailed descriptions of those services provided on behalf of the Debtors and the individuals who provided professional services on behalf of the Debtors in half-hour increments.

6. The Debtors shall indemnify Canaccord under the terms of the Indemnity Agreement but such indemnification shall subject to the Court's review for reasonableness.

7. To the extent the Application or the Engagement Letter is inconsistent with the terms of this Order, the terms of this Order shall govern.

8. The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

9. The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

10. Notwithstanding any provision to the contrary in the Application or the Engagement Letter, this Court shall retain jurisdiction to hear and to determine all matters arising from or related to the implementation of this Order.

Dated: _____                          BY THE COURT:

                                                _____
                                                The Honorable Howard R. Tallman
                                                United States Bankruptcy Judge

# EXHIBIT 1

# CANACCORD Genuity

April 10, 2015
*Confidential*
American Eagle Energy Corporation
2549 West Main Street, Suite 202
Littleton, Colorado 80120
Attention: Bradley M. Colby, President & CEO

Dear Brad:

This letter (the "*Agreement*") confirms the terms and conditions of the agreement by and among American Eagle Energy Corporation (including its controlled affiliates, successors and assigns, the "*Company*") and Canaccord Genuity Inc. ("*CGI*") regarding the retention of CGI as exclusive financial advisor and investment banker to the Company in connection with any New Capital Raise, M&A Transaction and/or Recapitalization Transaction (each as defined below and collectively, a "*Transaction*").

Section 1. Services to Be Rendered.

In connection with the formulation, analysis and implementation of various options for a Transaction or any series or combination of Transactions, CGI will perform the following services as the Company reasonably requests and to the extent feasible:

(a) Review and analyze the Company's business and financial projections;

(b) Evaluate the Company's strategic and financial alternatives;

(c) Assist the Company to negotiate, refinance, restructure, defer or amend the maturity of, principal amount of, or interest rate or yield of, exchange, or otherwise pay off some or all of the Company's existing indebtedness;

(d) Assist the Company in evaluating, structuring, negotiating and implementing potential Transactions;

(e) Assist the Company in preparing descriptive material to be provided to potential parties that might participate in potential Transactions;

(f) Develop, update and review with the Company on an ongoing basis a list of parties that might participate in potential Transactions;

(g) Contact potential parties to potential Transactions;

(h) Provide summaries to the Company of communications with potential parties to potential Transactions;

(i) Assist the Company and its counsel with evaluating potential term sheets, indications of interest, letters of intent and other Transaction agreements;

(j) Evaluate, structure and negotiate the terms and conditions of any proposed Transaction, whether in connection with a confirmed chapter 11 plan (a "Plan") or otherwise;

(k) Together with the Company and its counsel, prepare for and participate in meetings with the Company's existing lenders, creditor groups, official constituencies and other interested parties, as necessary;

American Eagle Energy Corporation
April 10, 2015
Page 2 of 12

    (l) In the event the Company seeks relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in order to pursue a possible Transaction or otherwise, and if requested by the Company and its counsel, participate in hearings before the Bankruptcy Court in which such cases are commenced (the "Bankruptcy Court") and provide relevant testimony with respect to the matters described herein and arising in connection with any Transaction or any proposed plan of reorganization;

    (m) Assist the Company and its counsel in negotiating agreements and definitive contracts for Transactions;

    (n) Assist in the development of financial data (including 13 week cash flow forecasts, budget to actual comparisons and analysis of accounts receivable as well as accounts payable) and presentations to the Company's Board of Directors and representatives, and to various creditors, committees and other parties, such on-site presence at the Company, as the Company shall reasonably request;

    (o) Provide the Company with other advisory services in connection with a Transaction (or combination of Transactions) as the Company and CGI may mutually agree upon; and

    (p) Perform other such services as CGI and the Company shall mutually agree in a separate writing.

    In performing their services pursuant to this Agreement, and notwithstanding anything to the contrary herein, CGI is not assuming any obligation or responsibility for: the Company's decision to pursue (or not to pursue) any business strategy, or to effect (or not to effect) any Transaction; nor designing or implementing operating, organizational, administrative, cash management or liquidity improvements. In addition, notwithstanding anything to the contrary herein, CGI shall not have any obligation or responsibility to provide: accounting advice, reserve engineering, audit, and "crisis management" or business consultant services to the Company; nor any fairness, solvency or other opinions of the firm.

    As used herein, *"New Capital Raise"* shall mean any new financing for any portion of the Company, whether in the form of secured, unsecured, subordinated or senior debt, equity or equity equivalents.

    As used herein, *"Recapitalization Transaction"* shall mean any one or more of the following: (i) any transaction or series of transactions that effects material amendments to or other material changes in any of the Company's outstanding non-trade indebtedness or credit facilities, whether or not currently funded, and other liabilities including any exchange or repurchase of the Company's indebtedness; (ii) any restructuring, reorganization, confirmation of a Plan in the event that the Company files for or consents to relief under chapter 11 of the Bankruptcy Code, exchange offer, consent solicitation, tender offer, refinancing or similar transaction accepted by the Company; or (iii) any transaction similar to any of the foregoing, including a business combination in which the Company's creditors are materially involved in the transaction.

    As used herein, *"M&A Transaction"* shall mean any transaction or series of transactions involving (a) an acquisition, merger, consolidation or other transaction with another party through which assets constituting or accounting for not less than a majority of the business or assets of the Company are, directly or indirectly, combined with or transferred to another party; (b) the acquisition, directly or indirectly, by a buyer or buyers of equity interests or options, or any combination thereof constituting a majority or controlling portion of the stock of the Company or possessing a majority or controlling portion of the voting power of the Company; (c) any other purchase or acquisition, directly or indirectly, by a buyer or buyers of a majority or controlling portion of the securities or other interests of the Company (through tender offer, merger, sale, exchange or otherwise); (d) the formation of a joint venture or partnership with the Company or direct investment in the Company for the purposes of affecting a transfer of a majority or controlling interest in the Company to a third party; or (e) any combination of the foregoing.

Section 2. Information Provided by the Company.

    (a)    The Company understands and agrees that the services to be rendered by CGI pursuant to Section 1

American Eagle Energy Corporation
April 10, 2015
Page 3 of 12

of this Agreement and the advice, whether formal or informal, relating thereto are solely for the benefit and use of the Company. The Company agrees that any reports, recommendations or opinions ("*Advice*"), which are provided to the Company in the context of this engagement, shall not be summarized, excerpted from, disclosed publicly, made available to third parties (other than the Company and its subsidiaries' boards of directors and the Company's advisors and counsel each of whom agrees to be bound by the provisions of this Section 2(a), the "*Advice Disclosure*") or otherwise referred to, in whole or in part, without the prior written consent of CGI; provided, however, that if the Company determines in good faith based upon the advice of outside counsel (and after 48 hours advance notice to CGI) that such Advice Disclosure is necessary in order to not be in violation of any applicable law, regulation, order or other similar requirement of any governmental, regulatory, or supervisory authority, the Company will disclose only that portion of the Advice which is legally required to be disclosed. Any reference to CGI in a press release shall be submitted to CGI for its approval, in accordance with the provisions above, prior to the distribution or dissemination thereof. Notwithstanding anything to the contrary contained herein, CGI acknowledges and agrees that certain information derived from, or provided by CGI in connection with its providing its services hereunder may be disclosed by the Company in various public filings, whether under the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, the NYSE MKT or other self-regulatory organizations or equivalents, the Bankruptcy Court, or related press releases.

(b) The Company will cooperate with CGI and furnish to, or cause to be furnished to, CGI any and all information CGI deems appropriate to enable CGI to render services hereunder (all such information being the "*Information*"). The Company recognizes and confirms that CGI (i) will use and rely on the Information and on information available from generally recognized public sources in performing the services contemplated by this Agreement without having assumed any obligation to verify independently the same; (ii) do not assume responsibility for the accuracy or completeness of the Information and such other information; and (iii) will not act in the official capacity of an appraiser of specific assets of the Company or any other party. The Company confirms that the information to be furnished by the Company, when delivered will be true and correct in all material respects, will be prepared in good faith, and will not contain any material misstatement of fact or omit to state any material fact. The Company will promptly notify CGI if it learns of any material inaccuracy or misstatement in, or material omission from, any Information theretofore delivered to CGI.

(c) The Company acknowledges that in the course of this engagement it may be necessary for CGI and the Company to communicate electronically. The Company further acknowledges that although CGI will use commercially reasonable procedures to check for the most commonly known viruses and to ensure accuracy of such information and communications, the electronic transmission of information cannot be guaranteed to be secure or error-free. Furthermore, such information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete or otherwise be adversely affected or unsafe to use. Accordingly, the Company agrees that, to the extent CGI utilizes such commercially reasonable procedures, CGI shall have no liability to the Company with respect to any error or omission arising from or in connection with (i) the electronic communication of information to the Company or (ii) the Company's reliance on such information.

Section 3. Fees to CGI.

As compensation for the services rendered hereunder, the Company agrees to pay CGI the following fees, payable in cash:

(a) Monthly Retainer Fees. A monthly fee in the amount of $75,000 due, earned and payable in advance in full, on the date hereof and the first business day of every month thereafter (the "*Monthly Retainer Fees*"); provided however, to the extent that the Services provided to Company in Section 1 are reduced, the Company and GCI shall work together to amend the Monthly Retainer Fee as

American Eagle Energy Corporation
April 10, 2015
Page 4 of 12

appropriate for such anticipated changes..

(b) <u>New Capital Fee</u>. A new capital fee (the "*New Capital Fee*"), upon the consummation of a New Capital Transaction, calculated by multiplying the applicable fee percentage by the total gross proceeds raised or committed pursuant to an executed final definitive agreement as set forth below:

| Funds Raised | Fee % |
|---|---|
| Debt | 3.00% |
| Equity or Equity Equivalents | 6.00% |

(c) <u>Recapitalization Fee</u>. A recapitalization fee (the "*Recapitalization Fee*") equal to $1,750,000 upon the consummation of any Recapitalization Transaction.

(d) <u>M&A Transaction Fee</u>. Upon the consummation of a M&A Transaction, a fee (the "*M&A Fee*") equal to 2.0% of Aggregate Consideration (defined below), subject to a $1,500,000 minimum fee.

CGI shall be paid all applicable fees in connection with a single Transaction (e.g., if a Transaction constitutes both a Recapitalization Transaction and a New Capital Raise, then CGI shall be paid both the Recapitalization Fee and the New Capital Fee), but such fees shall be without duplication and calculated ratably with respect to such proceeds raised or Aggregate Consideration, as the case may be, and further provided, GCI shall be entitled to the greater of such applicable minimum fees.

For purposes hereof, the term "Aggregate Consideration" means cumulative value of the M&A Transaction, representing the total value of the Company implied by the sum of (x) the total amount of cash and the fair market value (on the date of payment) of all of the property paid or payable in connection with the M&A Transaction, including amounts paid or payable in respect of, if any, convertible securities, preferred equity securities, warrants, stock appreciation rights, option or similar rights, whether or not vested, plus (y) the principal amount of all indebtedness for borrowed money of the Company as set forth on the most recent balance sheet plus the excess of the projected liability of any pension plan over its assets for the last completed reporting period prior to close, or, in case of the sale of assets, all liabilities assumed by the third party. If the Aggregate Consideration is subject to increase by contingent payments related to future events, the portion of CGI's fee relating thereto shall be calculated by CGI in good faith subject to the Company's reasonable approval, with the full amount paid to CGI upon closing.

For purposes of calculating Aggregate Consideration: (i) in an M&A Transaction involving the sale or transfer, directly or indirectly, of 50% or more of the outstanding common stock or other equity interest in, or assets of, the Company, Aggregate Consideration shall be calculated as if 100% of the outstanding common stock or other equity interest in, or assets of, the Company were sold or transferred for the same amount paid (and otherwise on the same terms) in such M&A Transaction; (ii) the value of any security (as that term is defined in the Securities Act of 1933, as amended) issuable in connection with a M&A Transaction will be determined, if a publicly-traded security, on the basis of the volume-weighted average of the closing prices for the 20 trading days prior to the closing, or, if the security is not freely traded (or having no established public market) on the basis of the fair market value of such security at closing as determined in good faith by CGI and the Company; and (iii) the value of any property transferred in connection with a Transaction will be determined on the basis of the fair market value of such property at closing as determined in good faith by CGI and the Company.

Section 4. Expenses.

Without in any way reducing or affecting the provisions of Exhibit A hereto, the Company shall reimburse CGI, upon its request from time to time, for all reasonable expenses incurred by it in connection with the initiation and performance of the engagement hereunder, and the enforcement of this Agreement, including without limitation the reasonable fees, disbursements and other charges of CGI's legal counsel, that are not duplicative of services to be performed by the Company's legal counsel. Other expenses shall also include, but not be limited to, expenses

American Eagle Energy Corporation
April 10, 2015
Page 5 of 12

incurred in connection with travel (at coach or equivalent fare) and lodging, data processing and communication charges, research and courier services.

Section 5. Indemnity.

The Company agrees to the provisions of Exhibit A hereto which provide for indemnification by the Company of CGI and certain related persons. Such indemnification is an integral part of this Agreement and the terms thereof are incorporated by reference as if fully stated herein. Such indemnification shall survive any termination, expiration or completion of this Agreement or CGI's engagement hereunder.

Section 6. Application for Retention of CGI.

In the event the Company determines to commence chapter 11 proceedings in order to pursue a Transaction or otherwise, the Company shall apply promptly to the Bankruptcy Court pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, Rule 2014 of the Federal Rules of Bankruptcy Procedure, applicable local rules and procedural orders of the Bankruptcy Court and procedural guidelines established by the Office of the United States Trustee, for approval of (a) this Agreement and (b) CGI's retention by the Company under the terms of this Agreement, nunc pro tunc to the date the Company commences its chapter 11 case, and shall use commercially reasonable efforts to obtain Bankruptcy Court authorization thereof. The Company shall use commercially reasonable efforts to obtain such Bankruptcy Court approval and authorization subject only to the subsequent review by the Bankruptcy Court under the standard of review provided in section 328(a) of the Bankruptcy Code, and not subject to the standard of review set forth in section 330 of the Bankruptcy Code. The Company shall supply CGI and its counsel with a draft of such application and any proposed order authorizing CGI's retention sufficiently in advance of the filing of such application and proposed order to enable CGI and its counsel to review and comment thereon. From and after the commencement of such chapter 11 case, CGI shall have no obligation to continue to provide any services under this Agreement unless and until CGI's retention under the terms of this Agreement is approved under section 328(a) of the Bankruptcy Code by a final order of the Bankruptcy Court in form and substance acceptable to CGI. Subject to being so retained, CGI agrees that during the pendency of any such proceedings, it shall continue its obligations under this Agreement pursuant to the provisions of this Agreement so long as the Company is using commercially reasonable efforts to seek CGI's retention under section 328(a) of the Bankruptcy Code.

CGI acknowledges that in the event that the Bankruptcy Court approves its retention by the Company pursuant to the application process described in this Section, payment of CGI's fees and expenses shall be subject to (i) the jurisdiction and approval of the Bankruptcy Court under section 328(a) of the Bankruptcy Code and any order approving CGI's retention, (ii) any applicable fee and expense guidelines and/or orders and (iii) any requirements governing interim and final fee applications; provided, however, that CGI shall not be required to maintain time records. In the event that CGI's engagement hereunder is approved by the Bankruptcy Court, the Company shall pay all fees and expenses of CGI hereunder as promptly as practicable in accordance with the terms hereof and the orders governing interim and final fee applications, and after obtaining all necessary further approvals from the Bankruptcy Court, if any.

With respect to CGI's retention under section 328(a) of the Bankruptcy Code, the Company acknowledges and agrees that CGI's industry and restructuring expertise as well as its capital markets knowledge, financing skills and mergers and acquisitions capabilities, some or all of which may be required by the Company during the term of CGI's engagement hereunder, were important factors in determining the amount of the various fees set forth herein, and that the ultimate benefit to the Company of CGI's services hereunder could not be measured merely by reference to the number of hours to be expended by CGI's professionals in the performance of such services. The Company also acknowledges and agrees that the various fees set forth herein have been agreed upon by the parties in anticipation that a substantial commitment of professional time and effort will be required of CGI and its professionals hereunder over the life of the engagement, and in light of the fact that such commitment may foreclose other opportunities for CGI and that the actual time and commitment required of CGI and its professionals to perform its services hereunder may vary substantially from week to week or month to month, creating "peak load" issues for the firm. In addition, the Company believes that given the numerous issues which CGI may be required to address in the performance of its services hereunder, CGI's commitment to the variable level of time and effort

American Eagle Energy Corporation
April 10, 2015
Page 6 of 12

necessary to address all such issues as they arise, and the market prices for CGI's services for engagements of this nature in an out-of-court context, the Company agrees that the fee arrangements hereunder are reasonable under the standards set forth in section 328(a) of the Bankruptcy Code.

Section 7. Term.

The term of CGI's engagement shall extend until the final Transaction(s) contemplated by this Agreement. The respective engagement of CGI pursuant to this Agreement may be terminated by CGI at any time, with or without "cause" (as defined below), and by the Company (a) for "*cause*" (defined as bad faith, fraud, gross negligence or willful misconduct by the other party) at any time or (b) without "cause" after two (2) months from the date of this Agreement, after which the terminating party must provide five (5) days advance notice in writing. If terminated, CGI shall be entitled to payment of any fees which are due and owing to CGI upon the effective date of termination; in addition, CGI will be entitled to reimbursement of any and all reasonable expenses described in Section 4 above. Termination of CGI's engagement hereunder shall not affect or impair the Company's continuing obligation to indemnify CGI and certain related persons as provided in Exhibit A. Without limiting any of the foregoing (except in the event of termination of the engagement of either of CGI pursuant to this Agreement by the Company for "cause" as set forth above and as finally determined by a court of law), the fees and obligations described in Section 3 above shall also be payable by the Company and enforceable against the Company in accordance with their respective terms in the event that the respective engagement of CGI pursuant to this Agreement is terminated by the Company and a Transaction described in Section 1 above is consummated prior to the expiration of nine (9) months after such termination, or an agreement with respect thereto is executed at any time prior to nine (9) months after such termination (which agreement subsequently results in the consummation of a Transaction).

Section 8. Miscellaneous.

(a) *Survival, Successors & Assigns*. Sections 2 through 7 hereof, inclusive, including the provisions set forth in Exhibit A hereto, shall survive the termination or expiration of this Agreement. The benefits of this Agreement and the indemnification and other obligations of the Company to CGI and certain related persons contained in Exhibit A hereto shall inure to the respective successors and assigns of the parties hereto and thereto and of the indemnified parties, and the obligations and liabilities assumed in this Agreement and Exhibit A by the parties hereto and thereto shall be binding upon their respective successors and assigns.

(b) *Benefit of Agreement; No Reliance by Third Parties*. CGI has been engaged only by the Company, and this engagement is not intended to confer rights upon any stockholder, partner or other owner of the Company or any other person not a party hereto. Unless otherwise expressly agreed, no one other than the Company is authorized to rely on any statements, advice, opinions or conduct by CGI. Any opinions or advice rendered by CGI to the Board or the Company's management in the course of this engagement are for the purpose of assisting the Board or the Company's management, as the case may be, in evaluating the Transactions contemplated hereby and such opinions or advice do not constitute a recommendation to any stockholder of the Company concerning action that such stockholder might or should take in connection with a Transaction. CGI does not provide accounting advice, tax advice or legal advice,. The Company confirms that it will rely on its own independent counsel and independent accountants for such advice.

(c) *Nature of Relationship*. The relationship of CGI to the Company hereunder shall be that of an independent contractor and CGI shall have no authority to bind, represent or otherwise act as agent, executor, administrator, trustee, lawyer or guardian for the Company, nor shall CGI have the authority to manage money or property of the Company. The price of the instruments and any Transaction will be established by the Company following discussions and arms-length negotiations with the investors or other participants and the Company is capable of evaluating and understanding the terms, risks and conditions of the transactions contemplated by this Agreement. The parties hereto acknowledge and agree that CGI's role in the services contemplated hereby is that of an independent contractor, and by providing the services contemplated hereunder, CGI will not act, nor

American Eagle Energy Corporation
April 10, 2015
Page 7 of 12

will either be deemed to have acted, in any managerial or fiduciary capacity whatsoever with respect to the Company or any third party including security holders, creditors or employees of the Company. The Company waives, to the fullest extent permitted by law, any claims the Company and its affiliates may have against CGI for breach of fiduciary duty or alleged breach of fiduciary duty and agrees that CGI shall have no liability (whether direct or indirect) to the Company or any of its affiliates in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on behalf of or in right of the Company, including stockholders, employees or creditors of the Company.

(d) *CGI and Affiliated Entities*. CGI has indirect affiliate relationships with numerous investment banking institutions located worldwide (the "***Affiliated Entities***"). None of the Affiliated Entities is being retained by CGI hereunder nor, to CGI's knowledge, will any professionals or employees of the Affiliated Entities provide services to the Company in connection with the matters contemplated hereby. CGI and Affiliated Entities are involved in a wide range of investment banking and other activities which may involve interests that differ from those of the Company and the Advisor/Agents have no obligation to disclose such interests and transactions to the Company by virtue of any advisory or agency relationship. CGI can make no representation as to the "disinterestedness" of the professionals or employees of the Affiliated Entities. Information that is held by the Affiliated Entities will not for any purpose be taken into account in determining CGI's responsibilities to the Company hereunder. None of CGI and Affiliated Entities will have any duty to disclose to the Company or any other party, or utilize for the Company's benefit, any non-public information acquired in the course of providing services to any other person engaging in any transaction or otherwise carrying on its business.

(e) *Required Information*. For your information, CGI may screen the Company against various databases to verify its identity.

(f) *Public Announcements*. The Company acknowledges that CGI may, at its option and expense, after announcement of a Transaction, place announcements and advertisements or otherwise publicize the Transaction in such financial and other newspapers and journals as each may choose, stating that CGI acted as financial advisor to the Company in connection with such Transaction. The Company further consents to CGI's public use or display of the Company's logo, symbol or trademark as part of CGI's general marketing or promotional activities, provided such use or display is in the nature of a public record or tombstone announcement in relation to a Transaction.

(g) CHOICE OF LAW; JURISDICTION. THIS AGREEMENT HAS BEEN NEGOTIATED, EXECUTED AND DELIVERED AT AND SHALL BE DEEMED TO HAVE BEEN MADE IN NEW YORK, NEW YORK. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO SUCH STATE'S PRINCIPLES OF CONFLICTS OF LAWS. REGARDLESS OF ANY PRESENT OR FUTURE DOMICILE OR PRINCIPAL PLACE OF BUSINESS OF THE PARTIES HERETO, EACH SUCH PARTY HEREBY IRREVOCABLY CONSENTS AND AGREES THAT ANY AND ALL CLAIMS OR DISPUTES BETWEEN THE PARTIES HERETO PERTAINING TO THIS AGREEMENT OR TO ANY MATTER ARISING OUT OF OR RELATED TO THIS AGREEMENT SHALL BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE OF NEW YORK. BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT. EACH PARTY HERETO HEREBY WAIVES ANY OBJECTION WHICH IT MAY HAVE BASED ON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT. THE COMPANY CONSENTS TO THE SERVICE OF PROCESS IN ACCORDANCE WITH NEW YORK LAW, AND AGREES THAT THE CORPORATE ATTORNEY OF THE COMPANY SHALL BE AUTHORIZED TO ACCEPT SERVICE ON ITS

American Eagle Energy Corporation
April 10, 2015
Page 8 of 12

        BEHALF.

(h) *Waiver of Jury Trial.* Each of the parties hereto hereby knowingly, voluntarily and irrevocably waives any right it may have to a trial by jury in respect of any claim upon, arising out of or in connection with this Agreement or any New Capital Raise, Recapitalization Transaction or other related transaction. Each of the parties hereto hereby certifies that no representative or agent of any other party hereto has represented expressly or otherwise that such party would not seek to enforce the provisions of this waiver. Each of the parties hereto hereby acknowledges that it has been induced to enter into this Agreement by and in reliance upon, among other things, the provisions of this paragraph.

(i) *Entire Agreement.* This Agreement embodies the entire agreement and understanding of the parties hereto and supersedes any and all prior agreements, arrangements and understandings relating to the matters provided for herein. No alteration, waiver, amendment, change or supplement hereto shall be binding or effective unless the same is set forth in writing signed by a duly authorized representative of each of the parties hereto. This letter agreement supersedes and replaces all previous agreements or understandings regarding the same, whether written or oral, except as to prior indemnity agreements which shall remain in full force and effect with respect to services provided during the course of any such agreements or understandings..

(j) *Authority.* Each party hereto represents and warrants that it has all requisite power and authority to enter into this Agreement and Exhibit A and the transactions contemplated hereby. Each party hereto further represents that this Agreement has been duly and validly authorized by all necessary corporate action and has been duly executed and delivered by each of the parties hereto and constitutes the legal, valid and binding agreement thereof, enforceable in accordance with its terms. CGI will assume that any instructions, notices or requests have been properly authorized by the Company if they are given or purported to be given by, or is reasonably believed by CGI to be, a director, officer, employee or authorized agent.

(k) *Counterparts.* This Agreement may be executed in as many counterparts as may be deemed necessary and convenient, and by the different parties hereto on separate counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by telecopier or PDF facsimile shall be effective as delivery of a manually executed counterpart to this Agreement.

(l) *Notices.* Any notice given pursuant to, or relating to, this Agreement shall be in writing and shall be mailed or delivered by courier (a) if to the Company, at the address set forth above, Attn: Corporate Attorney and (b) if to CGI, to Canaccord Genuity Inc., 350 Madison Avenue, New York, NY 10017; Attn: General Counsel.

    If the foregoing correctly sets forth the understanding and agreement between CGI and the Company, please so indicate by signing the enclosed copy of this letter along with the $75,000 Monthly Retainer Fee via wire transfer, whereupon it shall become a binding agreement among the parties hereto as of the date first above written.

                        Very truly yours,

                        CANACCORD GENUITY INC.

                        By: _____
                            Geoffrey Richards

606188358.1

American Eagle Energy Corporation
April 10, 2015
Page 9 of 12

Managing Director

Accepted and Agreed:

**AMERICAN EAGLE ENERGY CORPORATION**

By: _[signature]_
Name: BRAD COLBY
Title: President

606188358.1

American Eagle Energy Corporation
April 10, 2015
Page 10 of 12

## Exhibit A

The Company shall indemnify and hold harmless each of CGI and its affiliates, counsel and other professional advisors, and the respective directors, officers, controlling persons, agents and employees of each of the foregoing (CGI, SGS and each of such other persons, an "*Indemnified Party*" and, collectively, the "*Indemnified Parties*"), from and against any losses, claims or proceedings, including, without limitation, stockholder actions, damages, judgments, assessments, investigation costs, settlement costs, fines, penalties, arbitration awards and any other liabilities, costs, fees and expenses (collectively, "*Losses*") (a) directly or indirectly related to or arising out of (i) oral or written information provided by the Company, the Company's employees or other agents, which either the Company or an Indemnified Party provides to any person or entity or (ii) any other action or failure to act by the Company, the Company's employees or other agents or any Indemnified Party at the Company's request or with the Company's consent, in each case in connection with, arising out of, based upon, or in any way related to this Agreement, the retention of and services provided by CGI under this Agreement, or any Transaction or other transaction; or (b) otherwise directly or indirectly in connection with, arising out of, based upon, or in any way related to the engagement of CGI under this Agreement or any transaction or conduct in connection therewith, provided that the Company shall not be required to indemnify any Indemnified Party for such Losses if and only to the extent that it is finally judicially determined by a court of competent jurisdiction that such Losses arose solely because of the gross negligence, willful misconduct or fraud of such Indemnified Party. If multiple claims are brought against an Indemnified Party, with respect to at least one of which indemnification is permitted under applicable law and provided for under this Agreement, the Company agrees that any judgment or award against such Indemnified Party shall be conclusively deemed to be based on claims as to which indemnification is permitted and provided for, except to the extent the judgment or award expressly states that it, or any portion thereof, is based on a claim as to which indemnification is not available.

The Company shall further reimburse any Indemnified Party promptly for any reasonable legal or other fees, disbursements or expenses as they are incurred (a) in investigating, preparing, pursuing or settling any action or other proceeding (whether formal or informal) or threat thereof, whether or not in connection with pending or threatened litigation or arbitration (each, an "*Action*") and (b) in connection with enforcing such Indemnified Party's rights under this Agreement; provided, however, that in the event and only to the extent that it is finally judicially determined by a court of competent jurisdiction that the Losses of such Indemnified Party arose solely because of the gross negligence, willful misconduct or fraud of such Indemnified Party, such Indemnified Party will promptly remit to the Company any amounts reimbursed under this paragraph.

Upon receipt by an Indemnified Party of notice of any Action, such Indemnified Party shall notify the Company in writing of such Action, but the failure to so notify shall not relieve the Company from any liability hereunder (a) if the Company had actual notice of such Action or (b) unless and only to the extent that such failure results in the forfeiture by the Company of rights and defenses. The Company shall, if requested by f CGI, assume the defense of any such Action including the employment of counsel reasonably satisfactory to CGI and will not, without the prior written consent of CGI, settle, compromise, consent or otherwise resolve or seek to terminate any pending or threatened Action (whether or not any Indemnified Party is a party thereto) unless such settlement, compromise, consent or termination (i) contains an express, unconditional release of each Indemnified Party from all liability relating to such Action and the engagement of CGI under this Agreement and (ii) does not include a statement as to, or an admission of fault, culpability or a failure to act by or on behalf of any Indemnified Party. Any Indemnified Party shall be entitled to retain separate counsel of its choice and participate in the defense of any Action in connection with any of the matters to which this Agreement relates, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party unless (x) the Company has failed promptly to assume the defense and employ counsel or (y) the named parties to any such Action (including any impleaded parties) include such Indemnified Party and the Company, and such Indemnified Party shall have been advised by counsel that there may be one or more legal defenses available to it which are materially different from those available to the Company, in which case the Company shall be responsible for the fees and expenses of counsel to such Indemnified Party in accordance with this Annex A; provided that the Company shall not in such event be responsible under this Agreement for the fees and expenses of more than one firm of separate counsel (in addition to local counsel) in connection with any such Action in the same jurisdiction.

606188358.1

American Eagle Energy Corporation
April 10, 2015
Page 11 of 12

    The Company agrees that if any right of any Indemnified Party set forth in the preceding paragraphs is finally judicially determined to be unavailable (except by reason of the gross negligence, willful misconduct or fraud of such Indemnified Party), or is insufficient to hold such Indemnified Party harmless against such Losses as contemplated herein, then the Company shall contribute to such Losses (a) in such proportion as is appropriate to reflect the relative benefits received by the Company and its creditors and stockholders, on the one hand, and such Indemnified Party, on the other hand, in connection with the transactions contemplated hereby, and (b) if (and only if) the allocation provided in clause (a) is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (a) but also the relative fault of the Company and such Indemnified Party; provided, that, in no event shall the aggregate contribution of all such Indemnified Parties exceed the amount of fees received by CGI under this Agreement. Benefits received by CGI shall be deemed to be equal to the compensation paid by the Company to CGI in connection with this Agreement. Relative fault shall be determined by reference to, among other things, whether any alleged untrue statement or omission or any other alleged conduct relates to information provided by the Company or other conduct by the Company (or the Company's employees or other agents) on the one hand or by CGI on the other hand.

    The Company also agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company for or in connection with advice or services rendered or to be rendered by any Indemnified Party pursuant to this Agreement, the transactions contemplated hereby or any Indemnified Party's actions or inactions in connection with any such advice, services or transactions except for and only to the extent that such Losses of the Company are finally judicially determined by a court of competent jurisdiction to have arisen solely because of the gross negligence, willful misconduct or fraud of such Indemnified Party in connection with any such advice, actions, inactions or services. The Company shall use commercially reasonable efforts to require, as a condition of the Company releasing from liability any creditor or other party-in-interest in the case, that such creditor or other party-in-interest release all Indemnified Parties from all claims or other liabilities directly or indirectly in connection with, arising out of, based upon, or in any way related to the engagement of CGI under this Agreement or any transaction or conduct in connection therewith, provided that the Company shall not be required to use commercially reasonable to obtain such release with respect to the gross negligence, willful misconduct or fraud of any Indemnified Party.

    In the event that an Indemnified Party is requested or required to appear as a witness in any action brought by or on behalf of or against the Company relating to the engagement in which such Indemnified Party is not named as a defendant, the Company agrees to promptly reimburse such Indemnified Party on a monthly basis for all expenses reasonably incurred by it in connection with such Indemnified Party's appearing and preparing to appear as such a witness, including, without limitation, the reasonable fees and disbursements of its legal counsel.

    The rights of the Indemnified Parties hereunder shall be in addition to any other rights that any Indemnified Party may have at common law, by statute or otherwise. Except as otherwise expressly provided for in this Agreement, if any term, provision, covenant or restriction contained in this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions contained in this Agreement shall all remain in full force and effect and shall in no way be affected, impaired or invalidated. The reimbursement, indemnity and contribution obligations of the Company set forth herein shall apply to any modification of this Agreement and shall remain in full force and effect regardless of any termination of, or the completion of any Indemnified Party's services under or in connection with, this Agreement.

    Neither termination of the Agreement, nor termination of CGI's engagement, nor the filing of a petition under the United States Bankruptcy Code, shall affect these indemnification provisions, which shall hereafter remain operative and in full force and effect.

American Eagle Energy Corporation
April 10, 2015
Page 12 of 12



606188358.1