# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| American Eagle Energy Corporation | ) | |
| Tax ID / EIN: 20-0237026 | ) | Case No.  15-15073-HRT |
| | ) | |
| AMZG, Inc. | ) | |
| Tax ID / EIN: 20-8642477 | ) | Case No. 15-15074-HRT |
| | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

## MOTION OF THE DEBTORS FOR ENTRY OF ORDERS: (I) ESTABLISHING BIDDING AND SALE PROCEDURES; (II) APPROVING THE SALE OF ASSETS; AND (III) GRANTING RELATED RELIEF

**AMERICAN EAGLE ENERGY CORPORATION** ("American Eagle"), as the debtor and debtor-in-possession in Case No. 15-15073-HRT, together with its affiliate **AMZG, Inc.** ("AMZG"), who is also a debtor and debtor-in-possession in Case No. 15-15074-HRT (collectively, the "Debtors"), pursuant to 11 U.S.C. §§ 363(b), (f), and (m) and 365 of title 11 of the United States Code (the "Bankruptcy Code") and rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), file this motion (the "Motion") seeking:

    A. an order (the "Proposed Bidding Procedures Order") attached hereto as **Exhibit A**: (i) scheduling the auction  for sale  of substantially all their assets (the "Sale"); (ii) approving procedures attached hereto as **Schedule 1** to **Exhibit A** (the "Proposed Bidding Procedures") for the submission of qualifying bids and conducting the auction; and (iii) approving procedures for the assumption and assignment of contracts and leases attached hereto as **Schedule 2** to **Exhibit A** (the "Notice of Assumption and Assignment"); and

    B. an order (the "Proposed Sale Order") attached hereto as **Exhibit B**: (i) approving the Sale free and clear of all liens, claims, interests, and encumbrances to any

successful bidders at the auction (the "Purchaser") and the form of the Asset Purchase Agreement, attached hereto as **Schedule 1** to **Exhibit B** (the "Stalking Horse APA");[1] and (ii) granting the Purchaser the protections afforded to a good faith purchaser pursuant to section 363(m) of the Bankruptcy Code (as defined below).

In support of this Motion, the Debtors respectfully represent as follows:

## Preliminary Statement

1.      Driven by current market conditions, the Debtors' liquidity constraints have prevented them from increasing their oil and gas production and proved production reserves.  As such, continuation of the Debtors' business without new capital would diminish the value of their assets and business.  Accordingly, a sale of substantially all of the Debtors' assets to the Ad Hoc Group (as defined below) or such higher or better bidder, which would accomplish a recapitalization of the Debtors, is in the best interests of their estates and creditors.

2.      Prior to the Petition Date, the Debtors contacted 54 parties in connection with a proposed financing, many of which are potential purchasers. Since the Petition Date, the Debtors and their advisors have contacted an additional 79 potential purchasers in connection with a comprehensive marketing process. The Debtors have signed 20 confidentiality agreements and provided confidential information to these parties. The Debtors will continue to work with the advisors for the Office Committee of Unsecured Creditors (the "Creditors' Committee") and the Ad Hoc Group to contact additional parties until the bidding deadline to ensure that the assets are fully exposed to the market in order to receive the highest and best bid for the Debtors' assets.

3.      On May 18, 2015, the Debtors filed their Motion Seeking Entry of An Order: (A)

---

[1] For efficiency, the Debtors have made the  Stalking Horse APA available electronically at **www.bmcgroup.com/americaneagle** or by contacting the proposed claims agent for the Debtors at **(888) 909-0100.**

Scheduling the Auction for Sale of Substantially All of their Assets, and (B) Approving the Procedures for Submission of Qualifying Bids and the Auction (ECF No. 40) (the "Original Bidding Procedures Motion").   After extensive hearings and witness testimony, the Court determined the Debtors proposed bidding procedures were reasonable with the exception of the changes to the bidding procedures reflected herein, including, the extension of the bidding deadline, the auction date and a procedure for assumption and assignment of executory contracts. The Creditors' Committee's objection to the actual bidding procedures set forth in Original Bidding Procedures Motion was limited to one item: the length of the marketing period for the sale of the Debtors' assets.

4.   The Debtors are negotiating a Stalking Horse Asset Purchase Agreement (the "Stalking Horse APA") with AMZG Acquisition LLC (the "Stalking Horse Purchaser"), an entity formed by the Ad Hoc Group (the "Ad Hoc Group") of the 11% Senior Secured Notes (the "Notes" and the holders of the Notes are the "Noteholders") due 2019 issued by American Eagle Energy Corp. and guaranteed by AMZG, Inc. The form-of Stalking Horse APA provides for the acquisition of substantially all of the assets of the Debtors in exchange for a credit bid of $70 million. The Stalking Horse APA also provides for a wind down budget to be negotiated between the debtor and the Ad Hoc Group plus $200,000 to be retained by the Debtors' to fund a post-sale wind-down of the Debtors' estates.

### Procedural Background

5.   On May 8, 2015 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code"). No trustee has been appointed. The Debtors continue to operate their oil exploration and production business and properties as debtors-in-possession pursuant to §§ 1107 and 1108 of the

Bankruptcy Code.

6.      On May 13, 2015, The Court entered an order authorizing the joint administration of the Debtors' Chapter 11 cases and permission to use the consolidated case caption.

### Jurisdiction

7.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157(b) and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. §157(b), and the Court may enter a final order consistent with Article III of the United States Constitution.

8.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The statutory bases for the relief requested herein are Bankruptcy Code sections 105(a), 363(b), 363(f), 363(k), 363(m), 365(a), 365(b), 365(e), and 365(f) and Bankruptcy Rules 2002(a)(2), 2002(c)(1), 6004(a), 6004(c), 6004(f), and 6004(h).

### The Debtors and their Affiliated/Related Entities

10.      American Eagle was incorporated in the state of Nevada in March 2003 under the name Golden Hope Resources Corp., but later changed its name in July 2005 to Eternal Energy Corp.  In December 2011 the company changed its name to American Eagle Energy Corporation in connection with its acquisition of, and merger with, American Eagle Energy, Inc.

11.      Upon completion of the 2011 acquisition, American Eagle Energy, Inc. became AMZG, Inc., a wholly owned subsidiary of American Eagle.  As of the Petition Date, AMZG has no substantial asset and no operations. AMZG's only debt relates to guarantee claims on American Eagle obligations.

12.      The Debtors engage in the acquisition, exploration and development of oil and gas properties, and are primarily focused on extracting proved oil reserves from those properties. During the past five years, the Debtors have engaged in exploration and production activities in

the northern United States as well as southeast Saskatchewan, Canada. In July 2014, the Debtors sold all of their net revenue and working interests in Canada to focus on exploration and production opportunities in North Dakota and Montana.

13. American Eagle's current exploration and production activities are focused in the northwest portion of Divide County, North Dakota commonly referred to as the Spyglass Area were American Eagle produces oil and natural gas reserves from the Three Forks and Middle Bakken formations.

## Reasons for Filing Chapter 11

14. As of the Petition Date, the Debtors were indebted and liable to the Noteholders, without objection, defense, counterclaim, or offset of any kind, under the prepetition Notes documents, in the aggregate amount of not less: (i) $175,000,000 in aggregate principal amount; (ii) all accrued and unpaid interest; and (iii) additional amounts owed under the Prepetition Notes Documents including, but not limited to, defaulted interest, interest on defaulted interest, fees, expenses, costs, charges, premiums, make-whole, prepayment, yield maintenance or similar amounts payable pursuant to the Indenture or the Prepetition Notes Documents, and all other amounts due and owing under the Prepetition Notes Documents (collectively, the "Prepetition Notes Obligations").

15. As an exploration and development company, the Debtors' assets, revenue, and general financial condition are directly correlated to price of oil and natural gas. The sharp decrease in oil and natural gas prices by in excess of fifty percent (50%) from the time the Prepetition Notes Obligations were issued and remaining depressed until now has made it difficult to obtain capital for further development of American Eagle's leasehold interests.

16. Unable to raise additional capital in this environment, the Debtors were faced with

declining assets and revenue while costs remained relatively constant.

17.    In February of 2015, liquidity concerns caused the Debtors to commence and engage in discussions with the "Ad Hoc Group" regarding the approaching interest payment due under the Prepetition Notes Documents.  Those discussions yielded a forbearance agreement executed by the Debtors and the Ad Hoc Group, which provided for, among other things, a $4,000,000 partial interest payment to the Trustee for the benefit of the Noteholders and forbearance to allow the Debtors and Ad Hoc Group to discuss restructuring and sale alternatives.

18.    As crude oil prices remained low, the Debtors and Ad Hoc Group continued discussions on maximizing value to the Noteholders and all stakeholders in the Debtors' business and ultimately determined that relief under Chapter 11 of the Bankruptcy Code would allow the Debtors the best opportunity to restructure or sell its assets and maximize value.

## Marketing Process and Negotiation with the Ad Hoc Group

19.    As a result of the Debtor' liquidity concerns, the Debtors have retained experienced investment banking, financial, and restructuring advisors to facilitate their review, analysis, and development of potential alternatives.  The Debtors have considered all potential transaction structures before determining that a sale of substantially all of their assets was in the best interest of the estate and its creditors.

20.    The Debtors have entered into extensive, arm's-length discussions with the Ad Hoc Group regarding the Ad Hoc Group's potential acquisition of the Debtors' assets by credit bidding a portion of the Notes, subject to higher or better bids.  These discussions culminated in the Stalking Horse APA, pursuant to which the Ad Hoc Group proposes to acquire the Debtors' assets for $70 million in the form of a credit bid, as well as the assumption by the Ad Hoc Group

at the closing of the Assumed Liabilities. The Stalking Horse APA will also leave sufficient cash with the Debtors to fund a wind down of the Debtors' estates after the sale closes.

21.     Nonetheless, with the Ad Hoc Group acting as the stalking horse, the Debtors, in consultation with the Ad Hoc Group, have determined that a full and open marketing of the Debtors' assets at this time is in the best interests of the estate and its creditors. The Debtors and their advisors commenced an exhaustive marketing process, for [the past month] and began contacting potentially interest parties as potential acquirers across the United States and in Canada. The Debtors will continue to notify additional parties as they identify them or as identified by the Creditors' Committee or Noteholders.

## PROPOSED BIDDING PROCEDURES

### A.     *Bid Requirements*

22.     Any entity wishing to participate in the bidding process (each a "Potential Bidder") may submit a bid for either: (i) all or substantially all of the Debtors' assets; or (ii) only certain of the Debtors' assets (a "Piecemeal Bid").

23.     To participate in the Sale process, each Potential Bidder must on or before September 2, 2015  at 5:00 p.m. prevailing Mountain Time (the "Bid Deadline"):

i.      Submit to the Debtors a Modified Agreement (defined below) that includes a purchase price for the Purchased Assets (as defined in the Stalking Horse APA) in an amount no less than the requisite overbid amount to be determined by the Debtors after consultation with the Ad Hoc Group and such amount filed with the Court no later than June 5, 2015 (the "Requisite Overbid Amount") in cash or in cash equivalents, which is the sum of the stalking Horse APA purchase price which is $70,000,000, plus the assumed liabilities as identified in the Stalking Horse APA (unless the same liabilities are assumed in the Modified Agreement), plus

$250,000.00 in cash or in cash equivalents, and is net of any adjustments in the purchase price resulting from any costs arising in connection with Title Defects or violations, or conditions or circumstances giving rise to liability, under any Environmental Laws, unless otherwise consented to by the Debtors and the Ad Hoc Group; provided that, if such competing bid is a Piecemeal Bid, this requirement will be satisfied if the sum of all Piecemeal Bids received are Qualified Bids and combined exceed the Requisite Overbid Amount.

  ii. Submit to the Debtors an executed confidentiality agreement in form and substance acceptable to the Debtors.

  iii. Fully disclose the identity of each entity that will be bidding for the assets or otherwise participating in connection with such bid and the complete terms of any such participation.

  iv. Indicate the form of consideration of the bid and the estimated market value of any non-cash consideration.

  v. If the Potential Bidder is submitting a Piecemeal Bid, the Potential Bidder must identify which assets are included in the bid.

  vi. Submit to the Debtors an irrevocable offer in the form of an executed asset purchase agreement (the "Modified Agreement"): (A) without financing, regulatory or due diligence contingencies, including with respect to Title Defects or Environmental Laws, unless otherwise consented to by the Debtors, after consultation with the Ad Hoc Group, and without any or other contingencies; (B) at a price with a readably ascertainable market value in an amount equal to or greater to the Requisite Overbid Amount; and (C) on terms substantially similar to those terms contained in the Stalking Horse APA, and in no event, on terms less favorable to the Debtors than those contained in the Stalking Horse APA.  The Qualified Bidder

shall also submit a marked (redlined) Modified Agreement reflecting the changes the Qualified Bidder proposes to make to the Stalking Horse APA.

vii.     Make a good faith cash deposit in the form of a cashier's check or wire transfer into an interest-bearing escrow account (the "Escrow Account") maintained by the Debtors' counsel in an amount not less than 10% of the competing bid amount, which deposit shall immediately become non-refundable and credited toward the purchase price if and when the Qualified Bidder making such deposit is declared to be the winning bidder (the "Winning Bid" and "Winning Bidder") at the Sale Hearing.  In the event a Qualified Bidder is not the Winning Bidder, such Qualified Bidder's deposit shall be refunded as set forth herein.

viii.    Provide a list of the Debtors' executory contracts and unexpired leases with respect to which the Potential Bidder seeks assumption by and assignment from the Debtors.

ix.      Provide reasonably satisfactory written evidence, in the discretion of the Debtors, after consultation with the Ad Hoc Group, the Trustee, and the Creditors' Committee of its financial ability to: (a) fully and timely perform and close the Sale pursuant to the Modified Agreement if it is declared to be the Winning Bidder; and (b) provide adequate assurance of future performance of all executory contracts and unexpired leases to be assigned to it.

x.       Disclose any connections or agreements with the Debtors, the Ad Hoc Group, the Trustee, or the Creditors' Committee or any other known potential, prospective bidder or Qualified Bidder, and/or any officer, director or equity security holder of the Debtors.

xi.      Confirm in writing its agreement to accept and abide by the terms, conditions and procedures set forth herein and provide evidence of due authorization to enter into the Sale pursuant to the Modified Agreement.  In the event that the Potential Bidder is an entity specially formed for the purpose of effectuating the contemplated transaction, then the Bidder must furnish

written evidence acceptable to the Debtors and the Ad Hoc Group of the approval of the contemplated transaction by the equity holders or members of such Potential Bidder.

xii. Not request or seek entitlement to any break-up fee, expense reimbursement, termination fee or similar type of payment or bid protection, except as otherwise provided herein.

24. The Debtors shall provide the counsel to the Ad Hoc Group, the Trustee and the Creditors' Committee with copies of all bids and Preferential Purchase Right Notices (as defined below) promptly upon receipt. The Debtors will promptly advise each Potential Bidder in writing whether or not the Potential Bidder is a Qualified Bidder. If a bid submitted on or prior to the Bid Deadline fails to meet all the requirements of a Qualified Bid, the Debtors, after consultation with the Ad Hoc Group, are entitled to work with the Potential Bidder in an effort to cure any defects in the bid and to cause such bid to become a Qualified Bid prior to the commencement of the Auction (as defined below).

### B. Bid Deadline

25. The Bid Deadline for submitting bids on the Purchased Assets by a Potential Bidder shall be September 2, 2015 at 5:00 p.m. (prevailing Mountain Time).

26. A Potential Bidder that desires to make a bid must deliver written copies of its bid, by mail, facsimile, or email, prior to the Bid Deadline to: (i) counsel to the Debtors, Baker & Hostetler, LLP, 45 Rockefeller Plaza, New York, New York 10111, Attn: Jorian L. Rose (jrose@bakerlaw.com) and 200 SunTrust Center, Suite 2300, 200 South Orange Avenue, Orlando, Florida 32801, Attn: Elizabeth A. Green (egreen@bakerlaw.com); (ii) counsel to the Ad Hoc Group and Ad Hoc Group, Andrews Kurth LLP, 450 Lexington Avenue, New York, New York 10017, Attn: Paul N. Silverstein (paulsilverstein@andrewskurth.com) and 600 Travis, Suite 4200, Houston, Texas 77002, Attn: Timothy A. ("Tad") Davidson II

(taddavidson@andrewskurth.com); (iii) counsel to the Creditors' Committee, Pachulski, Stang, Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, California 90067, Attn: Jeffrey N. Pomerantz, (jpomerantz@pszjlaw.com); (iv) counsel to the Trustee, Kelley Drye & Warren LLP, 101 Park Avenue, New York, NY 10178, Attn: Benjamin D. Feder (bfeder@kelleydrye.com); (v) Canaccord Genuity, Inc., 350 Madison Avenue, New York, New York 10017, Attn: Geoffrey Richards (GRichards@canaccordgenuity.com); and (vi) the Office of the United States Trustee, Byron G. Rogers Federal Building 1961 Stout Street, Suite 12-200, Denver, Colorado 80294, Attn: Alan Motes (Alan.Motes@usdoj.gov), so as to be actually received no later than the Bid Deadline.

27.     After the Bid Deadline, but at least one business day prior to the Auction (as defined below), the Debtors may provide each Qualified Bidder that submits a Qualified Bid with a copy of all Qualified Bids and all Preferential Purchase Right Notices other than: (i) agreements, schedules, exhibits, and annexes which contain confidential or financial information of the Potential Bidder submitting the Qualified Bid; and (ii) financing letters delivered in connection with such Qualified Bid.

### C.     Obtaining Due Diligence Access and Due Diligence Requests from Potential Bidders

28.     Upon execution of a confidentiality agreement in a form acceptable to the Debtors and proof of financial wherewithal to consummate a transaction for the Requisite Overbid Amount plus any additional bid to be made at the Auction (as defined below), any Potential Bidder that wishes to conduct due diligence on the Purchased Assets may be granted access to all material information that has been or will be provided to the Ad Hoc Group and other bidders. The due diligence period for Potential Bidders will end one (1) business day prior to the Bid Deadline.

29.     The Debtors along with their advisors shall coordinate all reasonable requests for additional information and due diligence access from Potential Bidders; provided, however, the Debtors may decline to provide such information to Potential Bidders who, the Debtors in their reasonable business judgment subsequently determine do not intend in good faith to, or have the capacity to, consummate the purchase of any or all of the Assets.

30.     The Debtors designate Canaccord Genuity, Inc. to coordinate all reasonable requests for additional information and due diligence access.   The contact information for Canaccord Genuity, Inc. is: Canaccord Genuity, Inc., 350 Madison Avenue, New York, New York 10017, Tel. 212.849.3919, Attn: Geoffrey Richards, grichards@canaccordgenuity.com.

31.     Each Potential Bidder shall comply with all reasonable requests for additional information by the Debtors or their advisors regarding such Potential Bidder's financial wherewithal to consummate and perform obligations in connection with the Sale.  Failure by a Potential Bidder to comply with requests for additional information may be a basis for a determination that a bid made by such Potential Bidder is not a Qualified Bid.

### D.     "As Is, Where Is"

32.     The Sale of the Purchased Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtors, their agents or estates, except to the extent set forth in the purchase agreement between the Debtors and a Winning Bidder, the assignment and bill of sale delivered pursuant to such purchase agreement, or the order approving the sale of the Purchased Assets by the Debtors to the Winning Bidder. Except as otherwise may be provided in the Stalking Horse APA, all of the Debtors' rights, title and interest in and to the Purchased Assets shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon (collectively, the

"Interests"), such Interests to attach to the net proceeds (if any) of the Sale of the Purchased Assets, with the same validity and priority as existed immediately prior to such Sale.

33.     Each Qualified Bidder, other than the Ad Hoc Group (whose acknowledgements and representations are contained in the Stalking Horse APA), shall be deemed to acknowledge and represent that it has had an opportunity to inspect and examine the Purchased Assets prior to making its offer, that it has relied solely upon its independent review, investigation and/or inspection of any documents in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Purchased Assets or the completeness of any information provided in connection with the bidding process, in each case except as expressly stated in the proposed asset purchase agreement between such Qualified Bidder and the Debtors.

### E.     The Auction

34.     If a Qualified Bid (other than the Stalking Horse APA) by a Qualified Bidder is received by the Bid Deadline, an auction (the "Auction") with respect to the sale of the Purchased Assets shall take place on September 9, 2015 at 10:00 a.m. (prevailing Mountain Time) (the "Auction Date") at the offices of Baker & Hostetler, LLP, 1801 California St., Suite 4400, Denver, Colorado, or such other place and time as the Debtors shall notify all Qualified Bidders, the Ad Hoc Group, the Creditors' Committee, the Trustee, and any party that submits a Preferential Purchase Right Notice and other invitees so invited by the Debtors.  If the sum of all Piecemeal Bids combined does not exceed the Requisite Overbid Amount, the Debtors shall not conduct separate auctions for the assets that are the subject of the Piecemeal Bids without consultation with the Ad Hoc Group.

35.     If, however, no such Qualified Bid is received by the Bid Deadline, then the Auction will not be held and the Debtors will proceed to sell the Purchased Assets pursuant to the Stalking Horse APA.

36.     The following rules shall apply at the Auction:

i.       Only Qualified Bidders that have submitted Qualified Bids shall be entitled to make a bid at and otherwise participate in the Auction. In addition, any party that has submitted a Preferential Purchase Right Notice may exercise its Preferential Purchase Right at the Auction. The Ad Hoc Group is deemed to be a Qualified Bidder and the Ad Hoc Group is deemed to be a Qualified Bid;

ii.      Each Qualified Bidder or Preferential Purchase Right Holder shall appear in person or have an authorized representative appear on the Qualified Bidder's or Preferential Purchase Right Holder's behalf;

iii.     Each Qualified Bidder or Preferential Purchase Right Holder participating in the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale;

iv.      The Debtors, in their business judgment and in consultation with the Ad Hoc Group and the Trustee will determine which Qualified Bid is the Opening Bid;

v.       The Debtors, in their business judgment and in consultation with the Ad Hoc Group and the Trustee shall select the number of Qualified Bidders participating in the Auction and will conduct the Auction in the manner that they determine will best promote the goals of the bidding process and will achieve the maximum value for the Purchased Assets;

vi.      After selection of the Opening Bid, Qualifying Bidders may then submit successive bids on an open basis in increments of at least $500,000.00 higher in cash or in cash

14

equivalents, than the preceding Qualified Bid; provided, however, that the Debtors, after consultation with the Ad Hoc Group, may modify the bid increment requirement amount;

vii.    The Debtors, after consultation with the Ad Hoc Group and the Trustee may continue the Auction from time to time, adjourn the Auction at any time and re-open the Auction at any time prior to the commencement of the Sale Hearing;

viii.    At the conclusion of the Auction, the Debtors, after consultation with the Ad Hoc Group and the Trustee (or, if no bid or collection of Piecemeal Bids is greater than the sum of the allowed secured claims of the Noteholders, with the consent of the Ad Hoc Group), and the Creditors' Committee, shall identify the Winning Bid and the Winning Bidder.  There may be more than one Winning Bid and Winning Bidder if individual Piecemeal Bids are determined to be Qualified Bids.  The Debtors, after consultation with the Ad Hoc Group, the Trustee and the Creditors' Committee, shall also name the entity presenting the next highest and best bid (the "Next Highest Bid") and the entity presenting same (the "Next Highest Bidder").  At the Sale Hearing (as defined below), the Debtors shall present the Winning Bid and Next Highest Bid to the Court for approval. The Debtors' presentation of the announced Winning Bid to the Court for approval does not constitute the Debtors' acceptance of such Winning Bid. The

Debtors shall have accepted a Winning Bid only when the Court has approved such bid;

ix.    The Debtors reserve all rights to terminate the bidding process at any time if the Debtors determine, consistent with their fiduciary duties and in their business judgment, after consultation with the Ad Hoc Group and the Trustee, that the bidding process will not maximize the value of the Debtors' estates; and

x.    Bidding at the Auction will be transcribed to ensure an accurate recording of the bidding.

### F.      Holders of Preferential Purchase Rights

37.      Notwithstanding any contrary requirement in a contract or other agreement with the Debtors, holders of Preferential Purchase Rights[2] (each a "Preferential Purchase Right Holder") must submit a written notice (the "Preferential Purchase Right Notice") by mail, facsimile, or email, prior to the Bid Deadline to counsel to (i) the Debtors, Baker & Hostetler, LLP, 45 Rockefeller Plaza, New York, New York 10111, Attn: Jorian L. Rose (jrose@bakerlaw.com) and 200 SunTrust Center, Suite 2300, 200 South Orange Avenue, Orlando, Florida 32801, Attn: Elizabeth A. Green (egreen@bakerlaw.com); (ii) the Ad Hoc Group and Ad Hoc Group, Andrews Kurth LLP, 450 Lexington Avenue, New York, New York 10017, Attn: Paul N. Silverstein (paulsilverstein@andrewskurth.com) and 600 Travis, Suite 4200, Houston, Texas 77002, Attn: Timothy A. ("Tad") Davidson II (taddavidson@andrewskurth.com); and (iii) Canaccord Genuity, Inc., 350 Madison Avenue, New York, New York 10017, Attn: Geoffrey Richards (GRichards@canaccordgenuity.com), indicating that such holder may exercise its Preferential Purchase Right at the Auction.

38.      If a holder of a Preferential Purchase Right does not submit such notice to the Debtors by the Bid Deadline, such holder is deemed to have forever waived its Preferential Purchase Right in connection with the Debtors' Sale of the Purchased Assets contemplated by these Bidding Procedures.  The Debtors and the Ad Hoc Group reserve the right to object to, contest or otherwise challenge the validity of any Preferential Purchase Right and the submission of a Preferential Purchase Right Notice shall not constitute an admission by the Debtors or the

---

[2] A "Preferential Purchase Right" is any right under an agreement which confers a special preference or option on such agreement counterparty.  One example is a right of first refusal under an existing agreement with the Debtors over certain assets of the estate.  The Debtors expressly reserve any rights to contest the validity or enforceability of any such rights.

Ad Hoc Group that such holder has a Preferential Purchase Right. Preferential Purchase Right Holders that have timely submitted a Preferential Purchase Right Notice may only exercise such rights at the Auction.

### G.    Other Terms

39.    If an Auction is held, the Debtors shall be deemed to have accepted a Qualified Bid only when: (i) such bid is declared the Winning Bid at the conclusion of the Auction; (ii) the Winning Bidder (other than the Ad Hoc Group) shall have paid an additional deposit which when added to the initial deposit equals fifteen percent (15%) of the Winning Bid (the "Additional Deposit"); and (iii) definitive documentation has been executed in respect thereof. The Winning Bidder (other than the Ad Hoc Group) shall make the Additional Deposit into the Escrow Account within one (1) business day after the conclusion of the Auction. Such acceptance by the Debtors of the Winning Bid is conditioned upon approval by the Court of the Winning Bid and the entry of an Order approving such Winning Bid.

40.    In the event that the Winning Bid is reduced before the Closing Date as a result of adjustments to the Purchase Price, for among other things, Title Defects, violations, or conditions or circumstances giving rise to liability, under any Environmental Laws or the exercise of Preferential Purchase Rights, such that the Winning Bid is less than the Next Highest Bid, the Qualified Bidder with the Next Highest Bid that is not entitled to the same reductions to the Purchase Price shall be deemed the Winning Bid and Winning Bidder without further order of the Court. If the Winning Bid is a Piecemeal Bid (the "Winning Piecemeal Bid") and is subject to adjustments to the Purchase Price as described in the preceding sentence such that the Winning Piecemeal Bid is reduced to less than the Next Highest Bid, which may be the next highest Piecemeal Bid with respect to such assets or the Allocated Value of such Purchased

Asset under the applicable asset purchase agreement, the bidder with the next highest or best bid that is not entitled to the same reductions to the Purchase Price shall be deemed the Winning Bid and Winning Bidder without further order of the Court.

41.    In the event there are two or more Qualified Bidders who submit bids, each Qualified Bidder shall keep its final and highest bid open pending a closing of a transaction of the Winning Bid.  In the event that a transaction of the Winning Bid is not consummated by the Closing Date (unless the Closing Date is extended as set forth herein), the Next Highest Bidder with the Next Highest Bid shall be deemed the Winning Bidder without further order of the Court, and such bidder shall be required to consummate the transaction contemplated in its bid within ten (10) days of being deemed the Winning Bidder.

### H.    *Sale Hearing*

42.    Debtors propose that the Court hold a hearing on September 10, 2015 at 9:30 am (prevailing Mountain Time) to consider approval of the Sale of the Purchased Assets to the Winning Bidder (or to approve the Stalking Horse APA if no Auction is held).  If the Debtors do not receive Qualified Bids, the Debtors will report the same to the Bankruptcy Court at the Sale Hearing.

43.    The acceptance of all bids shall occur only upon approval of such bid by the Bankruptcy Court at the Sale Hearing.

44.    Following approval of the sale to the Winning Bidder, if the Winning Bidder fails to consummate the sale because of (a) failure of a condition precedent beyond the control of either the Debtors or the Winning Bidder upon which occurrence the Debtors have filed a notice with the Bankruptcy Court advising of such failure or (b) a breach or failure to perform on the part of such Winning Bidder upon which occurrence the Debtors have filed a notice with the

Bankruptcy Court advising of such breach or failure to perform, then the alternate bidder (to the extent there is one) will be deemed to be the Winning Bidder and the Debtors will be authorized, but not directed, to effectuate a sale to the alternate bidder subject to the terms of the alternate bid of such alternate bidder without further order of the Bankruptcy Court.

### I.      *Return of Deposit*

45.     Upon approval of the Sale by the Court, the Winning Bidder's deposit shall become non-refundable; provided, however, that the Winning Bidder's deposit shall be returned in the event that the Purchase Price of the Winning Bid is reduced below the Next Highest Bid as set forth in paragraph 36 above.  Within five (5) business days after the closing of the Sale to the Winning Bidder, the refundable deposits of all unsuccessful bidders shall be refunded.  In the event a dispute arises about whether a deposit is refundable or non-refundable, the deposit shall remain in the Escrow Account pending a determination of the dispute by the Court.

### J.      *Failure to Close*

46.     The transaction evidenced by the Winning Bid shall close not later than fifteen (15) days after entry the Sale Order (the "Closing Date") at which time the Winning Bidder shall pay the balance of the Winning Bid (the Winning Bid amount less the deposit) into the Escrow Account.

47.     In the event a declared Winning Bidder fails to timely perform any of its obligations under the Proposed Bidding Procedures or pursuant to the definitive agreements:

a)      The declared Winning Bidder shall forfeit all deposits made without regard to the Debtors' ultimate damages occasioned by such failure; such deposits shall be applied to the Debtors' damages, if any, and shall not constitute liquidated damages; and, notwithstanding the foregoing, the Debtors and the bankruptcy estates shall retain all

other rights, remedies, claims, counterclaims, and defenses, including the right to seek equitable or injunctive relief.

b)      The Ad Hoc Group shall have the right, but not the obligation to, keep its bid open pending the closing of a transaction with a Winning Bidder that is not the Ad Hoc Group.

c)      The Debtors, after consultation with the Ad Hoc Group, may grant any declared Winning Bidder additional time to perform, and, to the extent necessary, extend the Closing Date.

### K.      Reservation of Rights

48.      The Debtors, the Ad Hoc Group and the Trustee may jointly modify the Bidding Procedures set forth herein at any time prior to or during the Auction if the Debtors determine, in their judgment, that such modifications will better promote the goals of the Auction process and are in the best interests of the bankruptcy estates and the creditors thereof.

49.      The Court shall retain jurisdiction to enforce and interpret these Bidding Procedures and any Order approving them.

### L.      Fees and Expenses

50.      Any bidders presenting bids shall bear their own fees, costs, and expenses in connection with the proposed sale, whether or not such sale is ultimately approved, in accordance with the terms of the purchase agreement. Further, by submitting a bid, a Potential Bidder shall be deemed to waive its right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code or in any way related to the submission of its bid or the Bidding Procedures. Notwithstanding the foregoing: (i) the Ad Hoc Group may recover fees and expenses in accordance with the provisions hereof and the Stalking Horse APA; and (ii) to the

extent the Ad Hoc Group credit bids over and above the Requisite Overbid Amount and is determined to be the Winning Bidder, the Debtors shall reimburse the actual expenses of the next two highest Qualified Bidders who bid at the Auction up to $200,000 each.

### L.     Summary of Assumption and Assignment Procedures

51.     The Debtors are also seeking approval of certain procedures to facilitate the fair and orderly assumption and assignment of certain executory contracts and unexpired leases following the Auction, if any, pursuant to Section 365(f) of the Bankruptcy Code (collectively, the "Purchased Contracts") in connection with the Sale.  Due to the nature of the bidding process, it is impossible for the Debtors to currently identify the Purchased Contracts that will require assumption and assignment to the successful bidder.  As such, the Debtors further seek authority to establish certain procedures (the "Assumption and Assignment Procedures") by which contract counterparties can object to the potential assignment and assumption of an executory contract or unexpired lease to which it is a party.

52.     On or prior to seven (7) days after following entry of the Bidding Procedures Order, the Stalking Horse Purchaser, in its discretion by written notice to the Debtors (the "Designation Notice"), may (a) exclude from being assigned any executory contract or unexpired lease, and such executory contract or unexpired lease shall not constitute a Purchased Contract, and the Stalking Horse Purchaser shall not acquire or assume any rights with respect thereto, and (b) designate any executory contract or unexpired lease as a Purchased Contract, and such executory contract or unexpired lease shall constitute a Purchased Contract.  The Stalking Horse Purchaser shall be entitled to amend the Designation Notice until the closing of the Sale.

53.     As soon as practicable after receipt of the Designation Notice, the Debtors shall serve on all contract counterparties to a Purchased Contract a notice (the "Contract Notice"),

21

which identifies, to the extent applicable: (i) the executory contracts and unexpired leases that may be assumed and assigned to the Stalking Horse Purchaser; (ii) the name and address of the contract counterparties thereto; (iii) the earliest proposed effective date of the assignment (subject to the right of the Debtors and Stalking Horse Purchaser to either (i) withdraw such request for assumption and assignment of any Purchased Contract prior to the Closing (ii) otherwise extend such effective date); (iv) the amount, if any, determined by the Debtors to be necessary to be paid to cure any existing default in accordance with sections 365(b) and 365(f)(2) of the Bankruptcy Code (the "Cure Amount"); and (v) the deadlines by which any such contract counterparty must file an objection to the proposed assumption and assignment of any Purchased Contracts; provided, however, that the presence of any executory contract or unexpired lease on such Contract Notice does not constitute a determination to assume or assign such executory contract or unexpired lease.

54.     On the date following the conclusion of the Auction, or in the event there is no Auction, on the date the Auction was scheduled, the Debtors shall file with the Court and serve by facsimile, electronic transmission, overnight, or first class mail on the Creditors' Committee, the Ad Hoc Group, the Trustee and the contract counterparty (and its attorney, if known) to each Purchased Contracts that is assumed and assigned a notice: (a) identifying the Purchaser; (b) stating the Purchased Contracts to be assumed and assigned thereto; and (c) containing a statement as to the Purchaser's ability to perform the Debtors' obligations under the applicable Purchased Contracts that were assumed and assigned.  If a Qualified Bidder other than the Stalking Horse Purchaser is determined the Winning Bidder, then the Debtors shall serve the Cure Notice upon each counterparty to a Purchased Contract to the extent that such party did not already receive the Cure Notice from the Debtors.

55.     All objections to the proposed assumption and assignment of any Purchased Contract that is set forth on the Contract Notice must: (a) be filed with the Court on or before August 28, 2015 at 5:00 p.m. (MT) (the "Contract Assumption Objection Deadline") and served on the Objection Notice Parties; (b) identify the Purchased Contract to which the objector is party; (c) describe with particularity any cure the claimant contends is required under Section 365 of the Bankruptcy Code (the "Cure Claim") and identify the bases of the alleged Cure Claim under the executory contract or unexpired lease; and (d) attach all documents supporting or evidencing the Cure Claim.

56.     If no objection is timely and properly filed and served, the Cure Amount set forth in the Contract Notice shall be controlling notwithstanding anything to the contrary in any executory contract or unexpired lease or other document, and the contract counterparty thereto shall be forever barred from asserting any other claim or objection under Section 365(b)(1) (A) and (B) or otherwise, including, without limitation, any objection to the assignability of any of the Debtors' oil and gas assets, contracts, or leases, against the Debtors or Purchaser with respect to such Purchased Contracts arising prior to the assignment thereof, other than an objection to adequate assurance to perform under the Purchased Contracts pursuant to Section 365(b)(1)(C). To the extent the Debtors dispute any Cure Claim and such dispute is not resolved prior to the Sale Hearing, such dispute shall be presented to the Court at the Sale Hearing, or such later date and time as the Debtors, the Purchaser, and the objector may agree or the Court may order, but such dispute shall not affect in any way the effectiveness of any assumption and assignment of any executory contract or unexpired lease that is a Purchased Contract.

57.     If at any time after the delivery of the Contract Notice the Debtors are informed by the Stalking Horse Purchaser of additional prepetition executory contracts and/or unexpired

leases to be designated as Purchased Contracts (whether before or after closing of any Sale of relevant Assets), the Debtors shall serve a Supplemental Contract Notice by first-class mail, facsimile, electronic transmission, or overnight mail on the contract counterparty (and its attorney, if known) at the last known address available to the Debtors by no later than fourteen (14) calendar days before the proposed effective date of the assignment (the "Supplemental Contract Notice"). A contract counterparty receiving the Supplemental Contract Notice shall have fourteen (14) days from service of the Supplemental Notice of Assumption to file an objection to the assumption and assignment of its Purchased Contracts in accordance with the Purchased Contract Objection Procedures set forth herein. To the extent such objection is filed, the Debtors shall obtain a hearing date and provide notice of that date to the objecting party.

58.   The failure of an objecting contract counterparty to file a timely objection will be a bar to the assertion of any objection (including to the Sale of Assets free and clear of encumbrances and assumption and assignment of Purchased Contracts) and shall be deemed to constitute consent to the entry of the Sale Order and consummation of the Sale and all transactions related thereto including, without limitation, such assumption and assignment.

## THE BIDDING PROCEDURES ARE
## REASONABLE AND SHOULD BE APPROVED

59.   The paramount goal of any proposed sale of property of a debtor is to maximize the value received by the estate. See, e.g., In re Psychometric Sys., Inc., 367 B.R. 670, 674 (Bankr. D. Colo. 2007); Integrated Resources, 147 BR. at 659 ("It is a well-established principle of bankruptcy law that the Debtors' duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting Cello Bag Co. v. Champion Int'l Corp. (In re Atlanta Packaging Prods., Inc.), 99 B.R. 124, 131 (Bankr. ND. Ga. 1988)). The Debtors seek approval of the Proposed Bid Procedures as a means to maximize the value of their

assets for the benefit of the Debtors' estates and creditors.  Bankruptcy Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the bid procedures to be used in selling assets of the estate.  See, e.g., Official Committee of Subordinated Bondholders v. Integrated Resources. Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 656-57 (Bankr. S.D.N.Y. 1992) (noting that overbid procedures and break-up fee arrangements that have been negotiated by a debtor are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").  Here, the Proposed Bidding Procedures are reasonable, appropriate, and within Debtors' sound business judgment because they will serve to maximize the value of the Debtors' estates.

60.     Bankruptcy Rule 6004(f)(1) provides that a sale of property outside of the ordinary course of business may be by private sale or public auction.  The Debtors will make all good faith efforts to market its business and it assets.  Any offer will be subject to higher or better bids until the conclusion of the Auction to ensure the maximization of value for creditors.  The Debtors submit that the Proposed Bidding Procedures are fair and reasonable and should be approved.  They afford the Debtors the opportunity to subject their assets to competitive bidding while preserving the credit bid of the Ad Hoc Group and thereby providing a floor price for the estate.

61.     The Bidding Procedures will also ensure that the sale is conducted in a fair and orderly manner, and that participants are bona fide bidders with the ability and desire to consummate any proposed transaction.  The Requisite Overbid Amount will ensure that the competitive bidding process compensates the Debtor for the cost required by the Ad Hoc Group and permits the Debtor to derive an added economic benefit from any such bids.  The bidding

increments reflect a fair and reasonable increment that should encourage competitive bidding and ensure that there is a true economic benefit to the Debtor and the estate for each successive bid. The Bidding Procedures provide for a reverse-break up fee whereby the Debtors shall reimburse the actual expenses of the next two highest Qualified Bidders who bid at the Auction, up to $200,000 each, in the event that the Stalking Horse Purchaser increases its initial Stalking Horse Bid and is the Winning Bidder following the Auction.

62.     The Creditors' Committee's objection to the actual bidding procedures set forth in Original Bidding Procedures Motion was limited to one item: the length of the marketing period for the sale of the Debtors' assets. That concern has been addressed in the sale current timeline which provides for a longer marketing period prior to the sale of the Debtors' assets.

## The Sale is Supported by Sound Business Judgment and Should be Approved

63.     Section 363(b) of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although section 363 of the Bankruptcy Code does not set forth a standard for determining when a sale or disposition of property of the estate should be authorized, courts in the Tenth Circuit generally authorize sales of a debtor's assets if such sale is based upon the sound business judgment of the debtor. In re Castre, Inc., 312 B.R. 426, 428 (Bankr. D. Colo. 2004); see also In re Allen, No. 14-1242, 2015 WL 3389570, at *3 (10th Cir. May 27, 2015) (concluding that the record supported that the sale was within the trustee's sound business judgment); see also Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2nd Cir. 1983) (explaining that in order for a court to approve a request for the use of property of the estate outside the ordinary course of

business, the court must find that the proposed course of action is supported by sound business reasons).

64.     The factors that courts consider in this circuit under the "business judgment" test in deciding whether to approve the sale of the debtor's assets outside of the ordinary course of business include whether: "a) Any improper or bad motive; b) The price is fair and the negotiations or bidding occurred at arm's length; and c) Adequate procedures, including proper exposure to the market and accurate and reasonable notice to all parties in interest."  In re Colorado Sun Oil Processing LLC, No. BR 10-24424-SBB, 2011 WL 3585565, at *9 (Bankr. D. Colo. Aug. 12, 2011).

65.     The paramount goal of any proposed sale of property of a debtor is to maximize the value received by the estate. See, e.g., In re Psychometric Sys., Inc., 367 B.R. 670, 674 (Bankr. D. Colo. 2007); Integrated Resources, 147 BR. at 659 ("It is a well-established principle of bankruptcy law that the Debtors' duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting Cello Bag Co. v. Champion Int'l Corp. (In re Atlanta Packaging Prods., Inc.), 99 B.R. 124, 131 (Bankr. ND. Ga. 1988)).  The Debtors seek approval of the sale of the Debtors' assets as a means to maximize the value of their assets for the benefit of the Debtors' estates and creditors.  Bankruptcy courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to selling assets of the estate.

66.     A debtor's decision to sell property out of the ordinary course of business enjoys a strong "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992)

(quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code. For the following reasons, the Debtors respectfully submit that selling the Assets to the Ad Hoc Group is a sound exercise of their business judgment.

67.     The Debtors submit that consideration of these factors militates in favor of this Court's approval of a section 363(b) sale process. Given the Debtors current indebtedness, it is not believed that the Debtors are capable of reorganizing on a stand-alone basis without a sale or recapitalization of the Debtors' balance sheet. While the Debtors believe that they have sufficient funds to continue to operate pending the Sale Hearing, it believes a marketing of its assets at this time is the appropriate use of its business judgment and could maximize the value of its assets through a fair and open process.

68.     Based upon the foregoing, the Debtors submit that potential sale of the Assets is in the best interests of the Debtors, its estates, and its creditors, and is based upon sound, reasoned and informed business judgment warranting this Court's approval.

**The Court Should Authorize the Sale of the Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests Pursuant to Section 363(f) of the Bankruptcy Code**

69.     The Debtors also seek to sell the Acquired Assets free and clear of all liens, claims, encumbrances, and other interests pursuant to section 363(f) of the Bankruptcy Code. Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of any interest in such property if:

(1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property;

(4)    such interest is in bona fide dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

70.    Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements is sufficient to permit the sale of the Assets "free and clear" of liens and interests. Mich. Empl. Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991); see also re Kelistrom Indus., Inc., 282 B.R. 787, 793 (Bankr. D. Del. 2002). The Court also may authorize the sale of a debtor's assets free and clear of any liens pursuant to section 105 of the Bankruptcy Code, even if section 363(f) does not apply. In re Trans World Airlines, Inc., No. 01-0056(PJW), 2001 WL 1820325, at *3 (Bankr. D. Del. Mar. 27, 2001) aff'd sub nom. In re Trans World Airlines, Inc., 322 F.3d 283 (3d Cir. 2003).

71.    Under the Stalking Horse APA, holders of a secured claim either consents, will maintain its lien, or be paid in full in connection with the Chapter 11 Case. The Debtors respectfully submit that section 363(f)(2) of the Bankruptcy Code will be satisfied with respect to the transfer of the Assets under the Stalking Horse APA. The Ad Hoc Group proposed to credit its claims on account of the Notes to acquire the Assets as contemplated by section 363(k) of the Bankruptcy Code, thus evidencing its consent to the sale. The Debtors respectfully submit section 363(f) of the Code will be satisfied and, accordingly, request that the Assets be transferred to the Ad Hoc Group or whoever the Winning Bidder is free and clear of all liens,

claims, security interests, and encumbrances.

## The Court Should Grant the Ad Hoc Group or Such Higher or Better Bidder the Full Protections Afforded to a Good Faith Purchaser under Section 363(m) of the Code

72.     Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) of the Bankruptcy Code thus protects a purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal.  Although the Bankruptcy Code does not define "good faith purchaser," the Tenth Circuit has stated that a good faith purchaser is one who purchases in "good faith" and for "value."  In re Bel Air Associates, Ltd., 706 F.2d 301, 305 n.12 (10th Cir. 1983) (requiring that a purchaser give "value" for the property to be considered a good faith purchaser).  To constitute a lack of good faith, a party's conduct in connection with the sale usually must amount to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders or the trustee."  In re Crowder, 314 B.R. 445, 450 (B.A.P. 10th Cir. 2004).

73.     There is no fraud or collusion between the Ad Hoc Group or any of the Noteholders and the Debtors.  The Debtors have marketed and will continue to market their assets until the Bid Deadline to ensure fairness of their sale process.  Further, the Debtors and restructuring professionals, and the Ad Hoc Group engaged in extensive arm's length discussions to reach a deal.  The Debtors and the Ad Hoc Group were represented by separate counsel in

connection with the negotiation and documentation of the Stalking Horse APA.  Accordingly,

the Debtors request that the Court determine that the Ad Hoc Group has negotiated and acted at

all times in good faith and, as a result, is entitled to the full protections of a good purchaser under

section 363(m) of the Bankruptcy Code, and that the Stalking Horse APA does not constitute an

avoidable transaction under section 363(n) of the Bankruptcy Code.

### Assumption and Assignment of Executory Contracts and Unexpired Leases Should be Authorized under the Bankruptcy Code

74.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in

possession "subject to the court's approval, may assume or reject any executory contract or

[unexpired] lease of the debtor." 11 U.S.C. § 365(a).  The standard governing bankruptcy court

approval of a debtor's decision to assume or reject an executory contract or unexpired lease is

whether the debtor's reasonable business judgment supports assumption or rejection. See, e.g., In

re Grayhall Res., Inc., 63 B.R. 382, 384 (Bankr. D. Colo. 1986).

75.    The business judgment test requires only that the trustee or debtor in possession

demonstrate that assumption or rejection of the contract will benefit the estate.  RAF Fin. Corp.

v. Resurgens Commc'ns Grp., Inc., No. CIV. A. 89-A-1878, 1990 WL 145603, at *9 n.5 (D.

Colo. Sept. 27, 1990) ("A bankruptcy court will not authorize assumption of an executory

contract that would not benefit the estate.").  Pursuant to section 365(b)(1) of the Bankruptcy

Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance

that the debtor will promptly cure," any default, including compensation for "actual pecuniary

loss" relating to such default.  11 U.S.C. 365(b)(1).  Once an executory contract is assumed, the

trustee or debtor in possession may elect to assign such contract.  In re Rickel Home Center, Inc.,

209 F.3d 291, 299 (3d Cir. 2000) ("The Code generally favors free assignability as a means to

maximize the value of the debtor's estate.').

76.     Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided."   11 U.S.C. § 365(f)(2).   Adequate assurance of future performance is to be given a practical, pragmatic construction based upon the facts and circumstances of each case.   In re Colorado Sun Oil Processing LLC, No. BR 10-24424-SBB, 2011 WL 3585565, at *12 n.74 (Bankr. D. Colo. Aug. 12, 2011) (citing In re Bon Ton Restaurant & Pastry Shop, Inc., 53 B.R. 789 (Bankr . N.D. Ill. 1985)); see also In re Decora Indus., 2002 U.S. Dist. LEXIS 27031, at *23 (D. Del. May 20, 2002) ("[A]dequate assurance falls short of an absolute guarantee of payment.").

77.     The Debtors request approval under Bankruptcy Code section 365 of the Debtors' assumption and assignment of the Purchased Contracts in connection with the Sale.   The Debtors further request that the Sale Order provide that the Purchased Contracts will be transferred to, and remain in full force and effect for the benefit of, the Purchaser notwithstanding any provisions in the Purchased Contracts, including those described in Bankruptcy Code sections 365(b)(2) and (f)(1) and (f)(3) that prohibit such assignment.

**WHEREFORE,** the Debtors respectfully request this Court enter an order: (i) granting this Motion; (ii) establishing bidding and sale procedures under this Motion; (iii) approving the sale of assets; and (iv) granting such other and further relief as is just and proper.

**DATED** this 26th day of June, 2015.

/s/ Elizabeth A. Green
Elizabeth A. Green, Esq.
Florida Bar No, 0600547

Jimmy D. Parrish
Florida Bar No. 526401
Lars Fuller, Esq.
Attorney Reg. No. 26051
**BAKER & HOSTETLER LLP**
SunTrust Center, Suite 2300
Post Office Box 112
Orlando, Florida 32802-0112
Telephone:  407-649-4000
Facsimile:  407-841-0168

*Attorneys for the Debtors*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on June 26, 2015, a true and correct copy of the foregoing Notice was served by electronic noticing via the CM/ECF System all parties requesting such notice and/or served via U.S. First Class Postage Prepaid as follows: **American Eagle Energy Corporation and AMZG, Inc. (Debtors),** 2549 W. Main Street, Suite 202, Littleton, CO 80120 *(Debtors)*; **Barry L. Wilkie, Esq.,** Jones & Keller, P.C., 1999 Broadway, Suite 3150, Denver, CO 80202 *(Counsel to the Official Committee of Unsecured Creditors);* **Jeffrey N. Pomerantz, Esq., Ira D. Kharasch, Esq.,** Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, CA 90067-4100; *Counsel to the Official Committee of Unsecured Creditors);*; **Paul Silverstein, Esq.,** Andrews Kurth, 450 Lexington Avenue, New York, NY 10017; **Timothy A. Davidson, II, Esq.,** Andrews Kurth LLP, 600 Travis, Suite 4200, Houston, TX 77002 *(Counsel for the Ad Hoc Noteholders)*; **U.S. Bank National Association,** Trustee, Collateral Agent, Control, Agent - 11th Floor, 5555 San Felipe Street, Houston, TX 77056; **Bill Roberts, Esq., Roberts & Olivia, LLC,** 2060 Broadway, Suite 250, Boulder, CO 80302; **Royalty and Working Interest Holders** matrix attached hereto; **All Creditors and Parties in Interest** on the attached  matrix, which is a copy of the Court's Creditor Address Matrix for this case, obtained from PACER on June 16, 2015; and the **Office of the United States Trustee,** Byron G. Rogers Federal Building, 1961 Stout St., Suite 12-200, Denver, Colorado 80294.

/s/ Elizabeth A. Green
Elizabeth A. Green, Esq.