UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
Honorable Howard R. Tallman

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| AMERICAN EAGLE ENERGY | ) | Bankruptcy Case No. 15-15073 HRT |
| CORPORATION | ) | |
| Debtor. | ) | Chapter 11 |
| | ) | |
| AMZG, INC., | ) | Bankruptcy Case No. 15-15074 HRT |
| Debtor. | ) | Chapter 11 |
| | ) | |
| | ) | Jointly Administered Under 15-15073 HRT |

## ORDER ON DEBTOR'S INCENTIVE BONUS PLAN

THIS MATTER is before the Court on *American Eagle Energy Corporation's Motion for Entry of an Order Authorizing and Approving Incentive Bonus Plan* (docket #235) filed July 17, 2015, and *American Eagle Energy Corporation's Supplement to Motion for Entry of an Order Authorizing and Approving Incentive Bonus Plan and Response to Objections by the United States Trustee and Power Crude Transportation, Inc.* (docket #332) filed August 24, 2015. After an evidentiary hearing, the Court has considered the parties' evidence and arguments and is ready to rule.

### I.   BACKGROUND

The parties have provided the Court with a comprehensive twelve page listing of Uncontested Facts, which the Court adopts in its entirety for purposes of this Order. The specifically relevant facts involved in this matter are summarized below.

Debtor sought approval of an "Incentive" Bonus Plan (the "Plan") to pay certain employees for their continued work at the company. The U.S. Trustee objected asserting the Plan was a disguised, prohibited retention plan. Power Crude Transport Inc. ("PCT") and Power Energy Partners, LP ("PEP" and collectively with PCT, "Power"), who assert first priority lien interests in the Debtor's assets, joined the objection, but only provided argument and did not call or examine any witnesses or introduce any exhibits at hearing.

ORDER ON DEBTOR'S INCENTIVE BONUS PLAN
Case No. 15-15073 HRT

Prior to hearing the Debtor, the U.S. Trustee and Power agreed that all employees, except the Debtor's VP of Marketing and Strategy, CFO, and Treasurer, Mr. Marty Beskow, and in-house counsel and Secretary, Laura Peterson, could be paid under the Plan. The U.S. Trustee and Power continue their objection as to Mr. Beskow and Ms. Peterson, asserting that payment to him of a $60,000 bonus and to her of a $7,500 bonus represent payments that violate the prohibition in 11 U.S.C. § 503(c)(1) against insider employee retention plans, or KERPs.

The Debtor argues that the bonus payments are not part of such a retention plan, but instead are owed as part of a key employee incentive plan, or KEIP. However, the U.S. Trustee and Power respond that the Plan only set easily attainable financial and cash position milestones, and therefore provided little need or incentive to perform since Beskow and Peterson could easily reach such goals.

## II.  DISCUSSION

In relevant part, 11 U.S.C. § 503 provides:

(c) Notwithstanding subsection (b), there shall neither be allowed, nor paid--
    (1) a transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtor's business, absent a finding by the court based on evidence in the record that--
        (A) the transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;
        (B) the services provided by the person are essential to the survival of the business; and
        (C) either--
            (i) the amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given to nonmanagement employees for any purpose during the calendar year in which the transfer is made or the obligation is incurred; or
            (ii) if no such similar transfers were made to, or obligations were incurred for the benefit of, such nonmanagement employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose during the calendar year before the

> year in which such transfer is made or obligation is
> incurred;
>
> . . .
>
> (3) other transfers or obligations that are outside the ordinary course of
> business and not justified by the facts and circumstances of the case,
> including transfers made to, or obligations incurred for the benefit of,
> officers, managers, or consultants hired after the date of the filing of the
> petition.

11 U.S.C. § 503(c).

The Debtor admits that the Plan does not meet the rigid standards of 11 U.S.C.
§ 503(c)(1). Instead, the Debtor argues that the Plan should be approved under 11 U.S.C.
§ 503(c)(3) as a transfer or obligation that is outside the ordinary course of business, but is
justified by the facts and circumstances of the case. Specifically, the Debtor argues that that the
Plan sought to incentivize Beskow, Peterson, and others to remain with the Debtor, while it
considered its reorganization prospects or attempted to maximize the sale proceeds for its energy
producing assets from, hopefully, a cash buyer.

The evidence and arguments presented at hearing and the Court's knowledge of the
Debtor's circumstances from several prior hearings in this case, persuade the Court that the
Debtor's Plan is an incentive plan, a KEIP, not a retention plan, or KERP.

The Court has reviewed the case law, including that cited by the parties, and has found
the cases of *In re Alpha Natural Resources, Inc.*, 546 B.R. 348 (Bankr. E.D. Va. 2016); *In re
GT Advanced Technologies, Inc.*, 2015 WL 5737181 (Bankr. D. N.H. Sept. 30, 2015); *In re
Residential Capital, LLC (Residential Capital I)*, 478 B.R. 154 (Bankr. S.D. N.Y. 2012); *In re
Residential Capital, LLC (Residential Capital II)*, 491 B.R. 73 (Bankr. S.D. N.Y. 2013); *In re
Hawker Beechcraft, Inc*., 479 B.R. 308 (Bankr. S.D. N.Y. 2012); and *Official Comm. of
Unsecured Creditors v. Airway Indus.* (*In re Airway Indus.*), 354 B.R. 82 (Bankr. W.D. Pa.
2006), to be the most relevant and instructive on this KERP versus KEIP dispute.

From this analysis, the Court concludes that the Debtor's Plan is not the type of insider
retention plan that Congress sought to prohibit under 11 U.S.C. § 503(c)(1). This is not a case
where the same management that rode the company into a Chapter 11 filing is now proposing,
through the Debtor-In-Possession, to pay themselves bonuses and golden parachutes merely for
remaining with the Debtor and performing all or most of their same duties for a given time
period – a plan where those approving such a plan get the most benefit. The Debtor's Plan is not
the type of plan criticized in *Hawker Beechcraft*, where the senior leadership team would be
entitled to bonuses simply for staying with the company through the bankruptcy process without
having to meet challenging goals to earn those bonuses. 479 B.R. at 313-14. Instead, the

ORDER ON DEBTOR'S INCENTIVE BONUS PLAN
Case No. 15-15073 HRT

bonuses proposed to be paid under the Plan are transfers outside the ordinary course of business that are fully "justified by the facts and circumstances of the case." 11 U.S.C. § 503(c)(3).

Considering the evidence, arguments and the Debtor's circumstances in this Chapter 11 case, the Court concludes that the Debtor has met its burden to demonstrate that the payments owed to Mr. Beskow and Ms. Peterson have been earned as part of a key employee incentive plan. In reaching this decision, as it will soon discuss, the Court has found the recent case of *In re Alpha Natural Resources, Inc.* quite instructive. The Court will analyze the Debtor's Plan using the nine (9) factors or holdings set forth in *Alpha*. 546 B.R. at 358-63.

### (1) Considering all facts and circumstances, the scope of the KEIP is reasonable.

The Uncontested Facts state that the Debtor's Bonus/Compensation Committee selected nine of seventeen employees for participation in the Bonus Plan. The objectors have agreed to the payments regarding seven of the nine employees and the Court finds that this agreement is sufficient to conclude that the Debtor's Plan was reasonable in scope, seeking to cover and encourage only certain employees performing crucial duties to remain with the company.

Regarding Debtors' efforts to incentivize certain key employees, the Court finds that the U.S. Trustee's view of the Debtor's Plan is too narrow. It focuses almost entirely on the financial and/or cash balance thresholds established to evaluate Beskow and Peterson's entitlement to a bonus. The result is a somewhat hindsight assessment concluding that the financial/cash management goals to be obtained were easily accomplished – a virtual certainty from the very start – and therefore did not provide much of a performance incentive in qualifying for the bonuses.

While the Debtor's Plan may have some retentive effect based on the cash balance standard, that does not mean that the Plan, overall, is retentive rather than incentivizing, for the purpose of deciding what standards the Debtor must meet to obtain Court approval. *In re Patriot Coal Corp.*, 492 B.R. 518 (Bankr. E.D. Mo. 2013) (citing *In Re Dana Corp.* ("Dana I"), 351 B.R. 96, 102 (Bankr. S.D. N.Y. 2006)).

In the Court's view, the Plan and the facts and circumstances at the time of the Plan's inception were not that simple and clear cut. The Debtor filed Chapter 11 on May 8, 2015. At the time, and continuing since, the oil and gas industry has experienced an almost unprecedented, precipitous decline and volatility in oil prices. The Court observed, during several contentious hearings on Debtor's use of cash collateral, that the Debtor may not have finally determined liquidation was inevitable, but the general instability and decline in the oil markets were driving other producers to that result, often with mixed or unfavorable results.

On or about May 18, 2015, the Debtor filed Debtors' Motion Seeking Entry of an Order: (A) Scheduling the Auction for Sale of Substantially All of the Debtors' Assets, and (B) Approving Procedures for the Submission of Qualifying Bids And Conducting the Auction

4

ORDER ON DEBTOR'S INCENTIVE BONUS PLAN
Case No. 15-15073 HRT

(docket #40) (the "Initial Motion to Sell").  Debtor's Initial Motion to Sell contemplated using a credit bid from a group of certain holders of the 11.0% Senior Secured Notes due 2019 (the "Noteholders") as the stalking horse for a competitive auction.  However, the asset purchase agreement (the "Credit Bid APA") to initiate the process was not yet finalized and was filed about June 26, 2015, as an attachment to the Motion of the Debtors for Entry of Orders: (I) Establishing Bidding and Sale Procedures; (II) Approving the Sale of Assets; and (III) Granting Related Relief (docket #172) (the "Final Motion to Sell").

Before and after the chapter 11 filing, the CFO and other employees had either resigned or been let go to save costs.  At the June 26, 2015, Board of Directors Meeting, Mr. Colby, Debtor's CEO, proposed the concept of "retention" bonuses for certain employees, but not all, that remain and were doing essential jobs.  That Plan promised bonuses to Mr. Beskow and Ms. Peterson of $60,000 and $7,500 respectively for staying with the company, performing their duties as assigned and meeting the financial goals established through the sale of the Debtor's assets or the confirmation of a reorganization plan. In the Uncontested Facts, the Board minutes reflect that the Board recommended a 15% salary increase and a Court-approved bonus of $60,000, "if Mr. Beskow stays with the Company for the entirety of the bankruptcy proceeding." Giving Mr. Beskow a reason to stay through the entire case was the over-arching goal to achieve in the Plan.

Mr. Beskow and Ms. Peterson were asked to take on new job responsibilities.  Mr. Beskow is doing significant parts of two or three jobs previously performed by employees no longer with the company.  He continued his old job of VP of Capital Markets and Strategy, and took on essential duties of the former CFO and company Treasurer, as well as responsibility for the general financial reporting and analysis needs for the bankruptcy case.  Ms. Peterson kept her in-house counsel role and took on new or increased duties involving HR responsibilities and creation and maintenance of the Data Room.

If the Board merely wanted to reward Mr. Beskow for just staying around, management could have simply given him the 50% raise he requested, making his salary $300,000. But, would this ensure that Mr. Beskow would diligently perform the necessary duties that the Board was relying on him to do?  Maybe, maybe not.  This emphasizes the *incentive* nature and scope of the Board's bonus plan.  If Mr. Beskow wanted the extra compensation he sought, he needed to perform and provide the information required by the Board and management to entice a potential cash buyer to challenge the stalking horse credit bid.  The same also applies to Ms. Peterson.

Under such circumstances, the Court concludes that the driving factor incentivizing Mr. Beskow and Ms. Peterson to stay and perform was to complete a sale of the oil producing assets that would maximize their value to the estate.  Yes, the Debtor's cash position was a major focus,

ORDER ON DEBTOR'S INCENTIVE BONUS PLAN
Case No. 15-15073 HRT

but more to ensure that the company could continue to operate while a buyer could be obtained. The Court finds the scope factor is satisfied.

**(2) Suitable due diligence was undertaken for adoption of the KEIP by an Independent Compensation Committee.**

The Debtor satisfies this factor. Mr. Colby testified that the Board's normal practice pre-petition was to use a compensation committee and even independent HR consultants in granting bonuses. Likewise, as a Debtor-In-Possession, the Board used a Bonus Committee. No Board or Committee members received a bonus. The goal was to retain key people to perform the duties necessary to operate and eventually sell the Debtor's assets.

For Colby, the term "retention" bonus appears to be a generic term and the Court does not ascribe much weight to his use of the term when he presented the concept to the Board in June, 2015. Clearly, he wanted to retain Beskow and Peterson, but it is unlikely he had knowledge or even an awareness of either §§ 503(c)(1) or (c)(3)'s requirements at the time.

Colby's retention concept was not to keep the two doing the same jobs they were doing pre-petition. It was to find a way to keep them performing a myriad of new functions. As a matter of human nature this requires an incentive to keep performing under difficult circumstances and an uncertain future.

**(3) The targeted management team of the KEIP was appropriate.**

Mr. Colby testified that nine of seventeen employees were designated as being eligible to earn bonuses under the Debtor's Plan. It was targeted to maintain operations and to provide timely accurate financial, operational and asset reports and data to the extent necessary to maximize value in a sale.

Mr. Beskow's and Ms. Peterson's roles were crucial to this process and critical if the goal was to be achieved. Mr. Beskow provided the financial reports for parties in interest and prospective purchasers and generated the modelling for management's analysis of the offers to purchase the assets. Ms. Peterson did the same in being responsible for maintaining the Data Room. These two were the "worker bees" that kept the marketing/sales process on track. This factor is met.

**(4) The cost of the KEIP was reasonable in the context of the Debtor's assets, liabilities and earnings potential.**

The Debtor proposes to pay Mr. Beskow a bonus of $60,000 and Ms. Peterson one of $7,500. Under the circumstances here, the Court finds these amounts to be reasonable. When Mr. Beskow requested a 50% raise to compensate him for all of his new, added duties, (meaning a $300,000 salary), the Board provided a salary of $230,000 and offered a $60,000 bonus if cash balances were maintained or improved as of the time of sale and closing of the Debtor's assets.

ORDER ON DEBTOR'S INCENTIVE BONUS PLAN
Case No. 15-15073 HRT

The Court believes that, if the Board merely wanted to allow Mr. Beskow to remain with the company, it could have paid him $300,000 regardless of whether the assets eventually sold and the cash position was maintained.  Finally, the amount of these two bonuses, at $67,500, is modest in light of the outcome of the Debtor's efforts to sell its assets.  The eventual sale left the Debtor with more than $46 million comprised of an approximate cash sale price of $36.75 million plus the Debtor's cash, equivalents and receivables, which were not subject to the winning bid submitted by Resources Energy.  Mr. Colby testified that the sale was a success given the undesirability of a credit bid sale.  On the day of the sale approval hearing, the Court clearly remembers the palpable relief shown and expressed by the Debtor, the Noteholders, and the other lien creditors that a reasonable cash sale had been achieved at the 11th hour.  Therefore, Debtor satisfies this factor.

**(5)  <u>The Plan was properly designed to achieve performance standards.</u>**

The Court considers this one of the most important factors. The Debtor has met its burden.

The Court has reviewed the Exhibit A Budget attached to the July 13, 2015, Cash Collateral Order.  (UST Exhibit J).  The Budget is quite general and has no line items for bonuses.  It does include, among other entries: "G&A Payroll / Benefits / Payroll Taxes"; "G&A Misc. Expenses;" and "Debtor Restructuring Expenses - Data Room & Other."  It may be that the proposed bonuses are accounted for somewhere in these line items but, without specifics, questions or objections would likely arise.   Only the monthly cash balances projected and achieved connect the Debtor's Plan with the Budget.  Therefore, there is little information to be obtained or encouragement to be gained from the Budget alone.

Although the Debtor filed its Initial Motion to Sell on or about May 18, 2015, the Credit Bid APA, was not attached as an exhibit to that Motion.  That APA was still being negotiated. The Credit Bid APA was later filed as an attachment to the Debtor's Final Motion to Sell on or about June 26, 2015.

On or about July 24, 2015, the Court entered its Order: (A) Scheduling the Auction for Sale of Substantially All of the Debtors' Assets, and (B) Approving Procedures for the Submission of Qualifying Bids and Conducting the Auction (docket #252) ("Sale  Procedures Order") wherein the stalking horse bid was a credit bid of $70 million proposed by the Noteholders.

 The Credit Bid APA also included the transfer of the Debtor's cash and equivalents and accounts receivable.  The payment of Employee Liabilities were excluded from the sale, and § 503(c) liabilities were specifically listed as exclusions.  The Credit Bid APA allowed for the Debtor to retain cash for payment of the Debtor's unpaid administrative expenses incurred prior to the sale closing that were included in the Cash Collateral Budget, and an indeterminate

amount for Debtor's sale/closing costs, lien releases and $200,000 for administrative expenses due vendors and employees (the "Retained Cash").

On August 18, 2015, the Debtor filed its Notice of Amended Bidding Procedures and Amended Form of Asset Purchase Agreement (docket #304) ("Amended Credit Bid APA").  As a result of the continued decline in oil prices and apparently the concerns that the credit bid amount might chill or discourage a third party cash bid, the Noteholders reduced their credit bid to $52.5 million.  The Amended Credit Bid APA also changed what funds might be available to pay bonuses by reducing the Retained Cash available to pay administrative expenses due vendors and employees to $100,000 – a 50% reduction.

In the Court's view these provisions would not give Mr. Beskow or Ms. Peterson confidence they would be paid any bonus just for sticking around.  Despite what the Debtor's cash position might be at the time a credit bid sale was closed, the cash available to pay the promised bonuses would be limited by the terms of the Amended Credit Bid APA.  The bonuses could merely be part of the mix in seeking payment from the $100,000 fund set aside for unpaid vendor and employee administrative expenses.  Since certain creditors raised objections to the credit bid sale, asserting it could result in an administratively insolvent estate, the chances that administrative expense claimants might have to share available funds pro rata were more likely.

Given such circumstances flowing from the Amended Credit Bid APA, the Court finds it more likely that Mr. Beskow and Ms. Peterson were incentivized to work with the various professionals and Debtor's Board to do all they could to ensure the Data Room contained all necessary information for prospective cash purchasers and to develop efficient and effective financial models regarding sale prospects.

Despite the Noteholders' credit bid as a stalking horse, the goal of getting a cash buyer instead provided incentive for Mr. Beskow and Ms. Peterson to stay.  From this and previous hearings, the Court is convinced by the evidence that their efforts, especially during August through November, 2015, contributed significantly to the Debtor receiving a cash bid for its assets in the amount of approximately $36.75 million for its producing assets plus retention of its cash balances, cash equivalents and accounts receivable.  The fact that Resources Energy left the cash and equivalents and the receivables with the Debtor, while the Noteholders would not have, markedly improved Debtor's cash position post-closing, and eliminated the administrative expense cap in the Retained Cash.

From these surrounding facts and circumstances, the Court concludes that Debtor's Bonus Plan was properly designed and provided a major motivating factor to achieve performance standards and accomplish the Debtor's ultimate goal, a cash sale.

**(6) The KEIP was consistent with industry standards.**

The parties did not submit evidence or argument on this factor. However, Mr. Colby did testify that the Board's approach to developing this Bonus Plan was historically consistent with the process used by the company in deciding whether to grant bonuses in good years and in what amounts. The Court's review of the case law indicates that similar approaches were used by other companies in the industry. The Court does note that the amounts of the bonuses involved here are quite modest in relation to the scope and amount of bonuses requested and allowed in certain of the cases cited by the parties. This factor is neutral or tends in favor of the Debtor.

**(7) The KEIP fell well within the fair and reasonable business judgment of the Debtor**

Based on the Court's analysis of all the factors discussed herein, the Court concludes that the Bonus Plan was a fair and reasonable exercise of the Debtor's business judgment, given the difficulties and uncertainties encountered during this case.

The Debtor could have simply maintained Beskow's and Peterson's salaries at their pre-petition levels. Frankly, where could these employees reasonably expect to go given the condition of the oil and gas industry? However, the Court finds it reasonable that Mr. Colby and the Board would not want to take the risk of their leaving or just "going thru the motions" in performing their many, new additional duties. The use of bonus payments to incentivize the key employees, while protecting the continuity of the Debtor's operations and sale process, were worth the expense.

**(8) The KEIP was not a disguised KERP.**

Again, for the same reasons expressed in the other factors, the Court finds the Debtor's Plan was a KEIP, not a KERP. The objectors' narrow focus on the cash balance performance standard misses the point to be found from all the facts and circumstances surrounding the Debtor's primary goal of obtaining a cash buyer for its assets and the multiple duties and responsibilities it was asking a few key employees to perform to accomplish that successful result. Clearly, obtaining a cash buyer was not a certain thing. Mr. Beskow and Ms. Peterson were called upon to fulfill many tasks in the hope of bringing this desired result to fruition.

**(9) The KEIP satisfied the heightened-scrutiny standard set forth in Pilgrim's Pride.**

In *In re Pilgrim's Pride Corp.*, 401 B.R. 229 (Bankr. N.D. Tex. 2009), the bankruptcy court for the Northern District of Texas considered the approval of consulting/noncompetition agreements with the former CEO and COO. Since these transactions involved high ranking insiders outside of the ordinary course of business, that court set a higher bar than the reasonable business judgment test and would approve the agreements only if they were justified by the facts and circumstances of the case. *Id.* 236-37. In this way, there was a limit placed on the debtor's

ORDER ON DEBTOR'S INCENTIVE BONUS PLAN
Case No. 15-15073 HRT

ability to favor powerful insiders economically at the expense of the debtor's estate.  The court did approve the agreements.  As in *Pilgrim's Pride*, this Court finds that the Debtor has met a higher bar to demonstrate that the Bonus Plan is justified in this case.

Although Mr. Beskow and Ms. Peterson held officer titles, they did not participate in the Compensation Committee and Board decisions to award bonuses to nine of seventeen employees.  True, they held insider management positions, but they were not the ultimate decision makers on the key goal of the Chapter 11 case, selling to a cash buyer.  They provided key services to that end.

Whether or not it is a new factor to the *Alpha Natural Resources, Inc.* listing, the Court believes the higher standard is met based on the performance of the employees themselves.  That factor is whether the employees claiming entitlement to a bonus under a KEIP actually performed their duties responsibly and competently so as to meet the required standards and to make crucial, necessary contributions to successfully achieving the desired goals.  In this case, the Court has had the opportunity to observe and consider Mr. Beskow's testimony at several prior hearings.  The Court has been impressed by his credibility, candor and competence.  In the Court's view, he has earned the promised bonus.  Although the Court did not have the same chance to observe Ms. Peterson's performance, the Court accepts the testimony of Mr. Colby and Mr. Beskow that she performed her duties more behind the scenes so that crucial materials were available to parties in interest.

Finally, Power argues that since it claims a first priority security interest in all of the Debtor's assets, including the sale proceeds and retained cash balances, the Debtor is prohibited from paying these bonuses.  The Court disagrees.

That cash is also subject to the Noteholders' asserted first priority liens and to the terms of the Court's Orders allowing the use of cash collateral.  Therefore, any bonuses will be paid from that secured collateral.  The Noteholders do not object to the payment of the bonuses.  And, although Power does object and claims a prior interest over the Noteholders, it did not produce evidence in support of its position and its argument tracked the U.S. Trustee's lead, for the most part.  The Court is also aware that the Debtor, the Noteholders, Power and several other well lien claimants are parties to litigation to determine their lien priority dispute concerning the Debtor's escrowed sale proceeds.  In the Court's view, if Power does hold the first priority lien interest, its position is adequately protected by the available funds and the Court's orders allowing the Debtor to use cash collateral.  If Power's liens are junior to the Noteholders (or possibly other lien claimants) Power's interests are likely totally unsecured and not entitled to priority or adequate protection.  Therefore, the Court finds Powers' lien argument unpersuasive.

ORDER ON DEBTOR'S INCENTIVE BONUS PLAN
Case No. 15-15073 HRT

III. CONCLUSION

In accordance with the foregoing discussion,

**IT IS ORDERED** that the Debtor's Motion for Entry of an Order Authorizing and Approving Incentive Bonus Plan is GRANTED; and

**FURTHER ORDERED** that the Debtor is authorized to make the payments to those covered employees, including Mr. Beskow and Ms. Peterson, pursuant to the Bonus Plan once the conditions to the entitlement to such bonuses have been fully satisfied, if they have not been already.

Date:   June 23, 2016.                     BY THE COURT:

Howard R. Tallman, Judge
United States Bankruptcy Court

11